Reginald W. BLANTON, TDCJ No. 999395, Petitioner,

v.

Nathaniel QUARTERMAN, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.

No. SA–05–CA–598–OG.

United States District Court, W.D. Texas, San Antonio Division.

June 1, 2007.

J. Scott Sullivan, Law Offices of J. Scott Sullivan, San Antonio, TX, John Finbar Carroll, San Antonio, TX, for Petitioner.

Laura Grant Berins, Office of Atty. Gen., Asst. Atty. Gen., Austin, TX, for Respondent.

### MEMORANDUM OPINION AND ORDER

ORLANDO L. GARCIA, District Judge.

Petitioner Reginald W. Blanton filed this federal habeas corpus action pursuant to Title 28, United States Code, section 2254, collaterally attacking his otherwise final, August, 2001, Bexar County conviction for capital murder and sentence of death. For the reasons set forth in detail below,

petitioner is not entitled to federal habeas corpus relief from this Court but is entitled to a Certificate of Appealability limited to one aspect of his multi-faceted claim of ineffective assistance by his trial counsel and one complaint of ineffective assistance by his appellate counsel.

## I. *Statement of the Case*

### A. *Factual Background*

Late on the afternoon of April 9, 2000, a resident of the Stepping Stone Apartments in San Antonio, Texas climbed the stairs to the apartment of Carlos Garza, observed the door to Garza's apartment apparently had been kicked in, and also observed the interior of Garza's apartment appeared to have been ransacked.[1] Police were summoned to Garza's apartment.[2] They discovered Garza, bereft of the gold jewelry he had worn only hours before, lying mortally wounded in the hallway of his apartment.[3] An autopsy later revealed Garza sustained two gunshot wounds to the head:

1. More specifically, a Stepping Stone Apartment resident testified during the guilt-innocence phase of petitioner's capital murder trial (1) three-to-four weeks before Carlos Garza's murder, she saw petitioner banging on Garza's door and, when she called out to petitioner, he angrily and profanely told her to mind her own business, (2) on the afternoon of April 9, 2000, she saw Garza sitting outside with a girl at a picnic table near the pool, (3) later, sometime between 4:30 and 5:00 p.m., two individuals she identified as "Ralph and Joseph" informed her Garza's door was open and asked her to check on Garza, (4) she could see Garza's door frame appeared to have been shattered and Garza's door was open, (5) she walked up the stairs to Garza's third floor apartment and it appeared to her Garza's door had been kicked in, (6) when she stood at the doorway and looked inside Garza's open door, she saw the cushions on his sofa had been pulled up, Garza's stereo was playing loudly, and it appeared someone had ransacked Garza's apartment, (7) she could see the legs of a body lying in the hallway and the legs were moving, and (8) she notified the apartment manager and telephoned the police to report the apparent burglary and request an ambulance. Statement of facts from petitioner's trial (henceforth "S.F. Trial"), Volume 20, testimony of Patricia Romano, at pp. 282–306.

 A pair of Garza's acquaintances testified (1) they spoke with Garza on the afternoon of April 9, 2000, while Garza was sitting at a picnic table talking with his girlfriend, (2) Garza said he was doing his laundry and suggested the three of them should smoke some pot after his girlfriend left, (3) they briefly left the apartment complex to walk to a nearby store to buy beer and cigars, (4) when they returned, they noticed Garza's door open and heard his stereo playing, (5) when they called up to Garza they heard no response, (6) it appeared the dead bolts on Garza's door were extended and his door frame was damaged, (7) they unsuccessfully searched for Garza in the laundry room, (8) they unsuccessfully attempted to page Garza, (9) they saw a lady they recognized as Garza's neighbor and asked her to check on Garza, and (10) when the lady climbed the stairs to Garza's apartment, she called down to them to call an ambulance and the police. S.F. Trial, Volume 21, testimony of Ralph Vidal, at pp. 89–99; Volume 21, testimony of Joseph Anderson, at pp. 112–20.

2. *Id.*

3. A San Antonio Police officer testified (1) he and another officer arrived at the scene of Garza's murder on April 9, 2000 at approximately 6:15 p.m., (2) the door jam to Garza's apartment was destroyed and a footprint was present on the front of the door, (3) they could see Garza's feet in the hallway from the front door, (4) Garza had what appeared to be a bullet wound in the forehead, he was still bleeding from his wounds, and there was a lot of blood beneath the back of his head, (5) music was playing loud until the other officer unplugged a stereo, (6) two shell casings were found—one at Garza's feet and one near his head, (7) Garza was still breathing but appeared to be "gurgling on his own blood," (8) Garza's pager was going off, (9) there was no jewelry on Garza's body, (10) Garza's condition seemed to worsen while they waited for emergency medical personnel to arrive, and (11) a laundry basket was located just inside the door. S.F. Trial, Volume 21, testimony of Richard Odoms, at pp. 180–97.

 Garza's girlfriend testified (1) she had spent the previous night and most of the day with

a non-fatal wound which entered Garza's left cheek and exited the back of his neck and a fatal, close-range, wound which entered Garza's left temple, transected his brain, and exited his right cheek.[4] Garza's neighbor one floor below Garza's apartment reported being awakened from a nap on the afternoon of April 9, 2000 by the sound of someone tripping or falling to the floor directing above his apartment.[5]

Within minutes of Garza's murder, petitioner pawned several pieces of gold jewelry identified by witnesses who were familiar with same as belonging to Garza.[6]

Garza, (2) when she left Garza, sometime between 3:30 and 4:30 p.m. on April 9, 2000, he was wearing a gold lion's head ring with ruby eyes, a gold nugget bracelet, and a circular golden religious medallion on a gold chain held together with wire, (3) she sat outside at a picnic table by the pool with Garza on the afternoon of April 9, 2000, and (4) after Garza briefly conversed with two young men whom she did not know about smoking "weed," she and Garza went to the laundry room, and then she left. S.F. Trial, Volume 21, testimony of Debra Estrada, at pp. 143–56, 166–69, 173–74.

4. The Deputy Chief Medical Examiner of Bexar County testified in pertinent part (1) there was no jewelry on Garza's body when he arrived at the morgue, (2) Garza sustained two gunshot wounds, (3) one wound, most likely the first of the two, was fired from a distance of at least three feet and showed a shallow angle of entry consistent with Garza having been shot while standing, (4) this non-fatal wound entered Garza's left cheek and exited the left back of Garza's neck without penetrating the brain, (5) the other wound, which was fatal, entered Garza's left frontal parietal scalp anterior to the external auditory canal, entered the auditory canal, transected the brain, damaged the basal ganglion on both sides, and exited the Garza's right cheek, (6) gunpowder strippling at the entrance wound suggested this fatal shot was fired from a distance of one-to-two feet, (7) the fatal gunshot would have both paralyzed and rendered Garza unconscious immediately, and (8) Garza died as a result of a gunshot wound to his forehead fired by a firearm. S.F. Trial, Volume 23, testimony of Robert Bux, at pp. 36–60.

5. More specifically, Garza's neighbor testified (1) sometime between 5:00 and 5:30 p.m. on the afternoon of April 9, 2000, he heard a noise like something falling coming from upstairs, (2) the noise was loud enough to wake him from a nap, (3) it sounded as if the fall occurred in the hallway directly above his apartment, which shared a common floor plan with Garza's apartment, and (4) after the discovery of Garza's body, police unsuccessfully searched his apartment for bullets. S.F. Trial, Volume 21, testimony of Ernest Borroel, at pp. 75–84.

6. An eastside San Antonio pawn shop employee testified (1) just before 6 p.m. on April 9, 2000, petitioner entered his pawn shop and pawned a gold herringbone chain, a gold rope necklace, and a gold religious medallion identified at trial as State Exhibit nos. 13 and 14, (2) he noticed a black female and another black male, who appeared to be emotional, outside the shop while petitioner was negotiating the pawn of these items, (3) the rope chain petitioner pawned was broken, and (4) petitioner also had with him a gold lion's head ring which petitioner did not pawn but which the shop employee remembered because it had ruby eyes and a diamond in the lion's mouth, instead of a ruby in the mouth and diamonds for eyes as was more common. S.F. Trial, Volume 21, testimony of Brian Collins, at pp. 6–31.

Garza's estranged wife testified in pertinent part (1) she purchased Garza a gold lion's head ring with ruby eyes and a diamond in the mouth for Garza on February 16, 2000, (2) she purchased both a gold nugget bracelet and a gold herringbone chain for Garza on February 3, 2000, (3) State Exhibit no. 14, the gold herringbone chain, was identical to the one she purchased for Garza, (4) Garza often wore a gold rope chain held together with wire and a circular religious medallion which she identified as State Exhibit no. 13 and which she testified they had purchased two-to-three years before Garza's murder, (5) State Exhibit no. 32 was identical to the gold nugget bracelet she purchased for Garza, (6) Garza had a lockbox in his apartment in which he kept his jewelry, (7) about two weeks after Garza's murder, she cleaned up his apartment and found the lockbox broken and empty, (8) the last time she saw Garza

Two days later, on April 11, 2000, San Antonio police officers responded to what they believed was an unrelated domestic disturbance involving Latoya Mayberry and Robert Blanton. While refereeing the domestic dispute, police discovered through a routine warrant check that Mayberry, who initially furnished them with a false name, had active warrants outstanding for her arrest.[7] After violently resisting arrest, Mayberry volunteered to one of her arresting officers that she had information regarding a murder only days before at the Stepping Stone Apartments.[8] After Mayberry spoke with a police detective, she was transported to the office of the San Antonio Police homicide unit, where she gave a detailed written statement identifying petitioner as the person who fatally shot and robbed Garza.[9] Later that same date, Mayberry convinced petitioner's fraternal twin brother Robert to speak with police.[10] Robert Blanton gave

alive, he was wearing the gold lion's head ring, the gold nugget bracelet, the gold rope chain with the religious medallion, and (9) she had never known Garza to loan his jewelry to others. S.F. Trial, Volume 21, testimony of Yvonne Garza, at pp. 48–70. She also produced sales receipts for her purchases of the lion's head ring and herringbone chain on February 3 and 16, 2000, which were marked as State Exhibit nos. 24 and 25. *Id.*, at pp. 51–54. Representatives of the jewelry retailers who sold her those two items authenticated her sales receipts. S.F. Trial, Volume 20, testimony of Sandra Salinas, at pp. 251–56; testimony of Daniel Nathani, at pp. 257–61.

Garza's girlfriend identified State Exhibit no. 12 (the gold lion's head ring), State Exhibit no. 13 (the gold rope chain and religious medallion), and State Exhibit no. 32 (the gold nugget bracelet) as items that resembled the jewelry Garza wore when she last saw him on the afternoon of April 9, 2000. S.F. Trial, Volume 21, testimony of Debra Estrada, at pp. 149–50, 166–69, 173–74.

7. S.F. Trial, Volume 22, testimony of Ricky Lopez, at pp. 76–79.

8. S.F. Trial, Volume 22, testimony of Ricky Lopez, at pp. 78–82.

9. San Antonio Police Detective John "Rocky" Dyer testified (1) officer Lopez contacted him around 5 p.m. on April 11, 2000 after Mayberry stated to officer Lopez she had information regarding a fatal shooting a few days earlier at the Stepping Stone Apartments, (2) he went to a location near where Ms. Mayberry had been detained by officer Lopez and briefly interviewed her, (3) until he met Mayberry, detective Dyer knew of no suspects in the shooting of Carlos Garza and was unaware any property had been taken from Garza's person or residence, (3) Mayberry told Dyer the petitioner and his brother Robert were involved in Garza's shooting, petitioner had bragged about the shooting, and they had returned to Garza's residence shortly after the shooting, and (4) based on the information Mayberry related to him, he referred her to homicide detectives. S.F. Trial, Volume 22, testimony of John Dyer, at pp. 95–101.

A pair of San Antonio Police homicide detectives testified during petitioner's trial that (1) they had no information identifying any suspects in the Garza shooting until they interviewed Mayberry, (2) when she arrived at the police station, Mayberry was emotional but nonetheless very cooperative, giving a full statement recounting her knowledge of the events surrounding Garza's murder and identifying petitioner as the person who shot Garza, (3) she later spoke with Robert Blanton, both on the phone and in person, urging him to cooperate with the police investigation, and (4) both Mayberry and Robert Blanton were released after they gave police their written statements, which were completely voluntary and not induced by any threats. S.F. Trial, Volume 22, testimony of Thomas Matjeka, at pp. 120–24, 136–39, 143–44, 147–48; Volume 22, testimony of Raymond Roberts, at pp. 210–42; Volume 23, testimony of Raymond Roberts, at pp. 3–35.

Latoya Mayberry's written statement to police was read into the record during petitioner's trial in its entirety and appears at S.F. Trial, Volume 22, testimony of Raymond Roberts, at pp. 220–27.

10. S.F. Trial, Volume 22, testimony of Thomas Matjeka, at pp. 122–23; Volume 22, testimony of Raymond Roberts, at pp. 228–32; Volume 23, testimony of Raymond Roberts, at pp. 6, 31–32.

police a written statement which was substantially less inculpatory of his brother than Mayberry's statement but which nonetheless placed petitioner inside Garza's apartment at the time the shots were fired.[11]

On April 13, 2000, police arrested petitioner without incident.[12] At the time of his arrest, petitioner was wearing a distinctive gold, lion's head ring with ruby eyes and a diamond in its mouth and a gold nugget bracelet identified by others as similar to those owned and worn by Garza just prior to his murder.[13]

## B. *Indictment*

On June 29, 2000, a Bexar County grand jury indicted petitioner in cause no. 2000–CR–3452 in a one-count, two-paragraph, indictment alleging petitioner fatally shot Carlos Garza while in the course of committing and attempting to commit the predicate felonies of burglary and robbery.[14]

## C. *Guilt–Innocence Phase of Trial*

### 1. *The Prosecution's Evidence*

Testimony during the guilt-innocence phase of petitioner's trial commenced on August 13, 2001 with the prosecution calling as its first witness Latoya Mayberry Blanton, who less than a week earlier had become the wife of petitioner's brother Robert. During her trial testimony recounting the events of April 9, 2000, Latoya attempted to recant a number of the most inculpatory aspects of her written statement to police, particularly her detailed account of petitioner's oral recitation of the events surrounding his fatal shooting of Carlos Garza.[15] However, she con-

---

**11.** Robert Blanton's written statement was read into the record during petitioner's trial in its entirety and appears at S.F. Trial, Volume 22, testimony of Raymond Roberts, at pp. 237–41.

**12.** S.F. Trial, Volume 22, testimony of John Dyer, at pp. 102–15; testimony of Thomas Matjeka, at pp. 125–30.

**13.** S.F. Trial, Volume 22, testimony of John Dyer, at pp. 108–11; testimony of Thomas Matjeka, at pp. 128–29. Photographs of petitioner wearing the jewelry in question at the time of his arrest were admitted into evidence at trial as State Exhibit nos. 63–65 and appear in S.F. Trial, Volume 30.

**14.** Copies of the indictment against petitioner appear in several locations throughout petitioner's state court records submitted to this Court by respondent, including (1) at page 4 of the single volume containing the pleadings, motions, and other documents filed in petitioner's state trial court proceedings (henceforth "Trial Transcript") and (2) at page 616 of the third volume containing the pleadings, motions, and other documents filed in petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript").

**15.** For instance, *in her written statement*, Latoya explained in great detail (1) petitioner said he had kicked in the door, (2) she later heard a pair of loud noises which she believed were the sounds of a door being kicked down, followed shortly thereafter by another pair of loud noises which she knew to be gunshots, (3) the petitioner bragged and laughed about having shot Garza twice in the head, more specifically that petitioner recounted to her that, after he told Garza to "brake himself" and Carlos said "no," petitioner shot Carlos, he fell down, and petitioner then shot Carlos again in the head, (4) she saw a silver handgun in petitioner's waist band as he re-entered their vehicle which petitioner told her was a ".380," (5) when he returned to the car after his first visit to Carlos' apartment, petitioner was wearing several pieces of gold jewelry petitioner had not worn when she and Robert picked him up prior to their visit to Carlos' apartment, (6) petitioner exclaimed as they drove away from the scene "I peeled that motherfucker's head back," (7) later the same afternoon she, Robert, and the petitioner returned to Carlos' apartment, petitioner re-entered same, and petitioner then returned to their car and told her Carlos was "in there snoring," (8) petitioner insisted Robert drive them to a pawn shop, where petitioner pawned several gold necklaces and other jew-

tinued to assert that (1) she, Robert, and the petitioner twice visited Carlos' apartment complex on the afternoon of the fatal shooting; (2) when the three of them went to Carlos' third floor apartment on their first visit and knocked, there was no answer, and she returned to their vehicle; (3) shortly thereafter, she heard a pair of loud noises and, after a brief pause, another pair of loud noises, the nature of which she could not identify; (4) Robert and petitioner returned to their vehicle shortly thereafter; (5) they drove a short distance away, only to return to Carlos' apartment complex not long thereafter; (6) on their second visit, petitioner left her and Robert in their vehicle while he returned to Carlos' apartment; and (7) after the petitioner returned to their vehicle laughing, they proceeded to a pawn shop in east San Antonio where petitioner pawned several items of gold jewelry.[16]

The prosecution then called Robert Blanton, who also attempted to recant the most inculpatory aspects of his previous written statement.[17] However, Robert still

---

elry for about $79, and (9) she learned of Carlos' death from a news report she saw that evening. S.F. Trial, Volume 22, testimony of Raymond Roberts, at pp. 223–26.

In contrast, *during her trial testimony*, Latoya (1) claimed she had not heard anything either the petitioner or Robert had said to one another during their travels on April 9 because the air conditioner and radio had been too loud, (2) denied recognizing any of the four loud noises she heard that afternoon at Carlos' apartment as "gunshots," (3) specifically denied having heard petitioner admit he shot Carlos, (4) denied having seen a handgun in petitioner's waistband and having heard petitioner make any comments regarding a gun, (5) denied having seen any jewelry in petitioner's possession until they reached the pawn shop, and (6) claimed the police frightened her and "put words" in her mouth which were incorporated into the written statement which she signed. S.F. Trial, Volume 19, testimony of Latoya Mayberry Blanton, at pp. 32–35, 47, 50, 52, 81–84, 92–95, 101–03, 106; Volume 20, testimony of Latoya Mayberry Blanton, at pp. 12–13, 15, 22–28, 30–34, 58–59, 72.

16. S.F. Trial, Volume 19, testimony of Latoya Mayberry Blanton, at pp. 30–36, 41–45, 53–55, 66, 69, 73–74, 76–77, 84–86, 88, 90, 92, 98, 106, 108–09, 111, 118, 121; Volume 20, testimony of Latoya Mayberry Blanton, at pp. 40, 54, 56, 60, 69.

17. For instance, Robert Blanton's *written statement* to police included statements that (1) he knew how Carlos Garza died, (2) on April 9, 2000, he and Latoya picked up petitioner, (3) after running some errands, they went to Carlos' apartment, (4) when no one answered their knockknock, he and Latoya began to leave but petitioner asked Robert to stay, (5) as petitioner continued knocking, Robert sat on a stoop a few steps below the level of Carlos' apartment, (6) Robert heard a loud noise and turned around to see the door to Carlos' apartment open and petitioner walking inside, (7) Robert heard arguing so he entered Carlos' apartment, (8) he heard petitioner and Carlos arguing in the backroom, (9) the petitioner then walked out toward Robert, (10) Robert heard petitioner and Carlos cussing at each other, (11) Robert then heard a single gunshot, (12) Robert ran out of the apartment and down the stairs, (13) as he ran away, Robert heard a second gunshot, (14) petitioner later came down to their vehicle and Robert drove away to another location where they stayed only briefly, (15) petitioner directed Robert to drive back to the apartment complex next door to Carlos' apartment complex, (16) when they arrived at the complex next door to Carlos' apartment, petitioner got out and left, (17) petitioner returned about five minutes later, (18) they then went to a pawn shop on the east side of San Antonio where petitioner pawned some jewelry, (19) while he did not see petitioner with a gun that day and did not actually see petitioner shoot Carlos, there were only three persons inside the apartment at the time of the shooting, and (20) he learned of Carlos' death from a news report he saw that evening. S.F. Trial, Volume 22, testimony of Raymond Roberts, at pp. 238–41.

In contrast, during his *trial testimony*, Robert Blanton (1) denied ever seeing petitioner with a handgun, (2) claimed they left the Stepping Stone Apartments after no one came

insisted (1) he had driven petitioner and Latoya Mayberry to Carlos Garza's apartment complex twice on the afternoon of Carlos' murder, (2) on their first visit, he, petitioner, and Latoya went up to Carlos' apartment and knocked on the door, (3) they subsequently left the complex but returned to the apartment complex adjacent to Carlos' complex shortly thereafter the same afternoon, (4) petitioner left their vehicle but returned five minutes later, (5) they then proceeded to an eastside pawn shop because petitioner wanted to sell some jewelry, (6) petitioner sold some jewelry at the pawn shop, and (7) petitioner likes to wear gold jewelry.[18]

The prosecution also introduced the evidence outlined above which linked both the gold jewelry the petitioner pawned within minutes of Carlos Garza's fatal shooting and the gold jewelry the petitioner was wearing at the time of his arrest to jewelry missing from Garza's person and apartment shortly after the murder. A resident of the Stepping Stone Apartments testified she saw the petitioner angrily banging on Carlos Garza's apart-

ment door a few weeks before Carlos' murder.[19] Another Stepping Stone Apartment resident testified about an incident a few weeks before Carlos' murder in which Carlos pulled out and flaunted a roll of cash and petitioner responded by admonishing Carlos "somebody's going to take it from you." [20] Petitioner's girlfriend testified that, when petitioner returned to their home on the evening of April 9, 2000, he was wearing several pieces of gold jewelry she had never seen before, including an animal ring with rubies and a gold nugget bracelet.[21]

A San Antonio Police officer and a civilian police evidence technician each testified and presented crime scene photographs and a videotape recording showing (1) footprints on the broken door of Carlos Garza's apartment, (2) a bullet recovered from inside a closet in Carlos Garza's apartment adjacent to the hallway where his body was found, (3) holes in a mirror and the wall separating the hallway where the body was found from the closet where the bullet was recovered, and (4) a pair of spent shell casings found inside the apart-

in response to their knocking on Carlos' door, (3) denied ever seeing petitioner carrying a blue box, (4) denied that either he or petitioner kicked in Carlos' door, (5) insisted his written statement contained numerous false statements injected by the police officers who questioned him, (6) claimed the second time they went to the Stepping Stone Apartments, petitioner left their vehicle but returned five minutes later and said "he still ain't home," (7) denied seeing any news reports of Carlos' death, (8) denied apologizing to Latoya for petitioner's behavior on April 9, (10) denied he ever heard petitioner say anything about killing Carlos, (11) denied seeing petitioner with any jewelry on April 9 until petitioner said he wanted to go to a pawn shop, (12) denied he heard four loud noises while at Carlos' apartment on April 9, (13) denied he ever partied with Carlos, (13) claimed April 9, 2000 was the first time he had ever been to Carlos' apartment, (14) denied petitioner

wore any jewelry on April 9, and (15) categorically denied that he, petitioner, or Latoya had anything to do with Carlos' murder. S.F. Trial, Volume 20, testimony of Robert Blanton, at pp. 88, 97, 99, 104–08, 110–11, 114, 116–19, 123, 132–33, 139, 145–46, 169–73, 176–83, 184–85, 188, 190, 202–03, 214, 224–26, 230–31, 233–34, 236–40.

18. S.F. Trial, Volume 20, testimony of Robert Blanton, at pp. 78, 95–99, 105–08, 110–11, 114, 116–19, 132–33, 139–40, 142–44, 184–85, 187, 228.

19. S.F. Trial, Volume 20, testimony of Patricia Romano, at pp. 283–85.

20. S.F. Trial, Volume 21, testimony of Ralph Vidal, at pp. 101–04.

21. S.F. Trial, Volume 22, testimony of Alkeshia Hoyle, at pp. 58–60.

ment, including one recovered next to Carlos' body.[22] A firearms examiner testified both the shell casings found inside Carlos Garza's apartment had been fired from the same weapon and each matched the .380 caliber bullet recovered from the closet.[23]

Finally, the prosecution presented testimony from petitioner's acquaintance and fellow Bexar County Adult Detention Center ("BCADC") inmate Frank Trujillo that (1) he met petitioner while Trujillo was working at a local hotel, (2) a few days before Trujillo's arrest on April 13, 2000, petitioner asked Trujillo if he wanted to buy a gun and explained "I had to smoke a nigger," (3) on April 13, 2000, after his arrest, Trujillo saw petitioner at the magistrate's office and later spent time in the same holding cell with petitioner, (4) petitioner told Trujillo he had been arrested for capital murder in connection with a shooting next door to the Westwind Apartments, (5) later Trujillo and petitioner were housed in the same unit of the BCADC, and (6) during their detention, petitioner told Trujillo (a) he, his brother Robert, and Latoya Mayberry "went to some guy's house to jack him for some dope, coke," (b) he knocked on the door but no one answered, (c) he knew the guy was home so he kicked the door open, (d) he shot the guy as he jacked him and was going to shot the guy again but his gun jammed, so he re-cocked it and shot the guy a second time as the guy was moaning, and (e) he took some jewelry and pawned some of it while "on camera." [24]

### 2. The Defense's Evidence

The defense called Carlos Garza's estranged wife who testified (1) she found photographs while cleaning Carlos' apartment showing the petitioner wearing a bracelet similar to the one she had purchased for Carlos but (2) she had never known Carlos to loan his jewelry to others and Carlos was wearing the jewelry she had bought for him the last time she saw him, about a week before his murder.[25] The defense also called an acquaintance of petitioner who testified (1) a series of four photographs showing Carlos Garza and others which were taken about two and half months before Carlos' murder depicted Garza and others wearing various items of Carlos' gold jewelry, (2) Carlos and the petitioner were friends, (3) he did not recall ever seeing Carlos wearing a lion's head ring but did remember seeing Carlos wearing a gold nugget bracelet and a "Jesus" pendant on a gold chain, (4) it was uncommon for Carlos to wear others' jewelry and for others to wear Carlos' jewelry, (5) Carlos gave petitioner the Jesus pendant and chain because the chain was broken, (6) Carlos and the petitioner sometimes traded gold jewelry, (7) Carlos did not wear a gold lion's head ring or a Jesus pendant to the Poteet Strawberry festival the day before Carlos' murder, and (8) he had never known petitioner to pawn his own jewelry.[26]

### 3. The Verdict

On August 20, 2001, the jury returned its verdict, finding petitioner guilty of capi-

---

**22.** S.F. Trial, Volume 21, testimony of Scott Coonradt, at pp. 221–31; Volume 22, testimony of Myron Oberheu, at pp. 4–29, 33, 39–40.

**23.** S.F. Trial, Volume 22, testimony of Jamie Becker, at pp. 44–53.

**24.** S.F. Trial, Volume 22, testimony of Frank Trujillo, at pp. 156, 158–63, 165–71, 188–90.

**25.** S.F. Trial, Volume 23, testimony of Yvonne Garza, at pp. 73–79.

**26.** S.F. Trial, Volume 23, testimony of Ronald Marshall, at pp. 81–93, 98, 102–03, 105–07.

tal murder.[27]

## D. Punishment Phase of Trial

### 1. The Prosecution's Evidence

The prosecution presented numerous witnesses who testified regarding instances of criminal or violent conduct by petitioner. A former department store employee testified about stopping petitioner and another youth as they attempted to walk out of a store wearing new tennis shoes without paying for same on April 29, 1996.[28] A pair of San Antonio Police officers testified about an incident on May 23, 1996 in which petitioner and several other youths led police on a chase, both on foot and in a vehicle which contained an assault rifle.[29] A Bexar County Deputy Sheriff and a former member of the same street gang as petitioner, i.e., the Crips, each testified about an incident on July 10, 1996 in which petitioner, petitioner's brother Robert, and a third Crips member attempted to burglarize the home of their former fellow gang member but were arrested while still inside the garage.[30] A Comal County Sheriff's Deputy testified about an incident on December 18, 1997, in which he detected the aroma of marijuana and arrested petitioner for unlawfully carrying a handgun after a routine traffic stop.[31] A Windcrest Police officer testified about an incident on December 20, 1997 in which she cited petitioner for possession of drug paraphernalia after another officer stopped petitioner's vehicle after detecting the aroma of marijuana.[32] Another Bexar County Sheriff's Deputy testified about an incident on March 2, 1998 in which petitioner drove a vehicle he was stealing at a high rate of speed through a residential neighborhood, crashed through a brick mailbox, sending bricks flying a considerable distance in many directions, thereby damaging the vehicle he was attempting to steal as well as four other vehicles parked nearby and a nearby home's garage, and injured his brother Robert, who was a passenger in the stolen vehicle.[33] An off-duty Bexar County Adult Detention Center ("BCADC") detention officer testified about an incident on April 2, 1998 in which he witnessed petitioner smoking marijuana, reported his observations to the police, watched police arrest petitioner, and then led police to the location where petitioner had attempted to conceal several bags of marijuana beneath a bush.[34]

A pair of juvenile probation officers testified about petitioner's (1) violations of the terms and conditions of his probated juvenile sentences, (2) high intelligence, (3) refusal to take responsibility for his criminal conduct, (4) family difficulties following his parents' divorce in 1993, (5) long history of abusing marijuana and alcohol, (6) failure to cooperate or progress during his stays at Texas Youth Commission ("TYC") facilities, (7) multiple disruptive outbursts, both verbal and physical, while in TYC

---

27. S.F. Trial, Volume 24, at pp. 71–73; Trial Transcript, at pp. 171–72.

28. S.F. Trial, Volume 25, testimony of Charles Young, at pp. 37–43.

29. S.F. Trial, Volume 25, testimony of John David Slaughter, at pp. 176–84; testimony of Michael Ketzfey, at pp. 184–216.

30. S.F. Trial, Volume 25, testimony of Javier Diaman Ramirez, at pp. 97–120; testimony of Lance Billingsly, at pp. 120–26.

31. S.F. Trial, Volume 25, testimony of Weldon Campbell, at pp. 67–77.

32. S.F. Trial, Volume 25, testimony of Lori Harris, at pp. 55–58.

33. S.F. Trial, Volume 25, testimony of Monty Fox, at pp. 58–67.

34. S.F. Trial, Volume 25, testimony of Esteban Rublacana, at pp. 168–75.

custody, and (8) violations of the terms of his parole when released from TYC custody.[35]

A pair of San Antonio Police Detectives who participated in petitioner's arrest on April 13, 2000 testified petitioner had four bags of marijuana in his possession when arrested and had stored a shotgun in his girlfriend's apartment without her knowledge.[36]

A pair of BCADC detention officers testified about an incident on May 17, 2001, while petitioner was awaiting trial for capital murder, in which petitioner assaulted and seriously injured another inmate whom petitioner claimed had testified falsely against a friend of petitioner's in an unrelated capital murder proceeding.[37]

## 2. The Defense's Evidence

Petitioner's trial counsel presented testimony from a pastor who had known petitioner and petitioner's family for eight years and who opined petitioner is a "God-fearing person" who knows right from wrong, petitioner's relationship with God was "stable," and petitioner had found comfort in God.[38]

A "mitigation specialist" retained by petitioner's trial counsel testified (1) petitioner's mother had been pushed down a flight of stairs while pregnant with petitioner and his brother, (2) petitioner was 11 years old when his parents divorced, (3) petitioner was not adequately supervised during his adolescence, began smoking marijuana at age 11, and was exposed to violence both going to and coming from school on a daily basis, (4) petitioner's drug abuse was a way of escaping from his life situation, (5) about the same time, petitioner was befriended by gang members who furnished petitioner with the safety and protection his family could not, (6) petitioner is "very intelligent" and earned his GED while in TYC custody, (7) petitioner's participation in gang activities included violent and unlawful behavior, (8) petitioner's drug addiction was not adequately diagnosed or treated during his periods of detention, (9) prior to his arrest for capital murder, petitioner had attempted to inquire into joining the military and attending college, and (10) petitioner would likely do well in a structured environment.[39]

Petitioner's former civil attorney testified regarding an incident during petitioner's juvenile detention in which petitioner was assaulted by guards at a juvenile detention facility, as a result of which petitioner later obtained a settlement from Bexar County.[40]

Finally, petitioner's mother testified (1) she had a difficult pregnancy with petitioner and Robert, (2) her father-in-law once kicked her in the stomach while she was

35. S.F. Trial, Volume 25, testimony of Anthony Cooney, at pp. 223–43; Volume 26, testimony of Anthony Cooney, at pp. 6–26; Volume 26, testimony of Michelle Wood, at pp. 27–87.

36. S.F. Trial, Volume 25, testimony of John Dyer, at pp. 216018; testimony of Thomas Matjeka, at pp. 219–23.

37. S.F. Trial, Volume 25, testimony of Mark Anderson, at pp. 18–27; testimony of Keith Klepac, at pp. 28–37.

38. S.F. Trial, Volume 26, testimony of Richard Sullivan, at pp. 110–15. Pastor Sullivan conceded that (1) he was unaware of petitioner's parents' separation, (2) he was unaware of petitioner's father's problems with alcohol, and (3) while petitioner had once been a regular church attender, petitioner had not attended his church regularly in many years. Id.

39. S.F. Trial, Volume 26, testimony of Ann Matthews, at pp. 116–91.

40. S.F. Trial, Volume 26, testimony of James Myart, at pp. 191–99.

pregnant with petitioner and Robert, (3) her husband drank a lot and once screamed at her while she was pregnant, (4) petitioner was a breech birth, petitioner swallowed fluid and was blue when born, but Robert was the twin who was deprived of nutrition, (5) petitioner has always been smart but couldn't sit still, had trouble concentrating, and was "fidgety," as a child, (6) as a result, she allowed the school to put petitioner on Ritalin, a decision she now regrets, (7) her children saw her husband abuse her physically and assault petitioner's older sister, (8) petitioner began having problems at school after she divorced, (9) all of her children blamed her for the divorce, (10) she did not understand the degree of petitioner's drug involvement until petitioner was arrested, (11) after petitioner's first arrest, she sent him and Robert to live with her former husband, another decision she now regrets, (12) while she worked hard to support her family, in hindsight, she was too strict with petitioner, (13) the military should have done more to treat her husband's alcoholism, (14) petitioner's juvenile probation officer failed to get petitioner into the Gary Job Corps or the military, which would have furnished petitioner with the discipline he needed, (15) petitioner was severely burned as a child, (16) the petitioner's father never took him to baseball games, (17) the petitioner had a lot of anger when he left his father's home, (18) the petitioner was living with his father at the time of his initial arrests, and (19) she learned of petitioner's initial arrests only much later on.[41]

### 3. The Verdict

On August 24, 2001, petitioner's jury returned its verdict, finding (1) there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all of the evidence, including the circumstances of the offense and the petitioner's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant a life sentence for petitioner.[42]

### E. Direct Appeal

Petitioner appealed his conviction and sentence.[43] In an unpublished opinion issued June 30, 2004, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence. *Blanton v. State*, No. 74214, 2004 WL 3093219 (Tex.Crim. App. June 30, 2004). Petitioner did not thereafter seek certiorari review from the United States Supreme Court.

### F. State Habeas Proceeding

On November 17, 2003, petitioner filed an application for state habeas corpus relief.[44] The state habeas trial court held an evidentiary hearing thereon on November

---

**41.** S.F. Trial, Volume 26, testimony of Anna Blanton, at pp. 200–33.

**42.** S.F. Trial, Volume 28, at pp. 3–6; Trial Transcript, at pp. 189–90.

**43.** Petitioner's appellant's brief asserted six points of error, consisting of arguments that (1) the trial court erred in failing to reform or strike the jury panel after petitioner established a *Batson* violation; (2) the trial court abused its discretion in refusing to instruct the jury on the lesser-included offenses of murder, felony murder, criminal trespass, and criminal mischief; (3) there was legally insufficient evidence to support petitioner's conviction; (4) there was factually insufficient evidence to support petitioner's conviction; (5) the trial court in permitting the prosecution to improperly impeach its own witnesses using their previous statements; and (6) the prosecution denied petitioner a fair trial by attacking petitioner over the shoulder of his trial counsel.

**44.** As grounds for relief, petitioner's state habeas corpus application asserted fifteen claims consisting of arguments that (1) his

9, 2004 and heard testimony from petitioner's former lead trial counsel, the lead prosecuting attorney at petitioner's trial, and a pair of mental health experts.[45] On February 4, 2005, the state habeas trial court issued its findings of fact, conclusions of law, and recommendation that petitioner's state habeas corpus application be denied.[46] On June 22, 2005, the Texas Court of Criminal Appeals denied petitioner's state habeas corpus application in an unpublished order adopting the findings, conclusions, and recommendation of the state habeas trial court. *Ex parte Blanton,* WR–61,443–01 (Tex.Crim.App. June 22, 2005).

### G. *Federal Court Procedural History*

Petitioner filed his federal habeas corpus petition in this court on June 16, 2006, urging twenty claims for relief. *Docket entry no. 22.* Respondent filed his original answer on October 20, 2006. *Docket entry no. 30.* Petitioner replied thereto on January 22, 2007. *Docket entry no. 36.*

### II. *AEDPA Standard of Review*

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton,* 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 L.Ed.2d 334 (2005); *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section

---

trial counsel rendered ineffective assistance by failing to (a) properly request jury instructions on the lesser-included offenses of felony murder, criminal trespass, and criminal mischief, (b) request an accomplice-witnesses jury instruction regarding the trial testimony of Robert Blanton and Latoya Mayberry Blanton, (c) object to the definition of "reasonable doubt" contained in the jury charge, (d) present evidence of petitioner's organic brain damage during the punishment phase of trial, (e) timely object to the denial of cross-examination during the *Batson* hearing, (f) adequately preserve or make a record in connection with petitioner's *Batson* claim, (g) re-urge at the punishment phase of trial the jury charges requested during the guilt-innocence phase of trial, and (h) properly prepare petitioner to present himself in the courtroom during the trial, (2) petitioner's appellate counsel rendered ineffective assistance by failing to (a) present a point of error regarding the trial court's failure to submit a punishment-phase jury instruction on the effect of a hung jury, i.e., the effect of a single hold-out juror, and (b) argue *Batson* applies to a jury shuffle, (3) the Texas capital sentencing scheme's failure to inform jurors of the effect of a single hold-out juror at the punishment phase of trial violates the Eighth Amendment, and (4) the Texas capital sentencing scheme's use of open-ended questions renders same unconstitutional. State Habeas Transcript, Volume 1 of 3, at pp. 1–107.

**45.** The verbatim transcription of the testimony of the four witnesses from petitioner's state habeas corpus proceeding can be found at S.F. State Habeas Proceeding, Volume 2 of 7, at pp. 10–163.

**46.** State Habeas Transcript, Volume 3 of 3, at pp. 652–95.

2254(d)(1) have independent meanings. *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se,* establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza,* 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan,* —— U.S. ——, ——, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins v. Smith,* 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent,* 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado,* 541 U.S. 652, 660–61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan,* —— U.S. at ——, 127 S.Ct. at 1939–40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins,* 546 U.S. 333, ——, 126 S.Ct. 969, 974, 163 L.Ed.2d 824

(2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller–El v. Dretke*. 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)("we presume the Texas court's factual findings to be sound unless Miller–El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. § 2254(e)(1). However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller–El v. Dretke*, 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir.2006)(holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* —— U.S. ——, 127 S.Ct. 2133, 167 L.Ed.2d 869 (2007); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir.2006)(holding the same), *cert. denied,* —— U.S. ——, 127 S.Ct. 2129, 167 L.Ed.2d 866 (2007); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir.2003)(holding

the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir.2003)(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir.2002)(*en banc*)(holding that a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

## III. Insufficient Evidence Claim

### A. The Claim

In his tenth claim for federal habeas relief, petitioner argues the evidence at petitioner's trial was legally insufficient to support the jury's guilty verdict because the trial testimony of Robert Blanton and Latoya Mayberry Blanton was so full of inconsistencies as to be incredible and the trial testimony of Frank Trujillo was incredible because Trujillo was a "jail house snitch." [47]

### B. State Court Disposition

The Texas Court of Criminal Appeals rejected petitioner's insufficient evidence point of error on the merits in the course of petitioner's direct appeal, concluding that, when viewed in the light most favorable to the verdict, the evidence established petitioner killed Garza while in the course of entering Garza's apartment without Garza's consent and with the intent to

---

47. Petition, at pp. 105–15; Petitioner's Reply to Respondent's Original Answer, filed January 22, 2007, docket entry no. 36 (henceforth "Reply"), at pp. 29–30.

commit theft. *Blanton v. State*, 2004 WL 3093219, *8–*9.

## C. AEDPA Review

■ The standard for testing the sufficiency of evidence in a federal habeas review of a state court conviction is whether, after viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Aguilar v. Dretke,* 428 F.3d 526, 534 (5th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 2059, 164 L.Ed.2d 793 (2006).

■ The Texas Court of Criminal Appeals' rejection on the merits of petitioner's insufficient evidence point of error constituted an eminently reasonable application of the *Jackson v. Virginia* standard. The evidence before the jury at the guilt-innocence phase of petitioner's capital trial included not only Frank Trujillo's testimony regarding petitioner's jailhouse confession but also the written statements of Robert Blanton and Latoya Mayberry Blanton, which, when viewed in the light most favorable to the jury's verdict, established (1) petitioner directed Robert to drive to Garza's apartment because petitioner wanted to rob Garza, (2) petitioner kicked in Garza's door, (3) petitioner fatally shot Garza after they argued, (4) after petitioner returned to Garza's apartment a second time the same afternoon, petitioner directed Robert to drive to a pawn shop where petitioner pawned several items of jewelry which were identical to those once owned by Garza, and (5) upon returning to his girlfriend's apartment later that same night, petitioner's girlfriend observed petitioner wearing items of gold jewelry which were identified by knowledgeable persons as identical to those worn by Garza imme-

diately before his death. Furthermore, there was other testimony which, when viewed in the light most favorable to the jury's verdict, established (1) petitioner pawned several items of jewelry which were identical to those worn by Garza shortly before his murder and (2) at the time of his arrest, petitioner was wearing two items of jewelry identical to those missing from Garza's person and apartment immediately after the murder which petitioner's girlfriend had never seen petitioner wear until the night of Garza's murder. The petitioner's jury was entitled to draw all reasonable inferences from this evidence supporting a finding of petitioner's guilt. Thus, there was more than sufficient evidence establishing petitioner's guilt on the charge of capital murder.

Petitioner's arguments that the jewelry he pawned did not contain Garza's DNA or other identifying marks, as well as his assaults upon the credibility of the prosecution's three key witnesses, i.e., Trujillo, petitioner's brother, and petitioner's sister-in-law, all ignore the Supreme Court's holding in *Jackson v. Virginia* which mandates evidentiary sufficiency review be undertaken of all evidence "in the light most favorable to the jury's verdict." *Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789. As a result, challenges to the credibility of prosecution witnesses are virtually *non sequitur* in the context of federal habeas review of evidentiary sufficiency claims. *See United States v. Cuellar,* 478 F.3d 282, 287 (5th Cir.2007)("In assessing the sufficiency of the evidence, the court does not evaluate the weight of the evidence or the credibility of witnesses but views the evidence in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict."); *United States v. Harris,* 477 F.3d 241, 244 (5th Cir.2007)(holding the same), *cert. denied,* —— U.S. ——, 127 S.Ct. 2117, 167

L.Ed.2d 828 (2007); *United States v. Lewis,* 476 F.3d 369, 377 (5th Cir.2007)(holding the same), *cert. denied sub nom. Thompson v. United States,* —— U.S. ——, 127 S.Ct. 2893, 167 L.Ed.2d 1164, 2007 WL 1222585 (May 29, 2007); *United States v. Delgado,* 256 F.3d 264, 273–74 (5th Cir.2001)(holding the same).

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's insufficient evidence point of error was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented to the state courts in the petitioner's state trial court proceedings and direct appeal.

### IV. Absence of a "Hung Jury" Instruction at Punishment Phase

#### A. The Claim

■ In his eighth claim for relief herein, petitioner argues the Texas capital sentencing scheme's failure to inform the jury regarding the effect of a single hold-out juror during punishment-phase deliberations, i.e., an automatic life sentence, violated petitioner's rights under the Eighth Amendment.[48]

#### B. State Court Disposition

The state habeas trial court concluded petitioner's trial counsel's timely objections properly preserved petitioner's complaint regarding the absence of a "hung jury" instruction but nonetheless determined petitioner's challenge to the absence of a punishment-phase jury instruction addressing the consequences of a hung jury did not warrant state habeas relief.[49]

#### C. AEDPA Review

The Supreme Court implicitly rejected petitioner's arguments underlying this claim when it explained in *Jones v. United States,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death. *Jones v. United States,* 527 U.S. at 382, 119 S.Ct. at 2099.

On numerous occasions, both this Court and the Fifth Circuit have expressly rejected the legal premise underlying petitioner's seventh and eighth claims herein, i.e., the argument that a Texas capital murder defendant is constitutionally entitled to have his punishment-phase jury instructed regarding the consequences of a hung jury or a single holdout juror. *See Hughes v. Dretke,* 412 F.3d 582, 593–94 (5th Cir.2005)(holding same arguments underlying petitioner's eighth claim herein were so legally insubstantial as to be unworthy of a certificate of appealability), *cert. denied,* —— U.S. ——, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006); *Alexander v. Johnson,* 211 F.3d 895, 897–98 (5th Cir.2000)(holding the *Teague v. Lane* nonretroactivity doctrine precluded applying such a rule in a federal habeas context); *Davis v. Scott,* 51 F.3d 457, 466–67 (5th Cir.1995)(holding the same), *cert. denied,* 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995); *Jacobs v. Scott,* 31 F.3d 1319,

---

**48.** *Petition,* at pp. 87–98.

**49.** State Habeas Transcript, Volume 3 of 3, at pp. 671–72.

1328–29 (5th Cir.1994)(rejecting application of the Supreme Court's holding in *Mills v. Maryland*[, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) ] to a Texas capital sentencing proceeding), *cert. denied,* 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995); *Martinez v. Dretke,* 426 F.Supp.2d 403, 534–36 (W.D.Tex.2006)(relying on the Supreme Court's holding in *Jones v. United States* to reject the same arguments raised by petitioner herein premised on the Supreme Court's holdings in *Mills v. Maryland* and *Caldwell v. Mississippi*[, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) ] ); *Kimmel v. Dretke,* 2005 WL 1959074, *19–*21 (W.D.Tex. August 16, 2005)(holding the same), *CoA denied,* 199 Fed.Appx. 338 (5th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 2034, 167 L.Ed.2d 773 (2007); *Amador v. Dretke,* 2005 WL 827092, *23–*24 (W.D.Tex. April 11, 2005)(holding the same), *affirmed,* 458 F.3d 397 (5th Cir. 2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 2129, 167 L.Ed.2d 866 (2007); *Brown v. Dretke,* 2004 WL 2793266, *13–*14 (W.D.Tex. December 3, 2004)(holding the same), *CoA denied,* 419 F.3d 365 (5th Cir. 2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006); *Hinojosa v. Dretke,* 2004 WL 2434353, *24 (W.D.Tex. September 30, 2004)(holding the same), *CoA denied,* 141 Fed.Appx. 395 (5th Cir.2005), *cert. denied,* 547 U.S. 1022, 126 S.Ct. 1569, 164 L.Ed.2d 305 (2006). Simply put, no federal court has ever held a Texas capital defendant has a constitutional right to a punishment-phase jury instruction advising his capital sentencing jury of the effect of hung jury or a single hold-out juror.

Accordingly, the Texas Court of Criminal Appeals' rejection on the merits of petitioner complaint about the absence of such an instruction from his punishment-phase jury instructions was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented to the state courts in the petitioner's state trial court proceedings, direct appeal, and state habeas corpus proceeding.

## V. *"Vague" Special Issues and the Presumption of Innocence*

### A. *The Claim*

In his eighteenth claim herein, petitioner argues the first Texas capital sentencing special issue, i.e., the inquiry into the defendant's future dangerousness, violates the "fundamental tenet of the constitution and of criminal justice: that all persons are presumed innocent and may not be convicted except on proof beyond a reasonable doubt of each and every element of the offense." [50]

### B. *Failure to Exhaust Available State Remedies Resulted in Procedural Default*

Respondent correctly points out petitioner failed to fairly present this same argument to the Texas Court of Criminal Appeals, either as a point of error on direct appeal or as a claim for relief during the course of petitioner's state habeas corpus proceeding. Respondent also correctly notes that this failure constitutes a form of procedural default because the Texas writ-abuse statute effectively precludes petitioner from returning to state court at this juncture to obtain a ruling on the merits of this new argument.

#### 1. *Procedural Default Generally*

Procedural default occurs where (1) a state court clearly and expressly bases

---

50. *Petition,* at pp. 139–41.

its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999). Procedural defaults only bar federal habeas review when the state procedural rule which forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of the merits of a federal constitutional claim. *Ford v. Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 857–58, 112 L.Ed.2d 935 (1991).

### 2. Failure to Exhaust Can Produce Procedural Default

■ Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' *federal* rights. *Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004); *O'Sullivan v. Boerckel,* 526 U.S. 838, 842, 119 S.Ct. 1728, 1731, 144 L.Ed.2d 1 (1999); *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); 28 U.S.C. § 2254(b)(1). To provide the State with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *See Baldwin v. Reese,* 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (rejecting the argument that a

petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel,* 526 U.S. at 844–45, 119 S.Ct. at 1732–33 (holding comity requires that a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established appellate review process); *Gray v. Netherland,* 518 U.S. 152, 162–63, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457 (1996) (holding that, for purposes of exhausting state remedies, a claim for *federal* relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention that the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief). The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts and, thereby, to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. *Carey v. Saffold,* 536 U.S. 214, 220, 122 S.Ct. 2134, 2138, 153 L.Ed.2d 260 (2002); Duncan v. Walker, 533 U.S. 167, 179, 121 S.Ct. 2120, 2128, 150 L.Ed.2d 251 (2001); *O'Sullivan v. Boerckel,* 526 U.S. at 845, 119 S.Ct. at 1732; *Rose v. Lundy,* 455 U.S. 509, 518–19, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982).

■ Under the AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke,* 352 F.3d 980, 988 (5th Cir. 2003)("28 U.S.C. § 2243(b)(1) requires that

federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court."), *cert. denied,* 543 U.S. 835, 125 S.Ct. 250, 160 L.Ed.2d 56 (2004); *Riley v. Cockrell,* 339 F.3d 308, 318 (5th Cir.2003); *Anderson v. Johnson,* 338 F.3d 382, 386 (5th Cir.2003); *Henry v. Cockrell,* 327 F.3d 429, 432 (5th Cir.2003) ("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."), *cert. denied,* 540 U.S. 956, 124 S.Ct. 408, 157 L.Ed.2d 293 (2003); *Mercadel v. Cain,* 179 F.3d 271, 276–77 (5th Cir.1999); *Alexander v. Johnson,* 163 F.3d 906, 908 (5th Cir.1998); *Jones v. Jones,* 163 F.3d 285, 299 (5th Cir.1998), *cert. denied,* 528 U.S. 895, 120. S.Ct. 224, 145 L.Ed.2d 188 (1999). However, Title 28 U.S.C. § 2254(b)(2) empowers a federal habeas court to deny an exhausted claim on the merits. *Smith v. Cockrell,* 311 F.3d 661, 684 (5th Cir.2002), *cert. dism'd,* 541 U.S. 913, 124 S.Ct. 1652, 158 L.Ed.2d 263 (2004); *Daniel v. Cockrell,* 283 F.3d 697, 701–02 (5th Cir.2002), *cert. denied,* 537 U.S. 874, 123 S.Ct. 286, 154 L.Ed.2d 126 (2002). The exhaustion of *all* federal claims in state court is a fundamental prerequisite to requesting federal collateral relief under Title 28 U.S.C. Section 2254. *Wilder v. Cockrell,* 274 F.3d 255, 259 (5th Cir.2001); *Sterling v. Scott,* 57 F.3d 451, 453 (5th Cir.1995), *cert. denied,* 516 U.S. 1050, 116 S.Ct. 715, 133 L.Ed.2d 669 (1996); 28 U.S.C. § 2254(b)(1)(A).

■ In order to "exhaust" available state remedies, a petitioner must "fairly present" *all* of his claims to the state courts. *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor,* 404 U.S. at 270, 275–76, 92 S.Ct. 509, at 512–13, 30 L.Ed.2d 438 (1971); *Kunkle v. Dretke,* 352 F.3d at 988; *Riley v. Cockrell,* 339 F.3d at 318;

*Anderson v. Johnson,* 338 F.3d at 386; *Jones v. Jones,* 163 F.3d at 296; *Shute v. State of Texas,* 117 F.3d at 237 ("a habeas petitioner 'must fairly apprize [sic] the highest court of his state of the federal rights which were allegedly violated.' "). In Texas, the highest state court with jurisdiction to review the validity of a state criminal conviction is the Texas Court of Criminal Appeals. *Richardson v. Procunier,* 762 F.2d 429, 431–32 (5th Cir.1985).

More simply, the exhaustion doctrine requires that the petitioner present his *federal* claim in a manner reasonably designed to afford the State courts a meaningful opportunity to address same. The Supreme Court has succinctly explained the rationale behind the exhaustion requirement:

> Exhaustion means more than notice. In requiring exhaustion of a federal claim in state court, Congress meant that exhaustion be serious and meaningful.
>
> The purpose of exhaustion is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court. Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claim on the merits.

*Keeney v. Tamayo–Reyes,* 504 U.S. 1, 10, 112 S.Ct. 1715, 1720, 118 L.Ed.2d 318 (1992).

■ The exhaustion requirement is satisfied when the substance of the *federal* habeas claim has been "fairly presented"

to the highest state court, i.e., the petitioner presents his claims before the state courts in a procedurally proper manner according to the rules of the state courts. *Baldwin v. Reese,* 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Moore v. Cain,* 298 F.3d 361, 364 (5th Cir.2002), *cert. denied,* 537 U.S. 1236, 123 S.Ct. 1360, 155 L.Ed.2d 202 (2003); *Mercadel v. Cain,* 179 F.3d at 275. However, the petitioner need not spell out each syllable of the claim before the state court for the claim to have been "fairly presented" and thereby fulfill the exhaustion requirement. *Riley v. Cockrell,* 339 F.3d at 318; *Fisher v. Texas,* 169 F.3d 295, 303 (5th Cir.1999).

■■■■ The presentation of claims for the first time on discretionary review to the state's highest court does *not* constitute "fair presentation" for exhaustion purposes. *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989); *Satterwhite v. Lynaugh,* 886 F.2d at 92. Full exhaustion of *all* claims presented is required before federal habeas corpus relief is available. *Rose v. Lundy,* 455 U.S. 509, 518–22, 102 S.Ct. 1198, 1203–05, 71 L.Ed.2d 379 (1982); *Thomas v. Collins,* 919 F.2d at 334.

■■■■ The exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless,* 459 U.S. 4, 6–7, 103 S.Ct. 276, 277–78, 74 L.Ed.2d 3 (1982); *Riley v. Cockrell,* 339 F.3d at 318 ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim. The federal claim must be the 'substantial equivalent' of the claim brought before the State court."); *Wilder v. Cockrell,* 274 F.3d at 259 ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement"); *Finley v. Johnson,* 243 F.3d 215, 219 (5th Cir.2001). Likewise, to have "fairly presented" his *federal* claim, the petitioner must have reasonably alerted the state courts to the *federal* nature of his claim. *Baldwin v. Reese,* 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Wilder v. Cockrell,* 274 F.3d at 260 ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights.").

The Fifth Circuit has consistently held that federal habeas review on unexhausted claims presented by a convicted Texas criminal defendant is barred under the procedural default doctrine. *See Aguilar v. Dretke,* 428 F.3d at 533 (holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling); *Matchett v. Dretke,* 380 F.3d 844, 848 (5th Cir.2004)(holding the violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim), *cert. denied,* 543 U.S. 1124, 125 S.Ct. 1067, 160 L.Ed.2d

1074 (2005); *Bagwell v. Dretke,* 372 F.3d 748, 755–56 (5th Cir.2004)(holding a petitioner procedurally defaulted by failing to "fairly present" a claim to the state courts in his state habeas corpus application), *cert. denied,* 543 U.S. 989, 125 S.Ct. 498, 160 L.Ed.2d 374 (2004); *Cotton v. Cockrell,* 343 F.3d 746, 755 (5th Cir.2003)(holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied,* 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004); *Henderson v. Cockrell,* 333 F.3d 592, 605 (5th Cir.2003)(recognizing the Texas writ-abuse doctrine has been strictly and regularly applied since before August, 1997), *cert. denied,* 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004); *Smith v. Cockrell,* 311 F.3d 661, 684 (5th Cir.2002)(holding unexhausted claims were procedurally barred), *cert. dism'd,* 541 U.S. 913, 124 S.Ct. 1652, 158 L.Ed.2d 263 (2004); *Jones v. Johnson,* 171 F.3d 270, 276–77 (5th Cir.1999) (holding unexhausted ineffective assistance claim procedurally barred from federal habeas review), *cert. denied,* 527 U.S. 1059, 120 S.Ct. 29, 144 L.Ed.2d 832 (1999); *Muniz v. Johnson,* 132 F.3d 214, 221 (5th Cir.1998)(holding unexhausted claims procedurally barred), *cert. denied,* 523 U.S. 1113, 118 S.Ct. 1793, 140 L.Ed.2d 933 (1998); *Nobles v. Johnson,* 127 F.3d 409, 423 (5th Cir.1997) (holding the Texas writ-abuse rule an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied,* 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998).

■ Section 5 of Article 11.071 of the Texas Code of Criminal procedure prohibits a successive state habeas corpus application except in limited circumstances which do not apply to petitioner's complaint about the violation of the presumption of innocence arising from the alleged vagueness of the first Texas capital sentencing special issue. *See* Art. 11.071, § 5, Tex.Code Crim. Proc. Ann. (Vernon Supp.2006)(barring consideration on the merits of new claims contained in a subsequent state habeas corpus application unless either (1) the new claims could not have been presented in a previous application because the legal or factual basis for the new claims were unavailable at the time the previous application was filed; (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no rational juror would have answered in the state's favor one or more of the capital sentencing special issues). Absolutely nothing prevented petitioner from asserting this same complaint in the course of his direct appeal or state habeas corpus proceeding. Likewise, petitioner alleges no facts in this Court and presented the state habeas court with no evidence which satisfies either of the final two exceptions to the Texas writ-abuse barrier erected by Section 5 of Article 11.071. On the contrary, the evidence of petitioner's guilt was overwhelming, as was the evidence supporting the jury's answers to the petitioner's capital sentencing special issues.

Nothing in petitioner's appellant's brief or state habeas corpus application "fairly presented" the Texas Court of Criminal Appeals with the same legal and factual arguments contained in petitioner's eighteenth claim for relief before this Court. If petitioner were to attempt at this juncture to return to state court and assert his eighteenth claim herein in a successive state habeas application, the applicable provisions of the Texas writ-abuse statute would preclude him from doing so. Thus, petitioner failed to exhaust available state remedies on his eighteenth claim herein

and, thereby, procedurally defaulted on same. *See Hughes v. Dretke,* 412 F.3d 582, 594–95 (5th Cir.2005)(holding petitioner procedurally defaulted on a jury misconduct claim by presenting the state courts with purely state-law arguments supporting same and waiting until he reached federal court to first urge federal constitutional arguments), *cert. denied,* 546 U.S. 1177, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006); *Beazley v. Johnson,* 242 F.3d 248, 264–68 (5th Cir.2001)(holding petitioner procedurally defaulted on a claim by failing to present same to the Texas Court of criminal Appeals either on direct appeal or in a state habeas corpus application where claim was readily available at the time petitioner filed his state habeas application), *cert. denied,* 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001); *Hicks v. Johnson,* 186 F.3d 634, 637–38 (5th Cir. 1999) (petitioner procedurally defaulted on an unexhausted claim for relief), *cert. denied,* 528 U.S. 1132, 120 S.Ct. 976, 145 L.Ed.2d 844 (2000).

### 3. *Exceptions Inapplicable*

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. at 2565; *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson,* 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct.

2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine). While a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, petitioner does not argue or allege any specific facts suggesting his trial counsel's failure to object to petitioner's punishment-phase jury instructions as a violation of the "presumption of innocence" rendered said counsel's performance ineffective under the standard of *Strickland v. Washington.*

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley,* 505 U.S. 333, 335–36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley,* 505 U.S. at 346–48, 112 S.Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley,* 505 U.S. at 347, 112 S.Ct. at 2523. Petitioner has alleged no specific facts satisfying this "factual innocence" standard. Because petitioner has failed to satisfy the "actual innocence" test, he is not entitled to relief from his procedural defaults under the fundamental miscarriage of justice

exception to the procedural default doctrine.

## C. *Teague Foreclosure*

■ Furthermore, the rule urged by petitioner in his eighteenth claim herein is foreclosed by the non-retroactivity doctrine announced by the Supreme Court in *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). Under the holding in *Teague,* federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen,* 510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland,* 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997)(holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

■ The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the non-retroactivity principle. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953.

■ The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland,* 521 U.S. at 157, 117 S.Ct. at 1973. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953. Petitioner's conviction became final for *Teague* purposes not later than September 29, 2004, i.e., the ninety-first day after the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence on direct appeal and the date the deadline for the filing of petitioner's petition for writ of certiorari with the United States Supreme Court expired. *Beard v. Banks,* 542 U.S. 406, 411–12, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004) (recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of di-

rect appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."); 21 U.S.C. § 2101(d) (the deadline for filing a certiorari petition from a state criminal conviction shall be established by Supreme Court rule); Sup.Ct. Rule 13.1 (setting the deadline for the filing of a certiorari petition at 90 days from the date of the state court judgment for which review is sought). *Teague* remains applicable after the passage of the AEDPA. *See Horn v. Banks,* 536 U.S. 266, 268–72, 122 S.Ct. 2147, 2148–51, 153 L.Ed.2d 301 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell,* 325 F.3d 243, 255 (5th Cir.2003) (recognizing the continued vitality of the *Teague* non-retroactivity doctrine under the AEDPA), *cert. denied,* 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003).

 As of the date petitioner's conviction and sentence became final for *Teague* purposes no federal court had ever held the first Texas capital sentencing special issue unconstitutional based upon its alleged violation of the "presumption of innocence." Nor was such a holding arguably discernable based on any then-existing Supreme Court precedent. Thus, petitioner's eighteenth claim herein is foreclosed by the non-retroactivity doctrine of *Teague. See Chavez v. Cockrell,* 310 F.3d 805, 809–10 (5th Cir.2002) (holding a complaint that the accidental activation of the defendant's stun belt during trial deprived defendant of the presumption of innocence was foreclosed by *Teague* ), *cert. denied,* 538 U.S. 915, 123 S.Ct. 1501, 155 L.Ed.2d 241 (2003).

D. *No Merits*

 Finally, even if this Court reviews the substance of petitioner's "presumption of innocence" challenge to his punishment-phase jury instructions and the first Texas capital sentencing special issue, that claim is utterly without arguable merit. Once a defendant has been convicted fairly in the guilt phase of a capital trial, the presumption of innocence disappears. *Delo v. Lashley,* 507 U.S. 272, 278, 113 S.Ct. 1222, 1226, 122 L.Ed.2d 620 (1993); *Miller v. Estelle,* 677 F.2d 1080, 1085 (5th Cir.1982), *cert. denied,* 459 U.S. 1072, 103 S.Ct. 494, 74 L.Ed.2d 636 (1982).

## VI. *Attacks on Lethal Injection*

A. *The Claims*

In his nineteenth and twentieth claims herein, petitioner argues, as currently administered, the method of lethal execution employed by the State of Texas violates the Eighth Amendment.[51]

B. *Procedural Default on Unexhausted Claims*

Respondent correctly points out that petitioner has never "fairly presented" either of these same arguments to the state courts. Nothing prevented petitioner from presenting these same claims to the state courts during his state habeas corpus proceeding. In fact, on March 28, 2000, more than a year before the start of petitioner's trial, in cause no. SA–98–CA–775–FB, *Richardson v. Johnson,* this Court reviewed the merits of a similar federal habeas corpus challenge to the then-current method of lethal injection employed in Texas. The Fifth Circuit subsequently affirmed this Court's denial of federal habeas relief on the merits. *Richardson v. Johnson,* 248 F.3d 1139 [Table], 2001 WL 85895, *4–*5 (5th Cir. 2001), *cert. denied,* 533 U.S. 903, 121 S.Ct. 2244, 150 L.Ed.2d 232 (2001).

---

**51.** *Petition,* at pp. 141–62.

Thus, nothing precluded petitioner from presenting or factually developing his complaints about Texas' current method of lethal injection during petitioner's state habeas corpus proceeding, just as the petitioner in *Richardson* had done during his own state habeas corpus proceeding almost a decade ago. Therefore, for the same reasons set forth at length in Section V.B. above, petitioner has procedurally defaulted on his unexhausted Eighth Amendment challenges to Texas' current method of lethal injection.

C. *Section 1983 the Preferable Method for Challenging Execution Procedures*

[19] Moreover, even if petitioner had exhausted available state remedies with regard to his complaints about the current method of lethal injection employed by the State of Texas, those complaints should more appropriately be presented in the context of a federal civil rights action rather than a federal habeas corpus proceeding because petitioner's complaints do not impact the legality of petitioner's capital murder conviction or sentence of death and because Section 1983 is a superior procedural mechanism for seeking and obtaining injunctive relief. *See Nelson v. Campbell,* 541 U.S. 637, 643, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004) (constitutional claims that merely challenge the conditions of a prisoner's confinement fall outside the core of habeas corpus and are cognizable under Section 1983); *White v. Johnson,* 429 F.3d 572, 573 (5th Cir.2005) (method-of-execution actions may be brought in a Section 1983 lawsuit instead of a habeas petition), *stay of execution denied,* 546 U.S. 1000, 126 S.Ct. 601, 163 L.Ed.2d 502 (2005). The proper defendant in such a civil rights action seeking injunctive relief would be the very state officials personally responsible for carrying out the execution. In contrast, the proper respondent in a federal habeas corpus action is ordinarily the custodian of petitioner's person, i.e., a state official who might have no personal responsibilities vis-a-vis the impending execution.

## VII. *Ineffective Assistance by Trial Counsel*

A. *Overview of the Claims*

In his first through sixth, ninth, eleventh, twelfth, and fourteenth through seventeenth claims herein, petitioner argues his trial counsel rendered ineffective assistance in violation of petitioner's Sixth Amendment rights by failing to (1) request accomplice-witness jury instructions regarding the testimony of Robert Blanton and Latoya Mayberry Blanton, (2) request lesser-included offense jury instructions on felony murder, criminal trespass, and criminal mischief, (3) object to the definition of "reasonable doubt" contained in the jury charge, (4) adequately preserve and protect petitioner's Equal Protection rights in the face of the prosecutor's exclusion of African–Americans from the jury during voir dire, (5) object on involuntariness, hearsay, and Confrontation Clause grounds to the admission at trial of the written statements of Robert Blanton and Latoya Mayberry Blanton, (6) request instructions limiting the jury's consideration of the written statements of Robert Blanton and Latoya Mayberry Blanton to determining their credibility at trial, (7) adequately challenge the prosecution's theory of the case, (8) investigate and present evidence showing the shoes worn by petitioner at the time of his arrest did not match the shoe patterns found on Garza's door, (9) present evidence rebutting the trial testimony of Frank Trujillo, (10) adequately investigate petitioner's mental health and present expert testimony during the punishment phase of trial showing petitioner suffered from organic brain im-

pairments, and (11) argue during the punishment phase of trial that the lack of credibility displayed by prosecution witnesses Robert Blanton and Latoya Mayberry Blanton during their trial testimony warranted a finding "residual doubt" regarding petitioner's guilt which justified a life sentence for petitioner.[52]

## B. *The Federal Constitutional Standard of Review*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so

doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* In evaluating prejudice, a federal habeas court must re-weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Crim-

---

**52.** *Petition*, at pp. 60–87, 98–105, 116–39; *Reply*, at pp. 7–29, 30–34.

inal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir.2003), *cert. denied,* 540 U.S. 1154, 124 S.Ct. 1156, 157 L.Ed.2d 1050 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo. See Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

Applying the AEDPA's standard of review, the issue before this Court is whether the Texas Court of Criminal Appeals could *reasonably* have concluded that petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell,* 343 F.3d at 444. In making this determination, this Court must consider the underlying *Strickland* standard. *Id.*

## C. *Procedural Default on Unexhausted Claims*

Respondent correctly points out petitioner has not "fairly presented" four of his ineffective assistance claims herein to any state court, specifically petitioner's fourteenth through seventeenth claims herein.[53] Petitioner concedes he has not "fairly presented" these four of his asser-

tions of ineffective assistance by his trial counsel to the state courts but argues he should not be punished because of the unwillingness of his state-court-appointed state habeas counsel to present those claims during petitioner's state habeas corpus proceeding.[54]

■ Unfortunately for petitioner, the malfeasance or nonfeasance of his state-court-appointed state habeas corpus counsel does not excuse petitioner's failure to exhaust available state habeas corpus remedies on his unexhausted fourteenth through seventeenth claims herein. While a showing of ineffective assistance by a federal habeas corpus petitioner's state trial or state appellate counsel can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, deficient performance, or even gross incompetence, by the same petitioner's state *habeas* counsel does not satisfy either prong of the *Strickland v. Washington* test for ineffective assistance because a state habeas petitioner possesses no constitutional right to the assistance of counsel during his state habeas corpus proceeding. Both the Supreme Court and Fifth Circuit have held, because there is no *constitutional* right to the assistance of counsel in connection with a collateral attack upon an otherwise final conviction, error by counsel in an earlier state or federal habeas proceeding cannot give rise to a federal habeas claim or constitute "cause" for purposes of avoiding a procedural default. *Coleman v. Thompson,* 501 U.S. 722, 755, 111 S.Ct. 2546, 2567, 115 L.Ed.2d 640 (1991); *Martinez v. Johnson,* 255 F.3d 229, 239–41 (5th Cir.2001), *cert. denied,* 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002); *In re Goff,* 250 F.3d 273, 275 (5th Cir.2001); *Beazley v. John-*

---

**53.** Respondent's Original Answer, filed October 20, 2006, docket entry no. 30 (henceforth "Answer"), at p. 16.

**54.** *Reply,* at pp. 30–34.

*son,* 242 F.3d 248, 270 (5th Cir.2001), *cert. denied,* 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001); *Wheat v. Johnson,* 238 F.3d 357, 361 (5th Cir.2001), *cert. denied,* 532 U.S. 1070, 121 S.Ct. 2226, 150 L.Ed.2d 218 (2001); *Fairman v. Anderson,* 188 F.3d 635, 642–44 (5th Cir. 1999); *Callins v. Johnson,* 89 F.3d 210, 212 (5th Cir.1996), *cert. denied,* 519 U.S. 1017, 117 S.Ct. 530, 136 L.Ed.2d 416 (1996); *Woods v. Johnson,* 75 F.3d 1017, 1035 n. 26 (5th Cir.1996), *cert. denied,* 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996); *Irving v. Hargett,* 59 F.3d 23, 26 (5th Cir.1995), *cert. denied,* 516 U.S. 1120, 116 S.Ct. 929, 133 L.Ed.2d 857 (1996); *Johnson v. Hargett,* 978 F.2d 855, 859–60 (5th Cir.1992), *cert. denied,* 507 U.S. 1007, 113 S.Ct. 1652, 123 L.Ed.2d 272 (1993).

■ Patently unfair though it may be, the reality facing a convicted Texas criminal defendant under current Fifth Circuit precedent is that either a negligent failure or a malicious refusal by that convicted defendant's state habeas counsel to present a potentially meritorious claim in the course of the defendant's state habeas corpus proceeding effectively precludes federal habeas review of that claim, unless the defendant can satisfy the fundamental miscarriage of justice exception to the federal procedural default doctrine. *See Ruiz v. Dretke,* 2005 WL 2146119, *14 (W.D.Tex. August 29, 2005) (holding a state habeas counsel's inexplicable failure to assert glaringly obvious grounds for state habeas corpus relief constituted a procedural barrier to federal habeas review of those same unexhausted claims), *affirmed,* 460 F.3d 638 (5th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1815, 167 L.Ed.2d 326 (2007). Infirmities in state habeas corpus

proceedings, even those which arise exclusively from the gross incompetence of a petitioner's state habeas counsel, do not constitute grounds for federal habeas relief and are insufficient to excuse a federal habeas petitioner's failure to exhaust available state habeas remedies. *Ruiz v. Quarterman,* 460 F.3d 638, 644–45 (5th Cir. 2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1815, 167 L.Ed.2d 326 (2007).

Therefore, petitioner has procedurally defaulted on his unexhausted fourteenth through seventeenth claims for relief herein.

### D. *Failure to Request Accomplice–Witness Instructions*

#### 1. *The Claim*

■ In his first claim for relief herein, petitioner argues his trial counsel rendered ineffective assistance by failing to request an accomplice-witness jury instruction regarding the trial testimony of both Robert Blanton and Latoya Mayberry Blanton.[55]

#### 2. *State Court Disposition*

During the course of petitioner's state habeas corpus proceeding, the state habeas trial court concluded petitioner's complaints about his trial counsel's failure to request accomplice witness jury instructions satisfied neither prong of the *Strickland* test because neither Latoya nor Robert were "accomplices" within the meaning of the Texas accomplice-witness rule; therefore, there was nothing professionally deficient or prejudicial in the decision by petitioner's trial counsel not to request such instructions.[56]

In the course of petitioner's state habeas corpus proceeding, the state habeas trial court explained applicable Texas law provides "a conviction cannot be had upon the testi-

---

**55.** *Petition,* at pp. 60–67; *Reply,* at pp. 1–7.

**56.** State Habeas Transcript, Volume 3 of 3, at pp. 662–68.

### 3. AEDPA Review

#### a. Finality of the State Habeas Court's Conclusions Regarding the Application of State Law

██ The state habeas trial court's conclusions regarding the inapplicability at petitioner's capital trial of an accomplice-witness jury instruction *as a matter of state law* are critical to federal habeas review of petitioner's first ineffective assistance claim herein. The state habeas court's determinations as to the inapplicability of an accomplice-witness jury instruction with regard to the trial testimony of Robert Blanton and Latoya Mayberry Blanton are conclusive on the interpretation of this aspect of state law for purposes of this federal habeas corpus proceeding. *See Bradshaw v. Richey*, 546 U.S. 74, ——, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005)("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Amador v. Quarterman*, 458 F.3d at 412 (holding a federal habeas court must defer to a state court's interpretation of state law);

*Fuhrman v. Dretke*, 442 F.3d 893, 901 (5th Cir.2006)(holding the same); *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004)("In our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law."); *Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir.2000)(holding a federal habeas court may not review a state court's interpretation of its own law); *Gibbs v. Johnson*, 154 F.3d 253, 259 (5th Cir.1998)(holding the same), *cert. denied*, 526 U.S. 1089, 119 S.Ct. 1501, 143 L.Ed.2d 654 (1999).

██ Petitioner has not identified any federal legal authority, either constitutional in nature or otherwise, which purports to recognize a *federal* right to have a criminal jury instructed on a testifying witness' status as an accomplice. Nor has this Court's independent research disclosed any such *federal constitutional* authority.[57] Thus, insofar as petitioner argues his trial counsel's failure to request an accomplice-witness instruction was objectively unreasonable because petitioner was entitled to the benefit of such an instruction, petitioner's argument hinges upon an interpreta-

---

mony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." *Id.*, at p. 663, *quoting* Tex.Code Crim. Proc., art. 38.14 (Vernon 2004). The state habeas trial court also explained that, under Texas law, "an accomplice witness" is one who participates with a defendant before, during, or after the commission of a crime *with the required mental state*. *Id.*, at p. 663 (emphasis added), *citing Paredes v. State*, 129 S.W.3d 530, 536 (Tex.Crim.App.2004); *Medina v. State*, 7 S.W.3d 633, 641 (Tex.Crim.App.1999), *cert. denied*, 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000).

**57.** On the contrary, it is well-settled federal law that a guilty verdict may be supported only by the uncorroborated testimony of an accomplice or co-conspirator, even if the wit-

ness is interested due to a plea bargain or promise of leniency, unless the testimony is incredible or insubstantial on its face. *United States v. Posada–Rios*, 158 F.3d 832, 861 (5th Cir.1998), *cert. denied sub nom. Parada v. United States*, 526 U.S. 1080, 119 S.Ct. 1487, 143 L.Ed.2d 569 (1999); *United States v. Dixon*, 132 F.3d 192, 200 (5th Cir.1997), *cert. denied*, 523 U.S. 1096, 118 S.Ct. 1581, 140 L.Ed.2d 796 (1998); *United States v. Morgan*, 117 F.3d 849, 853 (5th Cir.1997), *cert. denied* 522 U.S. 987, 118 S.Ct. 454, 139 L.Ed.2d 389 (1997); *United States v. Cisneros*, 112 F.3d 1272, 1283 (5th Cir.1997); *United States v. Gibson*, 55 F.3d 173, 181 (5th Cir.1995). *See also Krulewitch v. United States*, 336 U.S. 440, 454, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949)(recognizing in federal practice there is no rule preventing conviction on the uncorroborated testimony of accomplices).

tion of purely state law. Because the state habeas trial court concluded petitioner was *not* entitled to an accomplice-witness instruction *as a matter of state law*, and the Texas Court of Criminal Appeals expressly adopted that conclusion, there is no arguable legal basis for a conclusion that the failure of petitioner's trial counsel to request accomplice-witness instructions was either "objectively unreasonable" or "prejudicial" within the meaning of *Strickland.*

### b. *Deficient Performance Analysis*

■ There is nothing professionally deficient or objectively unreasonable about a trial counsel's failure to make a patently meritless objection. *See Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir.2002)(holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied,* 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Robison v. Johnson,* 151 F.3d 256, 261 (5th Cir.1998)(nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Emery v. Johnson,* 139 F.3d 191, 198 (5th Cir.1997)(failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied,* 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998); *Meanes v. Johnson,* 138 F.3d 1007, 1012 (5th Cir.1998)(holding counsel was not constitutionally deficient for failing to raise an objection if, at the time of trial, the objection would have been futile in light of existing state law and the right asserted in the proposed objection was not clearly established), *cert. denied,* 525 U.S. 968, 119 S.Ct. 417, 142 L.Ed.2d 338 (1998); *Sones v. Hargett,* 61 F.3d 410, 415 n. 5 (5th Cir.1995)("Counsel cannot be deficient for failing to press a frivolous point"); *United States v. Gibson,* 55 F.3d 173, 179 (5th Cir.1995)("Counsel is not required by the Sixth Amendment to file meritless motions"); *Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir.1990)("[C]ounsel is not required to make futile motions or objections"); *Murray v. Maggio,* 736 F.2d 279, 283 (5th Cir.1984)("Counsel is not required to engage in the filing of futile motions"). The failure of petitioner's trial counsel to request accomplice-witness jury instructions when petitioner was not entitled to same under applicable state law did not cause the performance of petitioner's trial counsel to fall below an objective level of reasonableness.

### c. *Prejudice Analysis*

The failure of trial counsel to make a meritless objection could not possibly have had any negative impact on the ultimate outcome of petitioner's trial. *See Parr v. Quarterman,* 472 F.3d 245, 256 (5th Cir.2006)(holding a complaint about counsel's failure to raise a meritless objection fails to satisfy the prejudice prong of *Strickland* because the failure to make a meritless objection has no impact on the outcome of the proceeding), *cert. filed,* March 7, 2007 (06–10056); *United States v. Kimler,* 167 F.3d 889, 893 (5th Cir.1999)(holding the same). Because petitioner was not entitled to an accomplice-witness jury instructions under applicable state law, there is not even a remote possibility, much less a reasonable probability, that, but for the failure of petitioner's trial counsel to request such an instruction, the outcome of either phase of petitioner's capital trial would have been different.

### 4. *Conclusions*

Out of an abundance of caution, this Court has undertaken a *de novo* review of petitioner's first claim for relief herein and concludes there is no arguable factual or legal basis for a conclusion that the failure

of petitioner's trial counsel to request accomplice-witness instructions regarding the trial testimony of either Robert Blanton or Latoya Mayberry Blanton satisfies either prong of the *Strickland* test.

Moreover, applying the AEDPA's standard of review, the Texas Court of Criminal Appeals' conclusion that petitioner's complaints about his trial counsel's failure to request accomplice-witness jury instructions failed to satisfy either prong of the *Strickland* test was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented during petitioner's trial, direct appeal, and state habeas corpus proceeding.

### E. *Failure to Request Lesser–Included Offense Instructions*

#### 1. *The Claim*

In his second through fourth claims herein, petitioner argues his trial counsel rendered ineffective assistance by failing to request jury instructions at the guilt-innocence phase of trial on the lesser-included offenses of felony murder, criminal trespass, and criminal mischief.[58]

#### 2. *State Court Disposition*

During the course of petitioner's state habeas corpus proceeding, the state habeas trial court noted petitioner's trial counsel requested a jury instruction on the lesser-included offense of murder and concluded petitioner's complaints did not satisfy the deficient performance prong of *Strickland* because petitioner had failed to establish he was entitled *under applicable state law* to jury instructions on the lesser-included offenses of either felony murder, criminal trespass, or criminal mischief.[59]

#### 3. *AEDPA Review*

##### a. *Clearly Established Federal Law*

For the reasons set forth at length in Section VII.D.3.a. above, insofar as petitioner argues he was entitled *under applicable state law* to jury instructions on the lesser-included offenses of felony murder, criminal mischief, or criminal trespass, the state habeas trial court's conclusions to the contrary are binding in the course of this Court's federal habeas review of petitioner's ineffective assistance claims herein. *See Bradshaw v. Richey*, 546 U.S. at ——, 126 S.Ct. at 604 (state court interpretations of state law bind a federal court

---

**58.** *Petition*, at pp. 68–74.

**59.** State Habeas Transcript, Volume 3 of 3, at pp. 656–62.

The state habeas court made no effort to address the legal issue of whether petitioner was entitled to any lesser-included-offense jury instructions as a matter of *federal constitutional principle*. The reason for this omission may have been the fact petitioner made no overt attempt in his state habeas corpus application to assert such a federally-premised ineffective assistance complaint. In fact, the portion of petitioner's state habeas corpus application addressing petitioner's complaints about his trial counsel's failures to request lesser-included-offense jury instructions is wholly bereft of any citation to any federal authority. State Habeas Transcript, Volume 1 of 3, at pp. 38–40. However, petitioner's state habeas application did contain a cryptic passage in which petitioner adopted by reference a portion of his appellant's brief on direct appeal which, in turn, contained a citation and brief discussion of the Supreme Court's holding in *Beck v. Alabama, infra.* Appellant's Brief, at pp. 73–74. Reasonable minds could debate whether petitioner's "adoption by reference" of his appellant's brief was sufficient to "fairly present" the state habeas court with petitioner's federal gloss on an otherwise apparently purely state-law argument underlying this aspect of his ineffective assistance claims.

sitting in habeas corpus); *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)(it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions).

■■■■ Nonetheless, a capital murder defendant is constitutionally entitled to an instruction on a lesser-included offense if the evidence would permit a jury rationally to find the defendant guilty of the lesser offense and acquit him of the greater. *See Hopper v. Evans*, 456 U.S. 605, 611–12, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982)(holding due process requires a lesser-included offense instruction be given only when the evidence warrants such an instruction); *Beck v. Alabama*, 447 U.S. 625, 637–38, 100 S.Ct. 2382, 2389–90, 65 L.Ed.2d 392 (1980)(holding unconstitutional a state statutory prohibition against the submission of lesser-included offense instructions in capital murder cases). Due process requires a jury charge on a lesser-included offense when the evidence "unquestionably establishes" the defendant is guilty of a serious, violent offense but leaves some doubt with respect to an element that would justify conviction of a capital offense. *Pippin v. Dretke*, 434 F.3d 782, 791 (5th Cir.2005), *cert. denied*, —— U.S. ——, 127 S.Ct. 351, 166 L.Ed.2d 49 (2006); *Aguilar v. Dretke*, 428 F.3d at 531. A defendant is entitled to the instruction if the jury could rationally acquit the defendant on the capital crime and convict on the non-capital crime. *Aguilar v. Dretke*, 428 F.3d at 531; *Jones v. Johnson*, 171 F.3d 270, 274 (5th Cir.1999), *cert. denied*, 527 U.S. 1059, 120 S.Ct. 29, 144 L.Ed.2d 832 (1999); *Ransom v. Johnson*, 126 F.3d 716, 724–25 (5th Cir.1997), *cert. denied*, 522 U.S. 944, 118 S.Ct. 361, 139 L.Ed.2d 281 (1997); *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir.1988), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2832, 100

L.Ed.2d 932 (1988). This inquiry necessarily requires careful review of the elements of each offense and other applicable provisions of state law. *See Livingston v. Johnson*, 107 F.3d 297, 312–13 (5th Cir.1997)(analyzing the difference under Texas law between felony murder and capital murder in the course of rejection a *Beck* claim), *cert. denied*, 522 U.S. 880, 118 S.Ct. 204, 139 L.Ed.2d 141 (1997); *East v. Scott*, 55 F.3d 996, 1005–06 (5th Cir.1995)(examining the distinction under Texas between murder and felony murder, as well as the impact under Texas of evidence of voluntary intoxication, in analyzing a *Beck* claim); *Cordova v. Lynaugh*, 838 F.2d at 768–70 (analyzing the distinction under Texas law between capital murder and murder, as well as the Texas law of parties, while granting federal habeas relief based on *Beck* error).

### b. *De Novo Analysis of Petitioner's Beck Arguments*

■■■■ Because the state habeas court made no attempt to examine whether petitioner was entitled to any lesser-included offense instructions under *federal constitutional principles*, this Court's examination of this aspect of petitioner's arguments underlying his second through fourth claims herein is necessarily *de novo*. *See Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

#### (1) *Felony Murder*

At the time of petitioner's offense, as it does now, Section 19.02(b)(3) of the Texas Penal Code provided a person commits an

offense if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." *White v. State,* 208 S.W.3d 467 (Tex.Crim.App. 2006); Tex. Pen.Code Ann. § 19.02(b)(3)(Vernon Supp.2006).

Petitioner argues the evidence at his trial showed he went to Garza's apartment with the intent to rob Garza, not to shoot him.[60] However, this argument misconstrues the distinction under Texas law between felony murder and capital murder, as well as the requirements of Texas law regarding proof of intent to kill. Under Texas law, the distinction between felony murder and capital murder is the culpable mental state: capital murder requires proof the defendant *intentionally* caused the death of the victim, whereas felony murder requires only a showing the defendant intended to commit the underlying felony. *Salinas v. State,* 163 S.W.3d 734, 741 (Tex.Crim.App.2005); *Threadgill v. State,* 146 S.W.3d 654, 665 (Tex.Crim.App. 2004); *Fuentes v. State,* 991 S.W.2d 267, 272 (Tex.Crim.App.1999), *cert. denied,* 528 U.S. 1026, 120 S.Ct. 541, 145 L.Ed.2d 420 (1999); *Adanandus v. State,* 866 S.W.2d 210, 231 (Tex.Crim.App.1993), *cert. denied,* 510 U.S. 1215, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994); *Rousseau v. State,* 855 S.W.2d 666, 673 (Tex.Crim.App.1993). Put more simply, under Texas law, capital murder is intentional murder committed during the course of committing an underlying felony while felony murder results from unintentional murder, i.e., the commission of an act clearly dangerous to human life which actually causes the death of an individual, committed during the course of an under-

lying felony. *Threadgill v. State,* 146 S.W.3d at 665; *Fuentes v. State,* 991 S.W.2d at 272; *Rousseau v. State,* 855 S.W.2d at 673.

The relevant distinction for purposes of petitioner's case is not whether petitioner went to Garza's apartment or even entered same with only the intent to rob Garza but whether petitioner thereafter intentionally killed Garza. *See Fuentes v. State,* 991 S.W.2d at 273 ("what appellant anticipated before the offense is inconsequential; the issue is whether there is any evidence that appellant did not intend to kill Tate at the time he shot him.").

> The possibility that initially or at some point during the commission of the robbery the offender did not have an intent to cause death does not amount to evidence that the offender did not intend to cause the victim's death when the murder was committed. There is no requirement in the case of capital murder committed in the course of a robbery, that the intent to cause death be premeditated or formulated prior to the commission of the robbery. The offender must only have formulated an intent to cause death when he actually commits the murder.

*Rousseau v. State,* 855 S.W.2d at 674.

The evidence introduced during the guilt-innocence phase of petitioner's capital trial permitted no rational construction other than one concluding Garza's fatal shooting was intentional. Frank Trujillo testified without contradiction at the guilt-innocence phase of petitioner's capital trial that petitioner nonchalantly recounted to Trujillo how, on the date of the murder, petitioner (1) went to Garza's home "to jack him for some dope, coke," (2) kicked open the door when no one answered his knocking, (3) shot Garza, (4) attempted to

---

60. *Petition,* at pp. 73–74.

shoot Garza a second time when his gun jammed, (5) "re-cocked" his gun and shot Garza a second time as Garza was moaning, and (6) took some jewelry which he later pawned.[61] Latoya Mayberry Blanton's written statement to police, executed only days after Garza's fatal shooting and read into the record in its entirety during the guilt-innocence phase of petitioner's capital trial, recounted (1) she heard a series of loud noises, the last two of which she believed to be gunshots, while she waited downstairs from Garza's apartment in her grandmother's car, (2) shortly thereafter, petitioner ran back to the car carrying a blue container and some jewelry, including a broken herringbone necklace and a broken gold rope necklace, (3) she saw petitioner wearing a gold lion's head ring she had never seen before, (4) petitioner was carrying a silver gun in his pocket, which he identified as "a .380," (5) petitioner crudely commented he had left a bullet in the house, (6) petitioner urged Robert to drive back to Garza's apartment because petitioner wanted to "get his dope," (7) twenty minutes later they did return to the apartment complex and petitioner took off, (8) when petitioner returned again to their vehicle, he was laughing and said Garza was "in there snoring, I thought I was going to have to do that mother fucker again," (9) petitioner admitted he had taken one hundred dollars from Garza, (10) petitioner demanded Robert drive them to a pawn shop, where petitioner pawned a necklace, a Jesus charm, and the broken rope necklace, and (11) while they drove around after the shooting, petitioner laughingly described in detail how he (a) kicked in the door, (b) confronted Carlos in the hallway, (c) told Carlos to "brake himself," (d) shot Carlos when he said "no," (e) saw Carlos fall down, and (f) shot Carlos in the head a second time.[62] The autopsy performed on Garza revealed, in pertinent part (1) the non-fatal gunshot which struck Garza in the head was fired from a distance greater than three feet while the other, the fatal shot, was fired from a range of one-to-two feet, and (2) the physical evidence suggested the non-fatal shot was fired first.[63]

There was no evidence before petitioner's jury suggesting the fatal shooting of Garza had been accidental. Likewise, there was no evidence suggesting anyone other than petitioner fired the fatal shot; petitioner's guilt was not predicated on a conspiracy or law of parties theory. Petitioner offered no evidence showing there was a struggle to gain control of the handgun underway at the time the fatal shot was fired. Two shell casings were found inside Garza's apartment, one in close proximity to his body.[64] Garza was shot twice in the head, with the fatal shot coming from closer range than the non-fatal shot. There was no evidence suggesting anyone other than petitioner was inside Garza's apartment at the time the fatal shot was fired or that the fatal shot was fired from outside Garza's apartment. Under such circumstances, there was simply no evidence before petitioner's jury from which a rational fact-finder could have concluded the fatal shooting of Carlos Garza was unintentional.

61. S.F. Trial, Volume 22, testimony of Frank Trujillo, at pp. 166–69, 188–90.

62. S.F. Trial, Volume 22, testimony of Raymond Roberts, at pp. 223–26.

63. S.F. Trial, Volume 23, testimony of Robert Bux, at pp. 48–59.

64. S.F. Trial, Volume 21, testimony of Scott Coonradt, at pp. 224–26, 231; Volume 22, testimony of Myron Oberheu, at pp. 11–18, 29, 39–40.

While petitioner argues his jury was free to disbelieve and disregard portions of the internally inconsistent trial testimony of Latoya Mayberry Blanton and Robert Blanton and their written statements to police, it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, there must be some evidence directly germane to a lesser-included offense before an instruction is warranted. *Dowthitt v. Johnson*, 230 F.3d 733, 757 (5th Cir.2000), *cert. denied*, 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); *Jones v. Johnson*, 171 F.3d at 274. At the conclusion of the guilt-innocence phase of petitioner's capital trial, there was no evidence before petitioner's jury suggesting the fatal shooting of Carlos Garza was other than intentional. Thus, under applicable *federal* law, petitioner was not entitled to a jury instruction on the lesser-included offense of felony murder.

### (2) *Criminal Mischief and Criminal Trespass*

■ Petitioner argues the jury could reasonably have found the petitioner guilty *only* of having kicked in Garza's locked door and then having ransacked Garza's apartment; therefore, he argues further, he was entitled to jury instructions on the lesser-included offenses of criminal mischief and criminal trespass.[65]

At the time of petitioner's offense, as today, Texas law provided a person commits the offense of criminal mischief if, without the effect consent of the owner, he intentionally or knowingly either (1) damages or destroys tangible property, (2) tampers with the tangible property of the owner and thereby causes pecuniary loss or substantial inconvenience to the owner or another person, or (3) marks the tangible property of another. *Howlett v. State*, 994 S.W.2d 663, 665 (Tex.Crim.App.1999);

Tex. Pen.Code Ann. § 28.03(a)(Vernon Supp.2006).

At the time of petitioner's offense, as today, Texas law provided a person commits the offense of criminal trespass if he enters or remains on property of another without effective consent or he enters or remains in a building of another without effective consent and he (1) had notice the entry was forbidden or (2) received notice to depart but failed to do so. *United States v. Bailey*, 111 F.3d 1229, 1238 (5th Cir.1997), *cert. denied*, 522 U.S. 927, 118 S.Ct. 327, 139 L.Ed.2d 253 (1997); Tex. Pen.Code Ann. § 30.05(a)(Vernon Supp. 2006).

Petitioner identifies no Texas authority recognizing either criminal mischief or criminal trespass as a lesser-included offense of capital murder. This Court's extensive independent research located none. On the contrary, the Texas Court of Criminal Appeals has concluded criminal mischief is not a lesser-included offense of aggravated assault for purposes of *Blockburger* double jeopardy analysis. *See Mallett v. State*, 65 S.W.3d 59, 68 (Tex.Crim.App.2001)(holding the statutory definitions of criminal mischief and aggravated assault each include elements not included in the other offense). The Texas Court of Criminal Appeals has held that criminal trespass may be a lesser-included offense of certain types of burglary offenses. *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex.Crim.App.1985). However, no Texas court has yet held criminal trespass a lesser-included offense of an intentional murder committed during the course of a burglary.

Even if these property crimes were construed as "lesser-included" offenses of capital murder under Texas law, the evidence presented during the guilt-innocence phase

---

**65.** *Petition*, at p. 72.

of petitioner's capital trial foreclosed any rational conclusion the petitioner was not guilty of capital murder but, instead, guilty of one or both of these two property offenses. As explained above, it was undisputed Carlos Garza was shot twice and the fatal shot was fired at close range. Two shell casings were found inside Garza's apartment, one directly adjacent to his body. Garza's body was visible from his front door, lying in a hallway on the other side of the living room from the only entryway into his apartment. There was no evidence the fatal shot was fired from outside Garza's apartment. There was no evidence anyone other than petitioner was inside Garza's apartment with a firearm on the day of Garza's murder. Frank Trujillo testified petitioner recounted how he shot Garza twice. Petitioner's account to Trujillo coincided with the physical evidence suggesting Garza had been shot in the cheek, fell, and was fatally shot at close range in the side of the head, with the fatal bullet passing through Garza's head, through a nearby wall, and coming to rest inside a closet, where it was recovered. Petitioner was videotaped pawning items of jewelry identical to Garza's within minutes of Garza's murder. At the time of his arrest, petitioner was still in possession of a distinctive lion's head ring and a gold nugget bracelet, two items identical to Garza's jewelry which were missing from Garza's person and apartment following Garza's murder and which petitioner's girlfriend had never seen petitioner wear prior to the date of Garza's murder. There was no evidence showing Garza had ever given petitioner either of these two particular items prior to Garza's death.

Whether petitioner might have committed only criminal trespass or criminal mischief when he returned to Garza's apartment after having shot Garza the first time

petitioner visited there is not relevant to this Court's *Beck* analysis. There was no evidence anyone heard any gunshots, "bangs," or "loud noises" during petitioner's second visit to Garza's apartment on the date in question. On the contrary, Latoya Mayberry Blanton admitted during her trial testimony, as she had told police in her written statement, she heard four loud noises while waiting for petitioner and Robert to return to her grandmother's vehicle during their first visit to Garza's apartment and, shortly thereafter, Robert and petitioner returned to their vehicle.[66] The only possible rational conclusion from the evidence presented during the guilt-innocence phase of petitioner's trial is, by the time petitioner returned to Garza's apartment the second time, Garza was already mortally wounded.

The evidence presented during the guilt-innocence phase of petitioner's capital murder trial did not permit a rational jury to conclude petitioner was not guilty of capital murder but, instead, guilty only or either criminal mischief or criminal trespass. Thus, petitioner was not entitled as a matter of federal law to jury instructions on the "lesser-included offenses" of either criminal trespass or criminal mischief.

### c. *Deficient Performance Analysis*

Petitioner's lead trial counsel testified during petitioner's state habeas corpus proceeding that he requested a lesser-included offense jury instruction only on the offense of murder because he believed (1) the evidence did not support jury instructions on the offenses of felony murder, criminal mischief, or criminal trespass under applicable law and (2) as a matter of trial strategy, defense counsel chose not to request instructions on those lesser-includ-

---

66. S.F. Trial, Volume 19, testimony of Latoya Mayberry Blanton, at pp. 30–32.

ed offenses.[67]

As explained above, the state habeas trial court concluded, under applicable Texas law, the evidence presented during petitioner's trial did not support issuance of a lesser-included offense instruction on either felony murder, criminal mischief, or criminal trespass.[68] This Court has independently concluded petitioner was not entitled to lesser-included offense instructions on either felony murder, criminal mischief, or criminal trespass under applicable federal constitutional principles.

The Texas Court of Criminal Appeals has noted, under Texas law, there can be a potentially significant downside for a Texas capital murder defendant who attempts to present evidence or elicit testimony on cross-examination raising an issue concerning the defendant's lack of intent to kill. See Ex parte Thompson, 179 S.W.3d 549, 560 (Tex.Crim.App.2005)(suggesting such efforts might very well open the door to the prosecution's admission of evidence showing the defendant had previously engaged in extraneous violent offenses). Petitioner's trial counsel determined as a matter of trial strategy it was preferable to argue to the jury petitioner was guilty only of murder (presumably because he shot Garza for reasons other than robbery or burglary and then simply took items of Garza's jewelry as an after-thought) than to attempt to argue petitioner went to Garza's apartment only for the purpose of robbing Garza and, somehow, petitioner *accidentally* shot Garza...twice....in the head. Like the Texas Court of Criminal Appeals, this Court finds nothing objectively unreasonable in that strategic decision by petitioner's trial counsel because there was no affirmative evidence introduced during the guilt-innocence phase of

petitioner's capital trial from which a rational jury could have found petitioner guilty of only one of those three lesser-included offenses.

For the reasons set forth above, the Texas Court of Criminal Appeals reasonably concluded petitioner's complaints about his trial counsel's failure to request lesser-included offense instructions on felony murder, criminal mischief, and criminal trespass did not satisfy the deficient performance prong of the *Strickland* test. In so concluding, the Texas Court of Criminal Appeals reasonably applied the well-settled first prong of the test announced in *Strickland*.

d. *Prejudice Analysis*

Because the state habeas court did not address the prejudice prong of *Strickland* in the course of denying petitioner's ineffective assistance claims premised on his trial counsel's failure to request jury instructions on any of the three lesser-included offenses, this Court's examination of this aspect of petitioner's arguments underlying his second through fourth claims herein is necessarily *de novo*. See *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

This Court independently concludes the failures of petitioner's trial counsel to request jury instructions on the lesser-included offenses of felony murder, criminal mischief, and criminal trespass did not prejudice petitioner within the meaning of *Strickland*. As explained above, petitioner

---

**67.** S.F. State Habeas Hearing, Volume 2 of 7, testimony of Anthony Cantrell, at pp. 12–14.

**68.** State Habeas Transcript, Volume 3 of 3, at p. 662.

was not entitled to such instructions under applicable state or federal law. The evidence of petitioner's guilt was overwhelming. Therefore, there is no reasonable possibility, much less a probability, that, but for the failure of his trial counsel to request such instructions, the outcome of the guilt-innocence phase of petitioner's trial would have been different. *See United States v. Kimler,* 167 F.3d at 893 (holding the failure to make a meritless argument cannot satisfy the prejudice prong of *Strickland*).

### 4. *Conclusions*

Petitioner's complaints about his trial counsel's failure to request jury instructions on the lesser-included offenses of felony murder, criminal mischief, and criminal trespass satisfy neither prong of *Strickland.*

The state habeas court's rejection on the merits of petitioner's ineffective assistance claims premised on his trial counsel's failure to request jury instructions on the lesser-included offenses of felony murder, criminal mischief, and criminal trespass

was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented during petitioner's trial, direct appeal, and state habeas corpus proceeding.

### F. *Failing to Object to "Definition" of Reasonable Doubt*

### 1. *The Claim*

In his sixth ground for relief herein, petitioner argues his trial counsel were ineffective in failing to object to a portion of the guilt-innocence phase jury charge defining "reasonable doubt." [69] More specifically, petitioner complains his trial counsel should have objected to the trial court's inclusion of *any* definition of reasonable doubt in the guilt-innocence phase jury instructions because a year prior to petitioner's trial, in *Paulson v. State,* 28 S.W.3d 570, 572–73 (Tex.Crim.App.2000), the Texas Court of Criminal Appeals had overruled its holding in *Geesa v. State,* 820 S.W.2d 154, 162 (Tex.Crim.App.1991),

---

**69.** *Petition,* at pp. 82–87.

In pertinent part, the state trial court instructed the jury at the guilt-innocence phase of petitioner's trial as follows:

All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined, or indicted for, or otherwise charged with, the offense gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.

It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

In the event you have reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him and say by your verdict "Not guilty."

Trial Transcript, at pp. 162–63.

which had mandated a lengthy "reasonable doubt" definition be employed in all criminal trials.[70]

## 2. State Court Disposition

In the course of petitioner's state habeas corpus proceeding, the state habeas trial court concluded this ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* because the Texas Court of Criminal Appeals had concluded in *Woods v. State*, 152 S.W.3d 105, 114–15 (Tex.Crim.App.2004), *cert. denied*, 544 U.S. 1050, 125 S.Ct. 2295, 161 L.Ed.2d 1092 (2005), a trial court did not abuse its discretion by including a definition of reasonable doubt in a jury charge when the definition did not include either the fourth or fifth paragraphs of the *Geesa* instruction which it had criticized in *Paulson*.[71]

## 3. AEDPA Review

### a. Clearly Established Federal Law

In the course of petitioner's state habeas corpus proceeding, the state habeas trial court found the definition of reasonable doubt included in petitioner's guilt-innocence phase jury charge did not include either of the two objectionable paragraphs from the *Geesa* instruction which the Texas Court of Criminal Appeals expressly rejected in *Paulson* and concluded, therefore, as in *Woods*, there was no abuse of discretion committed by the trial court when it included portions of the *Geesa* instruction in petitioner's guilt-innocence phase jury charge. These determinations of state law are binding on this Court in this federal habeas proceeding. *See Bradshaw v. Richey*, 546 U.S. at ——, 126 S.Ct. at 604 (state court interpretations of state law bind a federal court sitting in habeas

---

**70.** The Texas Court of Criminal Appeals' opinion in *Geesa* had mandated the following jury instructions for use in all criminal trials:

> [1] All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined, or indicted for, or otherwise charged with, the offense gives rise to no inference of guilty at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after a careful and impartial consideration of all the evidence in the case.
>
> [2] The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant.
>
> [3] It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

> [4] A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.
>
> [5] Proof beyond a reasonable doubt, therefore, must be proof of such convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.
>
> [6] In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you and these instructions, you will acquit him and say by your verdict "Not guilty."

*Woods v. State*, 152 S.W.3d at 114 n. 36, *quoting Geesa v. State*, 820 S.W.2d at 162.

**71.** State Habeas Transcript, Volume 3 of 3, at pp. 668–70.

The Texas Court of Criminal Appeals overruled *Geesa* in its opinion in *Paulson*, explaining the lengthy definition of reasonable doubt set forth by the *Geesa* court was redundant and confusing; ultimately that court concluded "[i]f a conscientious juror reads the *Geesa* charge and follows it literally, he or she will never convict anyone." *Paulson v. State*, 28 S.W.3d at 572.

corpus); *Estelle v. McGuire,* 502 U.S. at 67–68, 112 S.Ct. at 480 (it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions).

■ Insofar as petitioner argues the state courts misapplied applicable state law in rejecting his analogous ineffective assistance claim during his state habeas corpus proceeding, that argument is foreclosed by well-settled Supreme Court precedent holding violations of state law do not warrant federal habeas relief. *See Estelle v. McGuire,* 502 U.S. at 67–68, 112 S.Ct. at 480 (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)(recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984)(holding a federal court may not issue the writ on the basis of a perceived error of state law).

The Supreme Court has implicitly rejected the primary constitutional argument underlying this aspect of petitioner's multifaceted ineffective assistance claim herein:

> The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, "taken as a whole, the

instructions must correctly convey the concept of reasonable doubt to the jury."

*Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994)(*citations omitted* ).

■ It is thus clear, contrary to petitioner's argument suggesting no definition of "reasonable doubt" should have been given during his trial, that the mere fact the state trial court attempted to define "reasonable doubt" in the jury instructions given during the guilt-innocence phase of petitioner's capital trial did not implicate any of petitioner's federally-protected rights. *See Earhart v. Johnson,* 132 F.3d 1062, 1069 (5th Cir.1998)(holding the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so), *cert. denied,* 525 U.S. 933, 119 S.Ct. 344, 142 L.Ed.2d 283 (1998); *Lackey v. Scott,* 28 F.3d 486, 491 (5th Cir.1994) (holding the same), *cert. denied,* 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995).

Petitioner argues the Supreme Court's opinion in *Adams v. Texas,* 448 U.S. 38, 50, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581 (1980), renders constitutionally deficient the state trial court's definition of "reasonable doubt" contained in petitioner's guilt-innocence phase jury instructions.[72] However, the Supreme Court's opinion in *Adams* addressed the circumstances under which members of a jury venire could be excluded for cause based upon their personal views regarding capital punishment. Thus, the language from the *Adams* opinion on which petitioner relies is not only directly contrary to the Supreme Court's subsequent holding in *Victor v. Nebraska, supra,* but, obiter dictum.

■ Improper jury instructions in state criminal trial do not generally form

---

**72.** *Petition,* at pp. 84–85.

the basis for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71–72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991); *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002). "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977); *Mayabb v. Johnson*, 168 F.3d 863, 867 (5th Cir.1999). The fact a jury instruction was incorrect under state law is not a basis for federal habeas relief. *Gilmore v. Taylor*, 508 U.S. 333, 342, 113 S.Ct. 2112, 2117, 124 L.Ed.2d 306 (1993); *Estelle v. McGuire*, 502 U.S. 62, 71, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991); *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6, 103 S.Ct. 843, 853 n. 6, 74 L.Ed.2d 646 (1983). Rather, the question is whether the allegedly ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. at 72, 112 S.Ct. at 482; *Henderson v. Kibbe*, 431 U.S. at 154, 97 S.Ct. at 1737; *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973); *Johnson v. Puckett*, 176 F.3d 809, 824 (5th Cir.1999); *Mayabb v. Johnson*, 168 F.3d 863, 867 (5th Cir.1999), *cert, denied*, 528 U.S. 969, 120 S.Ct. 409, 145 L.Ed.2d 319 (1999). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of law." *Henderson v. Kibbe*, 431 U.S. at 155, 97 S.Ct. at 1737. The relevant inquiry is whether the failure to give an instruction by itself so infected the entire trial that the resulting conviction violates due process. *Cupp v. Naughten*, 414 U.S. at 147, 94 S.Ct. at 400–01; *Galvan v. Cockrell*, 293 F.3d at 764–65. A federal court may reverse a state court criminal conviction based upon erroneous jury instructions only when the instructions in question render the entire trial fundamentally unfair. *Henderson v.*

*Kibbe*, 431 U.S. at 154, 97 S.Ct. at 1736; *Cupp v. Naughten*, 414 U.S. at 147, 94 S.Ct. at 400–01; *Mayabb v. Johnson*, 168 F.3d at 867. Moreover, there is a strong presumption that errors in jury instructions are subject to harmless error analysis. *Galvan v. Cockrell*, 293 F.3d at 765.

Petitioner does not identify any specific defect in the state trial court's definition of "reasonable doubt" found in the jury instructions at the guilt-innocence phase of petitioner's capital trial which rendered the guilt-innocence phase of petitioner's trial fundamentally unfair. This Court's independent review of the relevant portion of petitioner's guilt-innocence phase jury instructions disclosed neither the defect identified by the Texas Court of Criminal Appeals in its opinion in *Paulson, supra,* nor the defect identified by the United States Supreme Court in its opinion in *Cage v. Louisiana*, 498 U.S. 39, 41, 111 S.Ct. 328, 329–330, 112 L.Ed.2d 339 (1990). This Court's independent review of the petitioner's guilt-innocence phase jury instructions disclosed no basis for an objection by petitioner's trial counsel which would have furnished a potentially meritorious basis for appeal.

 Finally, applying the harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) ("whether the error had substantial and injurious effect or influence in determining the jury's verdict"), this Court concludes inclusion of the language mentioning reasonable doubt in question in petitioner's guilt-innocence phase jury instructions was harmless as a matter of federal law. The definition in question made no effort to actually define "reasonable doubt," as had the Texas Court of Criminal Appeals' lengthy definition in *Geesa*, and clearly assigned the prosecution the burden of proving every

element of the offense with which petitioner was charged.

Moreover, adoption of the analytical approach urged by petitioner with his vague allusion to dictum from the Supreme Court's opinion in *Adams v. Texas, supra,* would not only require this Court to ignore the Supreme Court's specific holding in *Victor v. Nebraska, supra,* but also run afoul of the Supreme Court's holding in *Teague v. Lane, supra.*

### b. *Deficient Performance Analysis*

Petitioner's lead trial counsel testified during petitioner's state habeas hearing that he believed the trial court's guilt-innocence phase jury instructions (1) included language beneficial to both parties and (2) were consistent with his understanding of the then-current state of the law in Texas criminal trials.[73]

As this Court explained above, the discussion of "reasonable doubt" contained in petitioner's guilt-innocence phase jury instructions did not result in reversible error under applicable Texas law and did not implicate petitioner's federal due process guarantees.

■■■ This Court independently concludes the failure of petitioner's trial counsel to object to the relevant portion of the guilt-innocence jury instructions did not cause the performance of said counsel to fall below an objective level of reasonableness. The Texas Court of Criminal Appeals reasonably concluded petitioner's complaint about his trial counsel's failure to object to the "reasonable doubt" language contained in petitioner's guilt-innocence phase jury instructions did not satisfy the deficient performance prong of the *Strickland* test. In so concluding, the Texas Court of Criminal Appeals reasonably applied the well-settled first prong of the test announced in *Strickland.*

### c. *Prejudice Analysis*

■■■ Because the state habeas court did not address the prejudice prong of *Strickland* in the course of denying petitioner's analogous ineffective assistance claim, this Court's examination of this aspect of petitioner's arguments underlying his second through fourth claims herein is necessarily de *novo.* See *Rompilla v. Beard,* 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

This Court independently concludes the failure of petitioner's trial counsel to object to the inclusion of the "reasonable doubt" language contained in petitioner's guilt-innocence phase jury instructions did not prejudice petitioner within the meaning of *Strickland.* The evidence of petitioner's guilt was overwhelming. There is no reasonable possibility, much less a probability, that, but for the failure of his trial counsel to object to the jury instructions in question, the outcome of the guilt-innocence phase of petitioner's trial would have been different. See *United States v. Kimler,* 167 F.3d at 893 (holding the failure to make a meritless argument cannot satisfy the prejudice prong of *Strickland* ).

### 4. *Conclusions*

Petitioner's complaint that his trial counsel failed to object to the relevant portion of the guilt-innocence jury instructions satisfies neither prong of the *Strickland* test.

The state habeas court's rejection on the merits of petitioner's ineffective assistance

---

**73.** S.F. State Habeas Hearing, Volume 2 of 7, testimony of Anthony Cantrell, at pp. 24–26.

claims premised on his trial counsel's failure to object to the "reasonable doubt" language contained in petitioner's guilt-innocence phase jury instructions was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented during petitioner's trial, direct appeal, and state habeas corpus proceeding.

### G. Failure to Object to the Admission of the Statements of Robert Blanton and Latoya Mayberry Blanton or to Request Limiting Instructions

#### 1. The Claim

In his fourteenth claim herein, petitioner argues his trial counsel rendered ineffective assistance by failing to (1) object on hearsay, Confrontation Clause, and involuntariness grounds to the admission of the written statements of his brother and sister-in-law, (2) object to the prosecution's improper impeachment of these same two trial witnesses, (3) object to the reading of their statements into the record in their entirety through another prosecution witness, (4) request a hearing outside the jury to challenge the voluntariness of their statements, and (5) request limiting instructions directing the jury to consider the statements in question only for the purpose of evaluating the credibility of these two witnesses.[74]

#### 2. Procedural Default on Unexhausted Claims

Petitioner made no effort to present any of these complaints about the performance of his trial counsel to the state courts during his state habeas corpus proceeding. Therefore, for the reasons set forth above

in Section VII.C., petitioner has procedurally defaulted on these complaints about the performance of his trial counsel.

#### 3. No Relief on the Merits

Out of an abundance of caution, however, this Court will address the merits of petitioner's fourteenth claim herein.

##### a. Clearly Established Federal Law

Because the state courts have never addressed the merits of any portion of petitioner's fourteenth claim herein, this Court's review of both prongs of the *Strickland* test is necessarily *de novo*. See *Rompilla v. Beard,* 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

##### b. Deficient Performance Analysis

###### (1) Failure to Object

The fundamental problem with petitioner's fourteenth claim herein is petitioner's failure to identify any arguable legal basis for a potentially viable objection to the manner in which the prosecution employed the two witness statements in question to impeach petitioner's brother and sister-in-law at trial.

Insofar as petitioner complains his trial counsel should have objected on hearsay or other state procedural grounds to the manner in which the prosecution employed the written statements during the testimony of Robert Blanton and Latoya Mayberry Blanton to impeach those two witnesses, petitioner's complaints are foreclosed by the Texas Court of Criminal Appeals' opinion in petitioner's direct appeal. See *Blan-*

---

**74.** *Petition,* at pp. 126–33.

*ton v. State,* 2004 WL 3093219, *13–*14 (Tex.Crim.App. June 30, 2004)(holding the manner in which the prosecution used the two written statements to impeach Robert Blanton and Latoya Mayberry Blanton was consistent with Rule 613, Texas Rules of Evidence). The Texas Court of Criminal Appeals' opinion upholding under applicable state evidentiary rules the manner in which the prosecution employed the two written statements to impeach these two witnesses forecloses petitioner's ineffective assistance complaints suggesting a potentially viable basis existed under applicable Texas law for an objection thereto. *See Bradshaw v. Richey,* 546 U.S. at ——, 126 S.Ct. at 604 (state court interpretations of state law bind a federal court sitting in habeas corpus); *Estelle v. McGuire,* 502 U.S. at 67–68, 112 S.Ct. at 480 (it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions).

Insofar as petitioner complains his trial counsel failed to object on Confrontation Clause grounds to the employment of the two written statements to impeach his brother's and sister-in-law's trial testimony, that complaint is also without any arguable legal support. *See California v. Green,* 399 U.S. 149, 164, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489 (1970)("the Confrontation Clause does not require excluding from evidence the prior statements of a witness who concedes making the statements, and who may be asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in question, thus opening himself to full cross-examination at trial as to both stories.").

Insofar as petitioner complains his trial counsel failed to request a hearing outside the jury's presence to contest the voluntariness of the written statements of Robert Blanton and his wife Latoya, that argument is likewise in vain. This Court has independently reviewed the entirety of the testimony from petitioner's trial, which included Robert Blanton's and Latoya Mayberry Blanton's assertions that their written statements were coerced and they were "fed information" by the police officers who took their statements.[75] However, this Court has also reviewed the sworn testimony of several San Antonio Police officers who testified that, until Latoya Mayberry gave them information regarding the details of Garza's fatal shooting, identified petitioner as the shooter, and informed them petitioner had pawned Garza's jewelry, they had no suspects in Garza's murder and knew none of the detailed information regarding the circumstances of Garza's murder which she furnished to them.[76] Likewise, this Court has reviewed the trial testimony of the San Antonio Police detectives who took the statements in question and who insisted both Latoya Mayberry's and Robert Blanton's statements were voluntary and uncoerced.[77] Finally, this Court has also reviewed the trial testimony of the two ci-

---

75. S.F. Trial, Volume 19, testimony of Latoya Mayberry Blanton, at pp. 47, 50, 52, 98, 101–02, 106, Volume 20, testimony of Latoya Mayberry Blanton, at pp. 11–13, 15, 27–28, 31–34, 40, 42, 58–59, 72; Volume 20, testimony of Robert Blanton, at pp. 169–71, 173, 176–83, 188–93, 195, 198.

76. S.F. Trial, Volume 22, testimony of Ricky Lopez, at pp. 81–83, 86, 92–93; testimony of John Dyer, at pp. 97–101; testimony of Thomas Matjeka, at pp. 120–23, 148; testimony of Raymond Roberts, at pp. 210–12, 217, 233, 246–47; Volume 23, testimony of Raymond Roberts, at pp. 6–7, 14, 17–18, 21, 23, 27, 29.

77. S.F. Trial, Volume 22, testimony of Thomas Matjeka, at pp. 120–23, 136–39, 141, 143–45, 147–48; testimony of Raymond Roberts, at pp. 214–17, 219–20, 229–30, 233, 234–35, 241–42; Volume 23, testimony of Raymond Roberts, at pp. 4–7, 17–18, 21, 23, 30–32.

vilian police department employees who witnessed Latoya Mayberry execute her written statement.[78] Having examined this trial testimony in its entirety, this Court concludes there was nothing objectively unreasonable about the decision by petitioner's trial counsel *not* to challenge the voluntariness of the written statements executed on April 11, 2000 by either Latoya Mayberry Blanton or Robert Blanton. The prosecution had readily available overwhelming evidence from disinterested witnesses which established the voluntary nature of both statements and the utter lack of credibility of the recantations offered at trial by Latoya Mayberry Blanton and Robert Blanton. Petitioner's trial counsel acted well within the broad range of objectively reasonable trial strategy when they chose not to challenge the voluntariness of those two witness statements.

This Court concludes there were objectively reasonable bases for petitioner's trial counsel's decision *not* to object on hearsay, Confrontation Clause, or involuntariness grounds to the prosecution's use of the written statements of Latoya Mayberry Blanton and Robert Blanton to impeach those two witnesses' trial testimony.

Insofar as petitioner complains his trial counsel failed to object to the *admission* of the two written statements, that argument suffers from a faulty factual premise. Neither of the two written statements were ever offered or admitted into evidence during petitioner's trial.

Petitioner also complains his trial counsel should have objected on unspecified grounds when prosecution witness Raymond Roberts read each of the two witness statements in their entirety into the

record before the jury. However, petitioner does not identify any state evidentiary rule or federal constitutional principle which forbade such a practice. During their trial testimony, both Robert Blanton and Latoya Mayberry Blanton admitted executing the statements in question but denied the accuracy of some, but not all, of the highly inculpatory information contained therein. As the Texas Court of Criminal Appeals explained in its opinion in petitioner's direct appeal, if a witness admits making a written statement but upon inquiry denies portions of the statement, then the portion that contradicts the witness may be proved for purposes of impeachment. *Blanton v. State*, 2004 WL 3093219, *13 (Tex.Crim.App. June 30, 2004).

Thus, insofar as petitioner complains his trial counsel failed to object to Detective Roberts reading the two witness statements in their entirety during his testimony, petitioner has identified no potentially viable bases for such an objection. Petitioner's trial counsel could possibly have objected on the ground the two statements had not yet been admitted into evidence (an argument petitioner has not specifically asserted in this Court). However, as a result of the prosecution's wholly proper examination of Robert and Latoya, by the time Detective Roberts testified, the jury was already well aware of the contents of those two witness statements. Furthermore, both Robert and Latoya had testified they had been "fed" false information contained in their written statements by Detective Roberts who, unsurprisingly, denied he coerced either person to give their statement and denied he had "fed" either of them any of the information contained

---

**78.** S.F. Trial, Volume 22, testimony of Christi Salazar, at pp. 66–71; testimony of Jesse Torres, at pp. 71–75.

therein. Thus, there appeared to be genuine disputes as to whether Robert and Latoya actually furnished all the information contained in their statements or were "fed" some portion of same by Detective Roberts. Under such circumstances, petitioner's trial counsel might have reasonably believed it was permissible under applicable state law for the prosecution to impeach Robert and Latoya's trial testimony by having Detective Roberts read their statements to the jury in their entirety. Having independently reviewed applicable state law, this Court concludes such an assumption would not have been completely outside the wide range of presumptively reasonable professional legal assistance. In fact, viewed from a strategic perspective, petitioner's trial counsel could reasonably have believed such an objection might place greater emphasis on the contents of the statements than on the actual trial testimony of Robert and Latoya.

■ The Supreme Court recognizes a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66. The courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *Burger v. Kemp,* 483 U.S. 776, 789, 107 S.Ct. 3114, 3123, 97 L.Ed.2d 638 (1987); *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065–66. It is strongly presumed that counsel has rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066. An attorney's strategic choices, usually based on information supplied by the defendant and from a thorough investigation of relevant facts and law are virtually unchallengeable. *Strick-*

*land v. Washington,* 466 U.S. at 691, 104 S.Ct. at 2066. As is explained in greater detail below, Robert's and Latoya's trial testimony regarding whether they had actually made all the statements contained in their written statements was highly equivocal. Under such circumstances, petitioner's trial counsel could reasonably have believed the prosecution was entitled to read their statements into the record as a means of impeaching Robert's and Latoya's trial testimony even though the statements themselves had not been offered or admitted into evidence. This Court is loathe to fault a trial counsel's failure to object to the admission of evidence when reasonable minds could disagree over whether the evidence in question was admissible under applicable evidentiary rules.

This Court's *de novo* review of the record from petitioner's trial and applicable law establishes petitioner's trial counsel's failures to object to the prosecution's use of the written statements of Latoya Mayberry Blanton and Robert Blanton during petitioner's trial did not cause the performance of said counsel to fall below an objective level of reasonableness. Thus, the first four complaints listed in petitioner's fourteenth claim for relief herein do not satisfy the first prong of the *Strickland* test.

### (2) *Failure to Request Limiting Instruction*

■ However, petitioner's complaint about his trial counsel's failure to request a limiting jury instruction requires further *de novo* review. Under applicable Texas law, *arguably* petitioner was entitled to a jury instruction limiting the jury's consideration of the written statements read in their entirety by Detective Roberts to the issues of the credibility of the trial testimony of the two person who executed those prior inconsistent statements. *See*

*McGary v. State*, 750 S.W.2d 782, 787 (Tex.Crim.App.1988)("where the prior inconsistent statement is in writing and the witness unequivocally admits making such statement, the instrument itself is not admissible, but the examining attorney may ask about specific sentences, remarks, or things in the prior statement."). Depending on how one views the highly equivocal trial testimony of both Robert Blanton and his wife (during which testimony they each alternately admitted they had executed the written statements in question but claimed portions of their statements were inserted by police Detective Roberts who "fed" information to them), at least some portions of their trial testimony might well have opened the door to the prosecution admitting portions of their written statements for more than merely impeachment purposes. *See McGary v. State*, 750 S.W.2d at 786 ("If the witness denies making the contradictory statement, it can then be proved by the prior inconsistent statement."). Regardless of whether they were formally admitted into evidence or not, the effect of having Detective Roberts read the two witness statements in their entirety was the same as if they had been admitted into evidence. The question remaining is whether petitioner's trial counsel acted in an objectively reasonable manner in not requesting an instruction limiting the jury's consideration of the contents of those two statements to determining the credibility of the trial testimony of Robert and Latoya.

Petitioner accurately describes the trial testimony of both Latoya Mayberry Blanton and Robert Blanton as "a disjointed mess."[79] Latoya Mayberry's first day on the stand (after she had been called by the prosecution), included admissions that she had executed her written statement, i.e., State Exhibit no. 1, but her steadfast insistence that (1) Detective Roberts had put words in her mouth and (2) many of the factual assertions contained therein were inaccurate.[80] The following day, when she took the stand for cross-examination, Latoya testified (1) she had been frightened when questioned by the police, (2) Detective Roberts had threatened her and shown her unpleasant pictures of Garza, (3) she had signed a false written statement to avoid a capital murder charge, (4) there were numerous inaccuracies in her written statement, (5) the entirety of her testimony the day before had been based on her inaccurate written statement, which she had felt intimidated into verifying, and (6) she was expressly disavowing all of her testimony from the day before.[81] On redirect examination, Latoya (1) again admitted she had signed the warnings card and each page of her written statement, (2) she had testified truthfully the day before when she said she, Robert, and the petitioner twice visited Carlos' apartment complex the day of the shooting, (3) however, she never saw the petitioner with a gun on that date and the petitioner never told her anything about a handgun on that date, (4) after their second visit to Carlos' apartment complex, petitioner wanted to go to a pawn shop, and (5) she did hear four loud noises while she waited for Robert and petitioner to return to their vehicle during their first visit.[82] On re-cross, Latoya testified (1) the majority of her written statement had been suggested to her by Detective Roberts, (2) petitioner had

**79.** *Petition,* at p. 127.

**80.** S.F. Trial, Volume 19, testimony of Latoya Mayberry Blanton, at pp. 38–39, 47, 50–52, 81–86, 92–95, 101–03, 106.

**81.** S.F. Trial, Volume 20, testimony of Latoya Mayberry Blanton, at pp. 12–13, 15, 22–28, 30–34.

**82.** *Id.,* at pp. 40, 42, 44–45, 56, 58–60.

never admitted having shot Garza, and (3) she heard four loud noises on the afternoon of the murder but could not identify any of them as gunshots.[83]

Robert Blanton's trial testimony was equally equivocal regarding his written statement. When initially called by the prosecution, Robert admitted he had driven petitioner and Latoya to Carlos Garza's apartment complex twice on the afternoon of the murder and later drove petitioner to a pawn shop.[84] However, Robert denied he or petitioner ever kicked open Garza's door or shot Garza and claimed the police had "fed" him the information contained in his written statement which he acknowledged executing but claimed to be false.[85] On cross-examination by petitioner's trial counsel, Robert (1) claimed the police "gave" him the information regarding Garza's shooting contained in his written statement, (2) denied ever hearing petitioner say anything about having shot Garza, (3) admitted he and petitioner had used cocaine and marijuana furnished by Garza prior to the date of the murder, and (4) denied seeing petitioner kick open Garza's door or shoot Garza.[86] On redirect examination, Robert (1) denied hearing any loud noises on the afternoon of the murder, (2) denied ever having "partied" with petitioner at Garza's apartment, (3) claimed he had never gone to Garza's apartment prior to the date of the murder, and (4) denied that either he, Latoya, or petitioner were involved in Garza's murder.[87]

Given the highly equivocal nature of the trial testimony of Robert and Latoya, it is far from clear under applicable state law whether their written statements would have been *admissible* in their entirety for impeachment purposes. Nonetheless, reasonable prudent counsel would have requested an instruction directing the jury to consider the contents of those statements for impeachment purposes only once they had been read into the record in their entirety. *See Miranda v. State*, 813 S.W.2d 724, 735 (Tex.App.—San Antonio 1991, *pet. ref'd*) (recognizing that trial courts admitting prior inconsistent statements for impeachment purposes should instruct juries to consider such statements solely for their impeachment value). Respondent has suggested no potentially beneficial strategic reason for not making such a request. This Court's independent review of the record from petitioner's trial and applicable state law has revealed none. Likewise, respondent suggests the existence of no state evidentiary or procedural rule would have precluded the trial court from issuing such a limiting instruction under circumstances such as petitioner's. Simply put, regardless of whether the written statements themselves were admitted into evidence, petitioner was entitled to a limiting jury instruction regarding the *contents* of the two written statements which were read in their entirety before the jury and his trial counsel possessed no objectively reasonable strategic reason for failing to make such a clearly appropriate request.

This Court concludes the failure of petitioner's trial counsel to request a limiting jury instruction regarding the *contents* of the written statements of Robert Blanton and Latoya Mayberry Blanton caused the

---

83. *Id.*, at pp. 69, 72–73.

84. S.F. Trial, Volume 20 testimony of Robert Blanton, at pp. 92, 97, 99, 104–08, 110–11, 114, 116–17, 124, 132–33, 135, 139, 184–85, 187.

85. *Id.*, at pp. 169–70, 172–83, 188–95, 198–200, 202–03, 205.

86. *Id.*, at pp. 224–26, 228–30.

87. *Id.*, at pp. 231, 233–34, 236–38, 240.

performance of said counsel to fall below an objective level of reasonableness.

### c. Prejudice Analysis

Because there were no legitimate legal bases for challenging the prosecution's use of the written statements of Robert Blanton and Latoya Mayberry Blanton to impeach their trial testimony, the failure of petitioner's trial counsel to object thereto did not prejudice petitioner within the meaning of *Strickland.* Likewise, because the two written statements were never formally offered into evidence, the failure of petitioner's trial counsel to object to their *admission* did not prejudice petitioner within the meaning of *Strickland.*

Further *de novo* review is required, however, regarding the potentially prejudicial impact of the failure of petitioner's trial counsel to request an instruction limiting the jury's consideration of the contents of the written statements of Robert Blanton and Latoya Mayberry Blanton to their impeachment value vis-a-vis the trial testimony of those two witnesses. The absence of such a limiting instruction allowed petitioner's jury to consider *as probative of petitioner's guilt* petitioner's highly inculpatory accounts of his fatal shooting of Garza reflected in Robert's and Latoya's written statements. If this had been the full extent of the prosecution's case against petitioner, the failure of petitioner's trial counsel to request a limiting instruction might well satisfy the prejudice prong of *Strickland.*

However, petitioner's jury also had before it (1) the trial testimony of Robert and Latoya, which placed petitioner at the scene of Garza's murder around the time of Garza's fatal shooting, (2) a videotape recording and documentary evidence showing, within hours of Garza's murder, petitioner pawned several items of jewelry identical to those owned by Garza, (3) testimony and photographs establishing peti-

tioner was wearing other items of jewelry at the time of his arrest which were identical to those owned or worn by Garza shortly before his murder and which petitioner's girlfriend had never seen petitioner wear prior to the date of Garza's murder, (4) testimony establishing petitioner had warned Garza only weeks before his murder that someone was going to rob Garza if he persisted in flaunting his money, and (5) testimony from petitioner's cell mate Frank Trujillo detailing petitioner's account of his fatal shooting of Garza, which account was remarkably consistent with the physical evidence, both at the crime scene and that discovered during Garza's autopsy. Thus, even disregarding the contents of the written statements in question, the prosecution's case against petitioner at the guilt-innocence phase of trial was strong.

While it is admittedly an extremely close case, this Court concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to request an instruction limiting the jury's consideration of the contents of Robert's and Latoya's written statements to their impeachment value vis-a-vis those same two witnesses' trial testimony, the outcome of the guilt-innocence phase of petitioner's capital trial would have been different.

### 4. Conclusions

Petitioner procedurally defaulted on his multi-faceted fourteenth claim herein by failing to fairly present these complaints of ineffective assistance to the state habeas court. Absolutely no external impediment prevented petitioner from doing so.

The first four of petitioner's complaints of ineffective assistance contained in petitioner's fourteenth claim herein and listed in Section VII.G.1. above satisfy neither prong of the *Strickland* test.

Petitioner's trial counsel's failure to request an instruction limiting the jury's consideration of the contents of the written statements of Robert Blanton and Latoya Mayberry Blanton to the impeachment value of those statements vis-a-vis the trial testimony of those two witnesses was objectively unreasonable and professionally deficient. Nonetheless, in view of the overwhelming evidence of petitioner's guilt, there is no reasonable probability that, but for this failure, the outcome of the guilt-innocence phase of petitioner's trial would have been different.

Accordingly, none of the complaints of ineffective assistance contained in petitioner's fourteenth claim herein satisfy both prongs of *Strickland.* Petitioner is not entitled to federal habeas corpus relief based on the complaints of ineffective assistance by his trial counsel contained in petitioner's fourteenth claim herein.

H. *Failure to Challenge Inconsistencies Between Robert Blanton's Written Statement and the Physical Evidence*

1. *The Claim*

In his fifteenth claim herein, petitioner argues his trial counsel rendered ineffective assistance by failing to point out to the jury certain discrepancies between the contents of the written statement of Robert Blanton, the physical evidence, and Robert's trial testimony.[88] More specifically, petitioner argues Robert Blanton's written statement was factually inaccurate insofar as it asserts Robert was inside Garza's apartment when the first shot was fired but did not see the shooting.

2. *Procedural Default on Unexhausted Claims*

Petitioner made no effort to present these complaints about the performance of

his trial counsel to the state courts during his state habeas corpus proceeding. Therefore, for the reasons set forth above in Section VII.C., petitioner has procedurally defaulted on these complaints about the performance of his trial counsel.

3. *No Relief on the Merits*

Out of an abundance of caution, however, this Court will undertake *de novo* review of the merits of petitioner's fifteenth claim herein.

a. *Deficient Performance Analysis*

■ As is explained above in connection with petitioner's fourteenth claim, petitioner's trial counsel had valid strategic reasons for not wanting to emphasize the contents of the written statement of Robert Blanton. Furthermore, during his trial testimony, Robert attempted to repudiate most of the information contained in his written statement. Under such circumstances, this Court is at a loss to understand what potential benefit petitioner could have hoped to achieve by attempting to impeach Robert's assertion that he had not seen the petitioner shoot Garza.

Petitioner suggests a showing of any inaccuracy in Robert's written statement would have supported his contention that Robert's written statement had been coerced. The problem with this suggestion is it ignores the evidentiary reality which confronted petitioner's trial counsel at the guilt-innocence phase of petitioner's trial. Robert stated in his written statement (1) he had stepped inside Garza's apartment, (2) he heard petitioner and Garza arguing in the rear of the apartment, (3) he saw petitioner walk toward him and then turn around, (4) he heard more arguing and a gunshot, but (5) he never actually saw petitioner shoot Garza.

88. *Petition,* at pp. 133–36.

Petitioner argues his trial counsel should have attempted to establish the physical impossibility of Robert being inside the apartment and not witnessing the firing of the first shot at Garza. Logically, such a showing would have required petitioner's trial counsel to convince the jury either (1) Robert was *not* inside the apartment at the time the first shot was fired, as indicated in his written statement, or (2) Robert *did* see petitioner shoot Garza.

Establishing Robert was not inside Garza's apartment at the time of the fatal shooting would have benefitted petitioner in no discernable way. Likewise, establishing Robert *had* seen petitioner shoot Garza would have been of even less benefit to petitioner. On the contrary, it would have cast further doubt on Robert's repudiation at trial of the contents of his highly inculpatory written statement.

Petitioner's trial counsel had obvious strategic reasons to avoid calling the jury's attention to the contents of Robert's written statement anymore than was absolutely necessary. Petitioner's trial counsel could reasonably have concluded that getting Robert to repudiate the contents of his written statement was far more beneficial to petitioner's chances of gaining an acquittal than attempting to impeach Robert's written statement through a showing of discrepancies between the contents of that highly inculpatory statement and the physical evidence. The failure of petitioner's trial counsel to adopt the strategic course urged by petitioner in his fifteenth claim herein did not cause the performance of petitioner's trial counsel to fall below an objective level of reasonableness.

### b. *Prejudice Analysis*

There is no reasonable probability that, but for the failure of petitioner's trial counsel to attack the accuracy of the details of Robert's Blanton's written statement, the outcome of the guilt-innocence phase of petitioner's trial would have been different. Robert's trial testimony placed petitioner at the scene of the crime on the date of Garza's murder around the time of the murder. Overwhelming evidence of petitioner's guilt, including the testimony of Frank Trujillo and evidence showing petitioner pawned Garza's jewelry within hours of Garza's murder, supported the prosecution's theory of the case.

### 4. *Conclusions*

Petitioner procedurally defaulted on his unexhausted fifteenth claim herein. Petitioner's complaints about the performance of his trial counsel contained in his fifteenth claim herein do not satisfy either prong of the *Strickland* test.

### I. *Failure to Present Evidence Showing Different Tread Patterns on Petitioner's Tennis Shoes on the Date of his Arrest and the Shoe Prints Found on Garza's Door*

### 1. *The Claim*

In his sixteenth claim herein, petitioner faults his trial counsel for failing to present evidence which showed the tread patterns on the bottom of the tennis shoes worn by petitioner at the time of his arrest on April 13, 2000 did not match the tread patterns on the shoe prints left on the door of Garza's apartment on April 9, 2000.[89]

### 2. *Procedural Default on Unexhausted Claim*

Petitioner made no effort to present this complaint about the performance of his trial counsel to the state courts during his state habeas corpus proceeding. Therefore, for the reasons set forth above in

---

**89.** *Petition,* at pp. 137–38.

Section VII.C., petitioner has procedurally defaulted on this complaint about the performance of his trial counsel.

### 3. *No Relief on the Merits*

Out of an abundance of caution, however, this Court will undertake *de novo* review of the merits of petitioner's sixteenth claim herein.

### a. *Deficient Performance Analysis*

■ Petitioner alleges no specific facts identifying any admissible evidence available at the time of his trial which would have shown either (1) the shoes worn by petitioner at the time of his arrest were, in fact, the same shoes petitioner wore several days earlier during his visits to Garza's apartment on the date of Garza's murder; (2) it was physically impossible for petitioner to have changed his shoes during the interim between the date of Garza's murder and the date of petitioner's arrest; or (3) it was physically impossible for petitioner to have worn shoes on the date of Garza's murder which could have left the shoe prints on Garza's door. In the absence of such a specific factual allegation regarding the availability of such evidence, petitioner's complaint fails to satisfy the deficient performance prong of the *Strickland* test. Petitioner's trial counsel cannot be faulted for failing to do the impossible.

Moreover, in the absence of such evidence, any evidence suggesting the tread pattern on the shoes petitioner wore at the time of his arrest did not match the shoe prints on Garza's door would have had no relevance to any issue before petitioner's jury. Simply put, evidence showing that the shoes the petitioner wore at the time of his arrest did not leave the shoe prints on Garza's door would not have excluded petitioner as the person, or one of the persons, who kicked open Garza's door. It simply would have meant petitioner was not wearing that particular pair of shoes

on the date of Garza's murder. Petitioner's trial counsel cannot reasonably be faulted for failing to undertake an investigation or presenting evidence which would have had no relevance to any issue before the jury at the guilt-innocence phase of petitioner's trial. Counsel is not required to undertake expeditions into the inane.

The failure of petitioner's trial counsel to present evidence showing the shoes the petitioner wore at the time of petitioner's arrest on April 13, 2000 did not leave the shoe prints found on the door of Garza's apartment days earlier, i.e., on April 9, 2000, did not cause the performance of said counsel to fall below an objective level of reasonableness.

### b. *Prejudice Analysis*

For the same reasons, there is no reasonable probability that, but for the failure of his trial counsel to introduce such evidence, the outcome of the guilt-innocence phase of petitioner's trial would have been different. Petitioner has alleged no facts showing the shoes he wore at the time of his arrest bore any evidentiary relevance to the shoe prints found on Garza's door.

### 4. *Conclusions*

Petitioner procedurally defaulted on his unexhausted sixteenth claim herein which, in any event, satisfies neither prong of the *Strickland* test.

### J. *Failure to Rebut the Testimony of Frank Trujillo*

### 1. *The Claim*

In his seventeenth claim herein, petitioner argues his trial counsel should have "rebutted" the testimony of "jailhouse snitch" Frank Trujillo by calling other BCADC inmates to testify it was petitioner's practice not to discuss his case or the underlying facts with others and they nev-

er overheard petitioner discussing his case or the underlying facts thereof with Trujillo.[90]

### 2. *Procedural Default on Unexhausted Claim*

Petitioner made no effort to present this complaint about the performance of his trial counsel to the state courts during his state habeas corpus proceeding. Therefore, for the reasons set forth above in Section VII.C., petitioner has procedurally defaulted on this complaint about the performance of his trial counsel.

### 3. *No Relief on the Merits*

Out of an abundance of caution, however, this Court will undertake *de novo* review of the merits of petitioner's seventeenth claim herein.

#### a. *Deficient Performance Analysis*

 Petitioner alleges no specific facts showing there was any evidence available at the time of his trial which would have shown it was physically impossible for petitioner to have privately told Frank Trujillo about petitioner's robbery and fatal shooting of Carlos Garza. While petitioner argues he wanted to call three of his former cell mates to testify they never overheard petitioner discuss his case with Frank Trujillo, petitioner has presented this Court with neither (1) any specific factual allegations showing any of these three, identified, potential witnesses were available to testify at the time of petitioner's trial or (2) any fact-specific allegations showing precisely what any of these individuals could have furnished in terms of admissible testimony. Petitioner has had the assistance of capable and very well-compensated federal habeas counsel to locate these same individuals and obtain affidavits clearly explaining what relevant, admissible, testimony, if any, they could have furnished at petitioner's trial. Complaints of uncalled witnesses are disfavored because presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *See Coble v. Dretke*, 444 F.3d 345, 350 (5th Cir., 2006)(complaints regarding uncalled witnesses address a matter of trial strategy and are speculative in nature); *Miller v. Dretke*, 420 F.3d 356, 362 (5th Cir. 2005)(such complaints necessarily involve matters of trial strategy); *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir.2003)(such complaints impinge on matters of trial strategy and are speculative in nature); *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir.2002)(such complaints are speculative in nature).

Absent some evidence showing the individuals whom petitioner wished to call to testify at his trial were constantly in the presence of both the petitioner and Trujillo throughout the entire time the petitioner and Trujillo had access to each other during their mutual stay at the BCADC, any testimony by these same individuals that they did not overhear any conversation between petitioner and Frank Trujillo regarding the facts of petitioner's fatal assault upon Carlos Garza would have had virtually no evidentiary value. This is because petitioner has alleged no specific facts showing it was impossible for he and Trujillo to have shared a private conversation during their time together in the same unit of the BCADC. The mere fact none of the petitioner's other cell mates overheard petitioner telling Trujillo about the details of petitioner's murder of Garza did not, standing alone, establish it was impossible for petitioner to have privately communicated that information to Trujillo.

90. *Petition,* at pp. 138–39.

Thus, none of the three witnesses identified by petitioner in his seventeenth claim herein could have effectively "rebutted" the testimony of Frank Trujillo regarding petitioner's detailed account of his fatal shooting of Garza.[91]

Under such circumstances, the failure of petitioner's trial counsel to locate and call as trial witnesses any of petitioner's three former cell mates identified in petitioner's seventeenth claim herein did not cause the performance of said counsel to fall below an objective level of reasonableness.

### b. *Prejudice Analysis*

For the same reasons, there is no reasonable probability that, but for the failure of petitioner's trial counsel to call any of the three potential witnesses identified in petitioner's seventeenth claim herein, the outcome of the guilt-innocence phase of petitioner's trial would have been different. Petitioner alleges no facts showing any of

these witnesses could have actually rebutted the trial testimony of Frank Trujillo.

### 4. *Conclusions*

Petitioner procedurally defaulted on his unexhausted seventeenth claim herein which, in any event, satisfies neither prong of the *Strickland* test.

### K. *Failure to Properly Preserve Batson Claims*

### 1. *The Claim*

In his eleventh and twelfth claims, petitioner argues his trial counsel failed to properly preserve petitioner's *Batson* claim arising from the prosecution's use of its peremptory challenges to exclude all blacks from petitioner's petit jury.[92] More specifically, petitioner complains his trial counsel failed to object in a timely manner on *Batson* grounds to the prosecution's request for a shuffle of the jury venire.[93]

---

**91.** Likewise, petitioner alleges no specific facts showing that any of these three potential witnesses could have furnished any admissible testimony rebutting Trujillo's accounts of either (1) the events which transpired prior to Trujillo's and petitioner's arrests, i.e., the incident in which petitioner offered to sell Trujillo a gun petitioner had used to shoot someone, or (2) the conversations between petitioner and Trujillo while they were in the magistrate court holding cell awaiting transfer to the BCADC.

**92.** *Petition*, at pp. 116–23; *Reply*, at pp. 23–29.

**93.** In his state habeas corpus application, petitioner identified five specific instances in which he alleged his trial counsel had rendered ineffective assistance in connection with petitioner's *Batson* claims, i.e., by failing to (1) include in the record comments made by the lead prosecutor regarding a prior Bexar County capital trial in which a black juror had allegedly "hung" that jury, (2) timely object to the jury shuffle, (3) immediately make a record showing where black members of the jury venire were seated or arranged prior to the jury shuffle, (4) obtain a "clear

and concise ruling" that the pre-shuffle jury list would be made part of the record, and (5) take unspecified action to ensure such evidence was made a part of the record (presumably on appeal). State Habeas Transcript, Volume 1 of 3, at pp. 86–97. Petitioner's arguments in support of his eleventh and twelfth claims in this Court focus on only the second of these specific complaints.

A review of petitioner's state habeas proceedings may offer a clue as to why petitioner appears to have abandoned the majority of these specific complaints. First, when called to testify at petitioner's state habeas corpus evidentiary hearing, petitioner's former lead defense counsel testified about an incident occurring before the jury shuffle in which the lead prosecutor allegedly had commented on an unidentified prior Bexar County criminal trial in which a black juror had "hung" the jury, resulting in a mistrial. S.F. State Habeas Hearing, Volume 2 of 7, testimony of Anthony Cantrell, at pp. 50–52. At the same hearing, however, the petitioner's lead prosecutor (1) abjectly denied she ever had any conversation with any member of petitioner's defense team (or anyone else for that matter) concerning a mistrial in any prior Bexar

Petitioner argues further his trial counsel should have been alerted to the racially discriminatory animus underlying the prosecution's request for a jury shuffle because, during an off-the-record conversation prior to trial, one of the prosecuting attorneys made a vague reference to a previous Bexar County capital murder trial in which a black juror had "hung" the jury.[94]

Petitioner then argues the state trial court erroneously overruled petitioner's *Batson* objections to the prosecution's use of peremptory challenges against post-

County criminal trial allegedly resulting from a black juror "hanging" the jury and (2) insisted she had no personal knowledge of such an event ever having occurred in Bexar County. S.F. State Habeas Hearing, Volume 2 of 7, testimony of Tamara Butler Strauch, at pp. 154–55, 160. Petitioner did not offer the state habeas court any evidence showing there was any means readily available to petitioner's trial counsel at the time of petitioner's jury shuffle to memorialize the allegedly pernicious comments which petitioner's trial counsel claimed the lead prosecutor had made "off the record." Thus, it is readily apparent the lead prosecutor would not have confirmed petitioner's lead trial counsel's version of their alleged conversation in question had petitioner's trial counsel sought to interrogate the lead prosecutor regarding same "on the record." While petitioner's lead trial counsel might have made a proffer to the state trial court of his own testimony regarding the conversation in question, petitioner made no effort during the evidentiary hearing in petitioner's state habeas corpus proceeding to inquire of his former trial counsel as to why said counsel chose not to do so.

Second, there does not appear to be any legitimate basis for disagreement among reasonable persons as to the order of black individuals appearing as petitioner's jury venire members, either before or after the prosecution's requested shuffle. The state habeas trial court made specific factual findings that, prior to the jury shuffle, African–Americans were in positions 2, 4, 20, 82, and 98 on petitioner's jury venire and after the shuffle these same five individuals were positioned as members 64, 68, 76, 87, and 90 among the petitioner's re-constituted jury venire. State

shuffle venire members 68 (Michelle Johnson) and 76 (Ann Henderson) and Texas Court of Criminal Appeals erred in denying petitioner's initial point of error on direct appeal complaining about the state trial court's failure to reform the jury venire after petitioner allegedly established a violation of his *Batson* rights. The problem with these latter arguments is petitioner has *not* presented this Court with a straight-forward claim for federal habeas corpus relief premised upon an alleged violation of petitioner's equal protection rights recognized in the Supreme Court's

Habeas Transcript, Volume 3 of 3, at p. 692. Having independently reviewed the relevant juror questionnaires, submitted to this Court under seal by respondent, this Court finds the foregoing factual findings beyond reproach. While respondent argues that venire member Anthony Cooke "is white," *Respondent's Original Answer*, filed October 20, 2006, docket entry no. 30, at p. 56 n. 14, even a cursory review of the first and second pages of Anthony Wayne Cooke's jury questionnaire answers reveals he identified himself as "a black male who have [sic] seen the misuse of the death penalty when it comes to blacks."

**94.** *Reply*, at pp. 27–29.

Petitioner correctly notes there was diametrically opposing testimony regarding the incident in question furnished during petitioner's state habeas corpus proceeding by petitioner's lead trial counsel and the lead prosecutor from petitioner's trial. S.F. State Habeas Hearing, Volume 2 of 7, testimony of Anthony Cantrell, at pp. 50–55, 58–59, 62, 64; testimony of Tamara Butler Strauch, at pp. 151, 154–56, 158, 160, 163.

Petitioner also correctly notes the state habeas trial court's order containing its findings of fact and conclusions of law recited the gist of the conflicting testimony on this point but failed to make a clear determination regarding which version of the incident was more credible, instead, concluding only "the State provided race neutral reasons for requesting a jury shuffle" and "[t]here was no evidence of purposeful or systematic discrimination in the State's practices or policies." State Habeas Transcript, Volume 3 of 3, at pp. 692–94.

opinion in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Rather, petitioner's eleventh and twelfth claims herein are couched exclusively in terms of the Sixth Amendment's right to the effective assistance of counsel.[95]

### 2. State Court Disposition

In the course of petitioner's state habeas corpus proceeding, the state habeas trial court concluded petitioner's complaints about his trial counsel's alleged ineffective assistance vis-a-vis petitioner's *Batson* objections failed to satisfy either prong of the *Strickland* test, in part, because at the time of petitioner's trial neither Texas law nor federal law recognized the applicability of the rule in *Batson* to a request for jury shuffle.[96]

### 3. AEDPA Review

#### a. Clearly Established Federal Law

In the course of analyzing petitioner's claims of ineffective assistance herein, this Court must focus exclusively on the propriety of the ultimate decision reached by the state habeas court in rejecting petitioner's analogous ineffective assistance claims and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Pondexter v. Dretke*, 346 F.3d at 148 (holding the precise question before a federal habeas court reviewing a state habeas court's rejection on the merits of an ineffective assistance claim is whether the state habeas court's ultimate

conclusion was objectively reasonable); *Anderson v. Johnson*, 338 F.3d at 390 (holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d at 246 (holding a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision).

In the course of reviewing the state habeas court's rejection on the merits of a petitioner's ineffective assistance claims, the issue properly before a federal habeas court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *St. Aubin v. Quarterman*, 470 F.3d 1096, 1101 (5th Cir.2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 2133, 167 L.Ed.2d 869 (2007); *Henderson v. Quarterman*, 460 F.3d 654, 665 (5th Cir.2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 1383, 167 L.Ed.2d 160 (2007); *Tenny v. Dretke*, 416 F.3d 404, 407 (5th Cir.2005); *Schaetzle v. Cockrell*, 343 F.3d at 444.

#### b. Deficient Performance Analysis

■ The central themes underlying petitioner's eleventh and twelfth claims herein consist of a pair of arguments that (1) the Supreme Court's holding in *Batson* should apply to requests for jury shuffle and (2) petitioner's trial counsel should have foreseen the Supreme Court's subsequent holding in *Miller–El v. Cockrell*, 537

---

**95.** Petitioner's initial point of error in petitioner's Appellant's Brief on direct appeal sought to challenge the state trial court's ruling on petitioner's *Batson* objections. The Texas Court of Criminal Appeals rejected petitioner's *Batson* claims on the merits. *Blanton v. State*, 2004 WL 3093219, *10–*12 (Tex. Crim.App. June 30, 2004). Thus, petitioner "fairly presented" his *Batson* claims to the state's highest criminal appellate court. Nothing prevented petitioner from presenting this Court with the same *Batson* claims the

Texas Court of Criminal Appeals denied on the merits in the course of petitioner's direct appeal. For unknown reasons, however, petitioner's federal habeas counsel chose instead to present this Court only with the ineffective assistance claims contained in his eleventh and twelfth claims herein.

**96.** State Habeas Transcript, Volume 3 of 3, at pp. 693–94.

U.S. 322, 346, 123 S.Ct. 1029, 1044, 154 L.Ed.2d 931 (2003)(holding the use of jury shuffling to manipulate the racial composition of the jury, i.e., seeking a jury shuffle when a predominant number of African–Americans were seated in the front of the panel, raised a suspicion the State sought to exclude African–Americans from the jury and thereby eroded the credibility of the prosecution's assertions that race was not a motivating factor in its use of peremptory challenges).

The defect in the first of these underlying arguments is, at the time of petitioner's trial in August, 2001, no Fifth Circuit or Texas court had ever expressly held the rule in *Batson* applicable to requests for a jury shuffle. *See Ladd v. Cockrell,* 311 F.3d 349, 353–55 (5th Cir.2002)(recognizing that, even as of that date, reasonable minds could disagree over whether extending *Batson* to jury shuffles would violate the non-retroactivity doctrine of *Teague* ); *Ladd v. State,* 3 S.W.3d 547, 575 n. 9 (Tex.Crim.App.1999)(declining to extend the holding in *Batson* to a request for jury shuffle), *cert. denied,* 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000). Petitioner's trial counsel cannot be declared to have performed in an objectively unreasonable manner in failing to raise a *Batson* objection to the prosecution's request for a jury shuffle when it was far from clear as of August, 2001 whether such a request was subject to scrutiny under the procedures set forth in *Batson* and its progeny.

The problem with the second argument underlying petitioner's eleventh and twelfth claims herein is that a criminal defense counsel is not required to exercise clairvoyance during the course of a criminal trial. *See Sharp v. Johnson,* 107 F.3d 282, 290 n. 28 (5th Cir.1997)(*quoting Gar-*

*land v. Maggio,* 717 F.2d 199, 207 (5th Cir.1983), for the principle "clairvoyance is not a required attribute of effective representation"); *Lackey v. Johnson,* 116 F.3d 149, 152 (5th Cir.1997)(holding trial counsel was not ineffective for failing to discover evidence about which the defendant knew but withheld from his counsel). Petitioner's trial counsel cannot be declared to have performed in an objectively unreasonable manner by failing to anticipate the Supreme Court's holdings in either *Miller–El v. Cockrell,* 537 U.S. 322, 346, 123 S.Ct. 1029, 1044, 154 L.Ed.2d 931 (2003)("*Miller–El I* ")(relying on the Dallas County District Attorney's office's history of racially-based requests for jury shuffles in analyzing the proffered "race neutral" reasons ten of eleven black venire members not successfully challenged for cause by the prosecution were peremptorily stricken by the prosecution) or *Miller–El v. Dretke,* 545 U.S. 231, 253–55, 125 S.Ct. 2317, 2332–33, 162 L.Ed.2d 196 (2005)("*Miller–El II* ")(relying again on the Dallas County District Attorney's office's official policy and longstanding history of blatant racial discrimination in jury selection practices, including the use of racially-tinged jury shuffles, in support of a finding of a *Batson* violation).

While petitioner's trial counsel may have had valid reasons to suspect the prosecution's request for a jury shuffle was at least partially motivated by a desire to remove three Black venire members from the first twenty venire members in line for individual voir dire, there was nothing objectively unreasonable in the subjective belief of petitioner's trial counsel, expressed during petitioner's state habeas corpus evidentiary hearing,[97] that, as of August, 2001, the prosecution nonetheless pos-

---

97. S.F. State Habeas Hearing, Volume 2 of 7, testimony of Anthony Cantrell, at pp. 50–55, 58–59, 62, 64.

sessed an absolute right, unhindered by the rule in *Batson*, to request such a shuffle in petitioner's case.

The question before this Court is not whether the state habeas court's *written opinion* disposing of the merits of petitioner's analogous ineffective assistance claims properly analyzed and applied the Supreme Court's holding in *Batson*. Rather, the question is whether the state habeas court's ultimate conclusion that petitioner's complaints regarding the performance of his trial counsel did *not* rise to the level of objectively unreasonable legal assistance was itself an objectively reasonable application of the first prong of *Strickland. See Pondexter v. Dretke*, 346 F.3d at 148 (holding the precise question before a federal habeas court reviewing a state habeas court's rejection on the merits of an ineffective assistance claim is whether the state habeas court's ultimate conclusion was objectively reasonable).

The reality is that petitioner's trial counsel raised timely *Batson* objections to each of the instances in which the prosecution employed a peremptory challenge to strike a black member of petitioner's jury venire.[98] Petitioner's lead trial counsel also informed the state trial court in connection

---

98. The prosecution sought to exclude venire member Michelle Johnson for cause based upon her voir dire answers indicating she would require the prosecution to prove the defendant's guilt "beyond all doubt" before she could vote to convict or sentence the defendant to death. S.F. Trial, Volume 16, at p. 43. The trial court overruled the prosecution's challenge for cause. *Id.* Petitioner's trial counsel objected on *Batson* grounds when the prosecution then employed a peremptory challenge against venire member Michelle Johnson. *Id.*, at pp. 43–44. The state trial court found a prima facie case had been established and required the prosecution to furnish race-neutral reasons for striking Ms. Johnson. *Id.*, at p. 44. The lead prosecutor responded that she believed Ms. Johnson (1) had demonstrated a reluctance to either convict a defendant of capital murder or impose the death penalty unless she were convinced of the defendant's guilt "beyond all doubt," (2) had indicated an unwillingness to convict anyone of capital murder or to impose the death penalty unless the crime involved had been "premeditated," and (3) had expressed personal, religious, reservations about imposing the death penalty. *Id.*, at pp. 44–45. The state trial court denied petitioner's *Batson* challenge. *Id.*, at p. 45. Petitioner's trial counsel then made a second *Batson* challenge and argued the prosecution should be compelled to explain why they sought a jury shuffle when four black venire members were seated in the first sixty members of the original venire panel. *Id.*, at pp. 45–50. The state trial court denied that challenge as well. *Id.*, at p. 50.

Likewise, the prosecution urged a challenge for cause to venire member Ann Henderson who had vacillated throughout her voir dire examination regarding (1) her ability answer the Texas capital sentencing special issues in a manner that resulted in the imposition of a death sentence, (2) the nature and degree of her bias against the Bexar County District Attorney's office for having successfully prosecuted her son, and (3) the level of proof she would require before convicting a criminal defendant of a capital offense. S.F. Trial, Volume 17, at pp. 36–39, 43–49, 51–55, 57, 60, 68–70, 72, 78–85, 88–89. When the trial court denied the prosecution's challenge for cause to Ms. Henderson, the prosecution exercised a peremptory strike and petitioner's trial counsel objected on *Batson* grounds. *Id.*, at pp. 88–89. The trial court was uncertain petitioner had established a prima facie case of discriminatory jury selection but, out of an abundance of caution, requested the prosecution to state its reasons for striking Mr. Henderson on the record. *Id.*, at pp. 89–90. The prosecution explained Ms. Henderson had (1) admitted to being biased against the Bexar County District Attorney's office, which had successfully prosecuted Ms. Henderson's son, (2) admitted she had answered falsely her juror questionnaire's inquiries concerning her criminal arrest record, (3) insisted she could not vote to impose a sentence of death, and (4) stated she would be distracted if asked to serve in a lengthy trial by virtue of the fact she would not be paid for such service and would lose pay. *Id.*, at pp. 90–91. The trial court denied petitioner's *Batson* challenge. *Id.*, at pp. 91–92.

with the state's first use of a peremptory challenge against a black venire member that, in hindsight, he believed the prosecution's request for a jury shuffle had been part of an overarching plan by the State to exclude blacks from petitioner's jury.[99] In the course of petitioner's direct appeal, the Texas Court of Criminal Appeals addressed and rejected both of petitioner's *Batson* claims on the merits. *Blanton v. State*, 2004 WL 3093219, *10-*12. Whether the Texas Court of Criminal Appeals' ruling on petitioner's initial point of error on direct appeal was erroneous is irrelevant for purposes of this Court's ineffective assistance analysis.[100] It is readily apparent petitioner's *trial* counsel did everything necessary to properly preserve for state appellate review the merits of petitioner's *Batson* claims.

Insofar as petitioner's arguments in support of his eleventh and twelfth claims herein elliptically attack his trial counsel's alleged failure to ensure that a record of the original, pre-shuffle, seating order of petitioner's jury venire was included in the state appellate court record, petitioner fails to identify any specific action petitioner's trial counsel could or should have undertaken to guarantee such an outcome. In point of fact, petitioner's trial counsel made a specific request on the record that the original seating order of petitioner's jury venire be included in the record and the state trial court granted that request.[101] Petitioner does not allege any facts showing it was objectively unreasonable for his trial counsel to doubt the veracity of the trial judge or question whether court staff would, in fact, comply with the trial judge's ruling on that subject.

There was nothing objectively unreasonable with the state habeas court's conclusion that petitioner's complaints about his *trial* counsel's conduct vis-a-vis petitioner's *Batson* claims failed to satisfy the deficient performance prong of *Strickland*. Petitioner's trial counsel raised objections and arguments which subsequently permitted petitioner to obtain rulings *on the merits* of petitioner's *Batson* claims from the Texas Court of Criminal Appeals. Thus, petitioner's trial counsel did everything reasonably necessary to preserve petitioner's *Batson* claims for state appellate review. The Texas Court of Criminal Appeals's opinion on petitioner's direct appeal may have misconstrued the importance of petitioner's arguments concerning the prosecution's request for a jury shuffle. *See Blanton v. State*, 2004 WL 3093219, *10 n. 17 (pointing out its previous refusal to extend the holding in *Batson* to jury shuffles but making no mention of the Supreme Court's reliance in *Miller–El I* on a District Attorney's office's history of racially-motivated jury shuffles as evidence eroding the credibility of a prosecutor's claims of race-neutral reasons for the exercise of particular peremptory challenges). However, petitioner's *trial* counsel did not fail to adequately preserve petitioner's *Batson* claims for state appellate review. Likewise, said counsel cannot be faulted for failing to anticipate the role of jury shuffles in the *Batson* analysis subsequently employed by the Supreme Court in its two subsequent *Miller–El* opinions.

### c. *Prejudice Analysis*

■ Furthermore, even assuming petitioner's trial counsel should have objected

---

**99.** S.F. Trial, Volume 16, at pp. 49–50

**100.** Nothing in this opinion should be construed as indicating any approval by this Court of the Texas Court of Criminal Appeals'

analysis of petitioner's *Batson* claim regarding venire member Michelle Johnson.

**101.** S.F. Trial, Volume 16, at pp. 50–51.

on *Batson* grounds at the time the prosecution requested a jury shuffle, there is no reasonable probability that, but for that failure, the outcome of petitioner's trial or direct appeal would have been any different. As explained above, it remains uncertain even at this juncture whether a *Batson* objection made at the time a jury shuffle is requested will preserve a valid federal constitutional claim, separate and apart from an ordinary *Batson* claim, for subsequent state and federal appellate review. *See Ladd v. Cockrell,* 311 F.3d at 353–55 (recognizing it is far from clear whether *Batson* extends to a jury shuffle). Under such circumstances, there is no reasonable probability a timely objection to the prosecution's request for a jury shuffle would (independent of petitioner's trial counsel's other actions) have preserved a valid *Batson* claim for subsequent state or federal review.

Petitioner's trial counsel made two timely *Batson* objections which enabled petitioner to later obtain rulings on the merits from the Texas Court of Criminal Appeals on each of petitioner's two *Batson* claims. Any lack of success petitioner's *Batson* claims might have achieved on direct appeal cannot be laid at the feet of petitioner's trial counsel.[102] Insofar as petitioner was dissatisfied with the rulings he received on his *Batson* claims from the Texas Court of Criminal Appeals on direct appeal, petitioner's remedies were to seek certiorari review of the Texas Court of Criminal Appeals's judgment affirming his conviction (and rejecting petitioner's *Batson* claims on the merits) or present this Court with a claim for federal habeas corpus relief asserting a straight-forward *Batson* claim. Petitioner has done neither.

The failure of petitioner's *trial* counsel to timely object to the prosecution's request for a jury shuffle did not alter the legal posture of petitioner's *Batson* claims arising from the prosecution's subsequent use of peremptory strikes against venire members Ann Henderson and Michelle Johnson. As the Supreme Court's analysis of the *Batson* claim in *Miller–El II* makes clear, even a prosecutor's well-documented history of using racially-motivated jury shuffles to help eliminate members of a particular racial group from petit juries does not *standing alone* satisfy the requirements for showing an equal protection violation in a particular criminal trial; rather, such evidence is (1) part and parcel of "totality of the relevant facts" about the prosecutor's conduct during the defendant's own trial which can establish a *prima facie Batson* violation, *see Miller–El v. Dretke,* 545 U.S. at 239, 125 S.Ct. at 2324 ("a defendant can make out a prima facie case of discriminatory jury selection by 'the totality of the relevant facts' about a prosecutor's conduct during the defendant's own trial"), and (2) relevant to the credibility of the prosecution's proffered race-neutral reasons for its use of peremptory challenges against an identifiable group of venire members, *see Miller–El v. Dretke,* 545 U.S. at 253–54, 125 S.Ct. at 2332–33 (explaining the prosecution's decision to seek a jury shuffle when a predominant number of African–Americans were seated in the front of the panel was one factor, along with many others, which undermined the prosecution's proffered race-neutral reasons for its use of peremptory challenges against black venire members). Thus, regardless of whether petitioner's trial counsel timely objected to the prose-

---

**102.** Petitioner offered the state habeas court no evidence showing it was impossible for his appellate counsel to have obtained a post-judgment order from the state trial court supplementing the trial record to include the original, pre-shuffle, seating order for petitioner's jury venire.

cution's request for a jury shuffle, petitioner was still free to argue to both the state trial and appellate courts that the prosecution's request for a jury shuffle at his trial was racially motivated and point to this factor, along with other allegedly discriminatory conduct by the prosecution, as evidence both (1) establishing a *prima facie* case of racially discriminatory jury selection in the first stage of the Supreme Court's burden-shifting *Batson* analysis and (2) undermining the credibility of the prosecution's proffered race-neutral explanations for its peremptory challenges targeting a particular category of venire members. This, in fact, is precisely what petitioner's trial counsel did once the prosecution began employing its peremptory strikes against black members of petitioner's jury venire.

Even before the Supreme Court's recent decisions in *Miller–El I* and *Miller–El II*, it was clear a defendant's showing of a prima facie case of discriminatory jury selection did not, standing alone, warrant reversal of his state criminal conviction; rather, such a showing merely shifted the burden to the prosecution to come forward with a race-neutral explanation for its peremptory challenges targeting venire members of a particular group. *See Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991)(holding a three-step inquiry is necessary to determine whether a party has violated *Batson,* i.e., used peremptory challenges in a way that violates the Equal Protection Clause: first, the opponent of the strike must make a prima facie showing the proponent of the strike exercised it on the basis of a juror's cognizable racial background; second, the burden then shifts to the proponent of the strike to articulate a race-neutral explanation for removing the potential juror in question; and finally, the trial court must determine whether the opponent of the strike has carried his burden of proving purposeful

discrimination). The Supreme Court's analysis of the *Batson* claim in *Miller–El II* demonstrates the continuing vitality of this three-step approach to allegations of racially discriminatory jury selection. *See Miller–El v. Dretke*, 545 U.S. at 239, 125 S.Ct. at 2324–25 (employing the same three-step approach first announced in *Batson* to the analysis of equal protection claims attacking allegedly racially discriminatory jury selection procedures).

The Supreme Court's opinion in *Miller–El II* makes clear a prima facie *Batson* equal protection violation can be established and the prosecution's proffered race-neutral reasons for the use of a peremptory strike undermined by evidence showing the prosecution engaged in a pattern of discriminatory behavior, including, but not limited to, (1) a request for a jury shuffle when members of the target group are disproportionately seated near the front of the jury venire, (2) employing a significantly different approach to the questioning of members of the target group during individual voir dire examination, and (3) evidence of an official policy or longstanding custom or practice of systematically excluding members of the target group from juries. *See Miller–El v. Dretke*, 545 U.S. at 253–66, 125 S.Ct. at 2332–40 (discussing these factors, along with the overtly discriminatory impact of the prosecution's exercise of its peremptory strikes against black members of a series of jury venires and evidence of explicit racially discriminatory animus contained in an official training manual for Assistant District Attorneys as establishing not only a prima facie *Batson* claim but also undermining the prosecution's proffered race-neutral reasons for excluding all blacks from the defendant's jury).

Nothing petitioner's *trial* counsel did or failed to do precluded petitioner from arguing on appeal, as petitioner's appellate counsel actually did, that the foregoing

factors warranted a reversal of petitioner's conviction. In point of fact, petitioner's appellate counsel presented an extremely compelling *Batson* claim to the Texas Court of Criminal Appeals addressing the prosecution's use of a peremptory strike against venire member Michelle Johnson in which petitioner's appellate counsel made many of the same legal arguments discussed by Supreme Court in *Miller–El II*.[103] Under such circumstances, this Court independently concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to make a timely objection to the prosecution's request for a jury shuffle, the outcome of either petitioner's trial or direct appeal would have been any different.

### 4. *Conclusions*

The state habeas court's conclusions that petitioner's complaints about the performance of his trial counsel vis-a-vis petitioner's *Batson* claims did not satisfy either prong of the *Strickland* test were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; nor were those conclusions based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial, direct appeal, and habeas corpus proceedings. Therefore, petitioner's eleventh and twelfth claims herein do not warrant federal habeas relief.

### L. *Ineffective Assistance at Punishment Phase*

#### 1. *The Claims*

In his fifth and ninth claims herein, petitioner argues his trial counsel rendered ineffective assistance during the punishment phase of petitioner's capital trial by (1) failing to adequately investigate petitioner's background and furnish petitioner's mental health expert with complete copies of petitioner's birth record and childhood medical records and a complete history of petitioner's family, (2) failing to adequately investigate petitioner's background and present potentially mitigating evidence showing petitioner (a) suffered from organic brain impairments, (b) suffered from oxygen deprivation at birth, (c) "had been unable to control himself since the age of thirteen," (d) had a long history of inhalant, alcohol, and marijuana abuse, (e) suffered emotionally from witnessing his father's abusive, alcoholic tirades against his mother, (f) suffered emotionally as a result of his parents' divorce, (g) sustained blows to the head during childhood, and (h) attended special education classes while in school, (3) calling an inexperienced graduate student to testify as a "mitigating specialist," and (4) failing to argue "residual doubt" as to petitioner's guilt warranted a sentence of life imprisonment.[104]

#### 2. *State Court Disposition*

During petitioner's state habeas corpus proceeding, petitioner's former lead trial counsel testified (1) he had petitioner examined prior to trial by a court-appointed mental health expert who advised said counsel she could not furnish any helpful testimony at petitioner's trial[105]; (2) he obtained the assistance of a court-appointed mitigation specialist who sought to ob-

---

**103.** *See Appellant's Brief*, at pp. 16–58.

**104.** *Petition*, at pp. 75–82, 98–105; *Reply*, at pp. 7–23.

**105.** S.F. State Habeas Hearing, Volume 2 of 7, testimony of Anthony Cantrell, at pp. 39–47, 67–68.

A copy of the psychological evaluation dated August 10, 2001 prepared by Betty Lou

tain petitioner's medical records but experienced some difficulty doing so because those records were in the possession of military officials in several other states [106]; and (3) while his court-appointed "mitigation specialist" was cross-examined effectively by the prosecution at trial and, in the future, he believed it would be preferable to have such a specialist simply obtain the defendant's records and to introduce the records themselves, nonetheless, when called to testify at petitioner's trial, petitioner's mother and petitioner's mitigation specialist did inform the jury regarding

the physical abuse petitioner's mother suffered during her pregnancy, petitioner's difficult breach birth, and petitioner's childhood head injury.[107]

Petitioner also presented the state habeas court with (1) a report dated October 26, 2003 from Dr. Jim Cox concluding petitioner very likely suffers from cognitive and emotional-behavioral difficulties associated with organic brain dysfunction resulting from problems petitioner experienced at birth and subsequently at age eleven from a head injury [108]; (2) a report

Schroeder, Ph.D., admitted into evidence during petitioner's state habeas corpus hearing as State Exhibit no. 1, appears at the beginning of S.F. State Habeas Hearing, Volume 6 of 7. In her report, Dr. Schroeder concludes, in pertinent part, petitioner (1) possesses average mental ability and functional academic ability, (2) was highly manipulative and evidence avoidant behavior during his interview, (3) evidence long-term impulsivity and a failure to conform to social norms with respect to lawful behavior, and (4) displayed a pervasive pattern of disregard for the rights of others.

**106.** S.F. State Habeas Hearing, Volume 2 of 7, testimony of Anthony Cantrell, at pp. 40–47, 65–66.

When challenged during petitioner's state habeas hearing, petitioner's former lead trial counsel testified (1) the defense team, including petitioner's court-appointed mitigation specialist, had difficulty obtaining a complete set of petitioner's childhood medical records, (2) he would have liked to have had a complete set of petitioner's medical records prior to trial (including records showing petitioner did not receive the appropriate childhood immunizations), and (3) although the defense team was unable to obtain a complete set of petitioner's medical records, the defense team was well aware, and introduced testimony from petitioner's mother at trial establishing, petitioner had suffered amniotic fluid on his lungs and registered an Apgar score of 1 at birth and petitioner had sustained a head injury as a child when he fell off a bicycle. *Id.*

**107.** *Id.*, at pp. 40–47, 64–68.

**108.** A copy of Dr. Cox's report appears at pages 109–11 of State Habeas Transcript, Volume 2 of 3.

In pertinent part, Dr. Cox also concluded (1) petitioner is not mentally retarded, (2) petitioner's cognitive functioning falls in the low average range, (3) petitioner nonetheless displayed "numerous indications of abnormal brain function," (4) the effects of petitioner's mother having fallen down a flight of stairs while pregnant with petitioner were unknown, (5) petitioner was cyanotic at birth and had an Apgar score of 1 at birth and 9 at five minutes, (6) petitioner appeared to progress normally through early life, (7) at age eleven, petitioner suffered a head injury and his parents split up, (8) a 1993 psychological evaluation performed by a school psychologist noted perceptual abnormalities, obsessive-compulsive and perseverative [sic] behaviors, and attention deficits but no follow up was done, (9) whether petitioner's brain has suffered any structural damage remains unknown, (10) petitioner's abuse of inhalants and alcohol undoubtedly damaged petitioner's brain, (11) as an adult, petitioner can be described as obsessive, easily confused, impulsively aggressive, and "he just doesn't seem to understand how things work," (12) while it is very likely petitioner suffers from cognitive and emotional-behavior difficulties, he seems moderately intelligent and understanding of his predicament, (13) petitioner's judgment of what is happening around him is "frequently aberrant and he becomes impulsive and aggressive when confused," (14) petitioner "may have been injured prior to or during birth, was raised in a household full of anger and abuse, suffered a head injury in

dated October 20, 2003 from a licensed psychological associate named Gordon Potter concluding petitioner suffers from severe organic brain disorder resulting from the combined effects of several significant head injuries and organic impairments due to inhalant abuse[109]; and (3) testimony from Mr. Potter noting petitioner's history of serious anoxia at birth, prenatal injuries to petitioner's mother, multiple childhood head injuries, and verbal and emotional childhood abuse (all of which were sources of great stress), culminating in petitioner's parents' divorce, after which petitioner became impulsive and developed problems making good judgments.[110] On cross-examination, however, Mr. Potter admitted (1) there was no hard evidence, such a CAT scan, confirming petitioner had suffered any organic brain damage, (2) petitioner had no history of seizures, blackouts, or impaired motor skills and was oriented as to time and place, (3) antisocial personality disorder (the diagnosis made by Dr. Schroeder at the time of petitioner's trial) can result in many of the same behaviors as organic brain damage, and (4)

not everyone who is deprived of oxygen at birth suffers organic brain damage.[111]

The state called Dr. John C. Sparks, medical director at the BCADC, who testified (1) petitioner had never mentioned inhalant abuse in his medical histories prior to petitioner's conviction for capital murder, (2) there was no objective evidence of organicity in petitioner's mental status examination or Dr. Schroeder's report, (3) nothing in Mr. Potter's test results suggested organicity, (4) any brain damage resulting from childhood head injuries and inhalant abuse would have been revealed by marked changes in behavior, seizures, memory changes, changes in the ability to speak clearly, and organize thoughts, (5) there was nothing in petitioner's history to suggest he had undergone such changes, (6) while inhalant abuse does cause brain damage, it is difficult to predict the extent of such damage, (7) significant anoxia at birth should have shown up in subsequent examinations during childhood in the form of problems with speech development and the child's general development, including growth pattern, (8) parental quarreling and divorce don't cause

childhood that apparently changed his personality and behavior and further injured potentially important areas in his brain involved with emotional controls," and (1) petitioner is "certainly dangerous but there appear many mitigating factors to his crimes."

**109.** A copy of Mr. Potter's written report appears at pages 112–16 of State Habeas Transcript, Volume 2 of 3.

Mr. Potter's report noted petitioner (1) reported several head injuries as a child, including once having been struck in the head when he was involved in a bicycle accident, which requires sutures to petitioner's head and face, (2) was placed in an incubator for several weeks after birth, (3) received special education services while in school for attention deficit disorder, (4) completed his GED while in a TYC facility, (5) reported an extensive history of drug and alcohol abuse, including cocaine, marijuana, inhalants, and codeine,

(6) was not mentally retarded, (7) displayed an affect with some undercurrents of hostility, (8) had unremarkable cognitive processing speed and expressed himself appropriately with adequate command of language, (9) was oriented to time and date, (10) appeared to have no difficulty concentrating or maintaining a cognitive set, (11) suffers from the effects of head wounds he received as a child and the organic impairments to his brain caused by inhalant abuse, (12) likely suffers from organic damage to the frontal lobes of his brain which fundamentally alter the way petitioner perceives the world, how petitioner reacts to stress, his impulse control, and his ability to conform to societal norms.

**110.** S.F. State Habeas Hearing, Volume 2 of 7, testimony of Gordon Potter, at pp. 86–99, 105–11.

**111.** *Id.,* at pp. 100–05, 111–12.

organic brain damage in children, (9) nothing in petitioner's history of criminal behavior is symptomatic of organic brain damage, (10) nothing in petitioner's medical records indicates organic brain damage, (11) inhalant abusers, like alcoholics, tend to suffer damage to the entire brain, rather than to isolated regions of the brain, and (12) most people with organic brain damage tend to be followers rather than leaders.[112]

The state habeas trial court ultimately concluded (1) petitioner failed to prove he had organic brain damage or that organic brain damage caused his impulsivity or poor judgment and (2) none of petitioner's complaints about the performance of his trial counsel at the punishment phase of petitioner's capital trial satisfied the dual prongs of *Strickland*.[113]

### 3. AEDPA Review

#### a. Clearly Established Federal Law

The standard for reviewing the performance of trial counsel in connection with the punishment phase of a capital trial is well-settled:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the

circumstances, applying a heavy measure of deference to counsel's judgments. *Wiggins v. Smith*, 539 U.S. at 521, 123 S.Ct. at 2535, *quoting Strickland v. Washington*, 466 U.S. at 690–91, 104 S.Ct. at 2066.

Additionally, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

 It is not enough for a petitioner alleging ineffective assistance to show merely that additional investigation by his trial counsel might have produced additional potentially mitigating evidence; counsel's decisions must have been unreasonable under an objective standard. *Wiggins v. Smith*, 539 U.S. at 521, 123 S.Ct. at 2535; *Strickland v. Washington*, 466 U.S. at 690–91, 104 S.Ct. at 2066. This means the relevant inquiry necessarily entails examination of (1) precisely what steps petitioner's trial counsel took to investigate the petitioner's background in search of potentially mitigating evidence, i.e., the extent of trial counsel's investigation; (2) whether said counsel's investigation revealed to them the same "additional" mitigating evidence petitioner now argues should have been presented at the punishment phase of trial, i.e., precisely what mitigating evidence trial counsel actually discovered; (3) why, if trial counsel were aware of the "additional" mitigating evidence they chose not to present same during the punishment phase of petitioner's capital trial, i.e., the reasoning behind the decision not to introduce such evidence; and (4) why, if said counsel were unaware of the additional mitigating evidence, said counsel chose not to investi-

---

112. S.F. State Habeas Hearing, Volume 2 of 7, testimony of John C. Sparks, at pp. 114–49.

113. State Habeas Transcript, Volume 3 of 3, at p. 688.

gate petitioner's background further than they did, i.e., the reasons why trial counsel chose not to investigate further into petitioner's background for other, available, mitigating evidence. *See Neal v. Puckett*, 286 F.3d 230, 236–40 (5th Cir. 2002)(in evaluating the performance of trial counsel against a claim counsel failed to investigate and present mitigating evidence, the relevant inquiry focuses on what counsel did to prepare for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and the results counsel might reasonably have expected from those leads), *cert. denied*, 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003); *Gutierrez v. Dretke*, 392 F.Supp.2d 802, 875 (W.D.Tex.2005)(recognizing the importance of interrogating the petitioner's former trial counsel on each of these four subjects during the course of a state habeas corpus proceeding if a claim of ineffective assistance at the punishment phase of a capital trial is to be fully developed), *certificate of appealability denied*, 201 Fed.Appx. 196 (5th Cir.2006), *cert. denied*, ⸺ U.S. ⸺, 127 S.Ct. 1297, 167 L.Ed.2d 112 (2007). Counsel's performance is evaluated as of the time of counsel's conduct: "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *Schaetzle v. Cockrell*, 343 F.3d at 448. The objective reasonableness of counsel's performance is measured under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time. *Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536; *Strickland v. Washington*, 466 U.S. at 688–91, 104 S.Ct. at 2065–66.

Likewise, a showing that additional potentially mitigating evidence existed which was available but not presented during the punishment phase of a capital trial does not, standing alone, satisfy the prejudice prong of *Strickland*. Rather, to satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* In evaluating prejudice, a federal habeas court must re-weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Sonnier v. Quarterman*, 476 F.3d 349, 356–57 (5th Cir.2007). The prejudice evaluation is governed by the law in existence at the time habeas relief is sought, not the status of the law at the time of counsel's conduct. *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993); *Schaetzle v. Cockrell*, 343 F.3d at 448.

b. *Deficient Performance Analysis*

This Court has independently reviewed the entirety of the evidence from petitioner's trial, direct appeal, and state habeas corpus proceeding. While petitioner criticizes the performance of his trial counsel in failing to obtain all of petitioner's relevant childhood medical records, petitioner failed to present the state habeas court with any evidence showing precisely what steps petitioner's trial counsel and mitigation specialist undertook prior to or during petitioner's trial to obtain

complete copies of petitioner's relevant medical records.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions; the reasonableness of counsel's investigative decisions is particularly dependent upon such information. *Strickland v. Washington*, 466 U.S. at 691, 104 S.Ct. at 2066. Petitioner presented the state habeas court with virtually no evidence establishing precisely what information petitioner furnished his trial counsel concerning petitioner's background or the circumstances of petitioner's offense which might have given petitioner's trial counsel leads as to available potentially mitigating evidence. For instance, petitioner presented the state habeas court with no evidence showing petitioner or anyone else in petitioner's family ever informed petitioner's trial counsel that petitioner had a history of long-term inhalant abuse (as opposed to alcohol, cocaine, and marijuana abuse) or that petitioner's childhood bicycle accident had resulted in petitioner suffering far more serious injuries than those reflected in petitioner's childhood medical records (which included no indication of concussion). Nor did petitioner present the state habeas court with any evidence showing petitioner or his family (or anyone else for that matter) ever furnished petitioner's trial counsel with information before or at the time of petitioner's trial suggesting petitioner suffered from organic brain damage. Petitioner identifies nothing in Dr. Schroeder's report which suggesting inquiry into such a possibility might prove efficacious. Under such circumstances, petitioner's trial counsel's failure to investigate further into these subjects cannot be considered objectively unreasonable.

Likewise, most of petitioner's complaints about the performance of his trial counsel at the punishment phase of trial focus on what petitioner perceives as the poor quality of specific mitigating evidence said counsel presented, rather than on the nature of the overall case for mitigation petitioner's trial counsel presented. While petitioner complains his trial counsel failed to produce medical records showing petitioner's Apgar score at birth was 1, petitioner's trial counsel did present testimony from petitioner's mother at the punishment phase of petitioner's trial regarding the difficulties petitioner experienced at birth and suggesting her former husband may have dropped petitioner on the floor when petitioner was a baby.[114] Mrs. Blanton also testified she sustained injuries while pregnant with petitioner and his brother as a result being kicked in the stomach.[115] Mrs. Blanton testified, as a child, petitioner had (1) once been severely burned and (2) witnessed his father verbally abusing his sister and physically abusing his mother.[116] Mrs. Blanton also testified extensively regarding an incident in which petitioner was beaten while incarcerated at a Bexar County juvenile detention facility.[117] However, Mrs. Blanton also testified petitioner "has always been smart," was the stronger of the two twins, maturing faster than Robert, but had a lot of anger after she left his father.[118] Petitioner's "mitigation specialist" also testified during the punishment phase of petitioner's capital trial, disclosing (1) petitioner lived in a very abusive family as a child, (2) petition-

114. *Id.*, at pp. 202–09.

115. S.F. Trial, Volume 26, testimony of Anna Blanton, at p. 203.

116. *Id.*, at pp. 204–05, 208, 220.

117. *Id.*, at pp. 215–17.

118. *Id.*, at pp. 207, 224–25.

er's father was verbally and physically abusive toward petitioner's mother and sister and emotionally abusive toward petitioner, (3) petitioner's mother was pushed down a flight of stairs while pregnant with petitioner, (4) after his parents divorced, petitioner, then age 11, was left without adequate supervision and started smoking marijuana and becoming involved in gang activities, (5) petitioner is very intelligent, (6) petitioner's drug addiction problem was never adequately addressed during his juvenile incarcerations, (7) as a child, petitioner was dropped once and would often sit and bang his head in frustration, thereby possibly causing brain damage, but (8) petitioner would nonetheless perform successfully in a structured environment.[119]

While the properly authenticated medical records petitioner presented to the state habeas court would have corroborated the trial testimony of both Mrs. Blanton and petitioner's "mitigation specialist" on some of the foregoing points, petitioner presented the state habeas court with no evidence showing the efforts of petitioner's trial counsel and mitigation specialist to obtain petitioner's childhood medical records were objectively unreasonable or otherwise professionally deficient. Nor did petitioner present the state habeas court with any evidence showing precisely how or when petitioner ultimately acquired those medical records. Thus, petitioner failed to establish that his trial counsel's failure to obtain petitioner's childhood medical records deprived petitioner of the ability to present petitioner's capital sentencing jury with evidence establishing the abusive nature of petitioner's childhood, petitioner's history of childhood head injuries, the difficult circumstances of petition-

er's birth, or the significant difficulties petitioner faced as a child.

Petitioner argues that obtaining his childhood medical records would have enabled his trial counsel to present his capital sentencing jury with evidence showing petitioner suffered from organic brain damage. The problem with this argument is that the state habeas court reasonably concluded petitioner failed to carry the burden of establishing petitioner did, in fact, suffer from organic brain damage.[120] While petitioner did offer the state habeas court the speculative reports of Dr. Cox and Mr. Potter suggesting petitioner's breach birth, childhood bicycle-riding accident, and abuse of inhalants may have caused petitioner to suffer brain damage, as explained above, Dr. Sparks emphatically denied there was any objective evidence in petitioner's medical records suggesting petitioner had suffered brain damage. The state habeas court also accurately noted petitioner failed to present that court with any "hard evidence," such as a CAT scan, furnishing proof petitioner actually suffers from organic brain damage. Mr. Potter's testimony during petitioner's state habeas hearing included admissions that no such "hard evidence" existed to support a finding of organic brain damage and that petitioner's Apgar score of 1 at birth could not, without hard evidence, be definitively identified as having caused petitioner brain damage.[121]

More significantly, petitioner failed to present the state habeas court with any evidence showing Dr. Schroeder or any other competent mental health expert would have recommended that petitioner be subjected to a CAT scan at the time of

---

119. S.F. Trial, Volume 26, testimony of Ann Matthews, at pp. 116–91.

120. State Habeas Transcript, Volume 3 of 3, at p. 688.

121. S.F. State Habeas Hearing, Volume 2 of 7, testimony of Gordon Potter, at pp. 102–05.

petitioner's trial based on the information contained in the medical records petitioner furnished petitioner's state habeas court. Simply put, petitioner failed to present the state habeas court with any evidence showing petitioner's trial counsel acted in an objectively unreasonable manner in relying upon the diagnosis and conclusions of Dr. Schroeder in formulating petitioner's punishment-phase trial strategy.

Finally, petitioner presented the state habeas court with no evidence showing the failure of petitioner's trial counsel to argue "residual doubt" warranted a life sentence for petitioner caused the performance of said counsel to fall below an objective level of reasonableness. As explained at length above, the evidence of petitioner's guilt was overwhelming. The jury had already convicted petitioner of capital murder. Under such circumstances, arguing "residual doubt" might well have undermined the credibility of petitioner's trial counsel at the very time said counsel were arguing to save petitioner's life.

### c. *Prejudice Analysis*

 More significantly for purposes of this Court's independent analysis of the prejudice prong of *Strickland*, petitioner presented the state habeas court with absolutely no evidence showing Dr. Schroeder, petitioner's court-appointed mental health expert, would have changed her diagnosis of anti-personality disorder had she been furnished with complete copies of petitioner's childhood medical records. At the time of trial, petitioner's trial counsel was assisted by Dr. Schroeder, not Dr. Cox or Mr. Potter. Petitioner presented the state habeas court with no evidence

showing his trial counsel had any reason to question the qualifications, abilities, or conclusions of Dr. Schroeder or to believe consultation with a different mental health expert would furnish said counsel with other or additional potentially mitigating evidence.

Nor is there a reasonable probability that, but for the failure of petitioner's trial counsel to present evidence similar to that furnished during petitioner's state habeas corpus proceeding by Dr. Cox and Mr. Potter, the outcome of the punishment phase of petitioner's capital trial would have been different. Had petitioner attempted to present evidence and argue in mitigation that he suffered from organic brain damage, the prosecution could easily have called Dr. Sparks to testify, as he did during petitioner's state habeas proceeding, there was no objective evidence petitioner suffered from organic brain damage during childhood and the only way to determine definitively whether petitioner's alleged abuse of inhalants had caused petitioner brain damage would have been through a CAT scan of petitioner's brain.[122] Mr. Potter admitted petitioner failed to present the state habeas court with any hard evidence petitioner suffers from organic brain damage.[123] Dr. Sparks testified further there are many potential causes for the type of impulsiveness consistently noted in petitioner's mental health evaluations and organic brain damage is but one such potential cause.[124]

Likewise, the failure of petitioner's trial counsel to argue for "residual doubt" at the punishment phase of petitioner's trial did not "prejudice" petitioner within the meaning of *Strickland*. More significant-

---

**122.** S.F. State Habeas Hearing, Volume 2 of 7, testimony of Dr. John C. Sparks, at pp. 116–14, 137, 139–46.

**123.** S.F. State Habeas Hearing, Volume 2 of 7, testimony of Gordon Potter, at pp. 102–05.

**124.** S.F. State Habeas Hearing, Volume 2 of 7, testimony of Dr. John C. Sparks, at pp. 119–22.

ly, the state habeas court reasonably concluded, by the time petitioner's capital trial moved to the punishment phase, arguing "residual doubt" was no longer a reasonable trial strategy.

### 4. Conclusions

None of petitioner's complaints about the performance of his trial counsel in connection with the punishment phase of petitioner's trial satisfy both prongs of the *Strickland* test. Petitioner failed to present the state habeas court with any evidence showing the steps petitioner's trial counsel and mitigation specialist took to obtain petitioner's childhood medical records and present petitioner's capital sentencing jury with potentially mitigating evidence regarding petitioner's background were objectively unreasonable. Likewise, petitioner failed to present the state trial court with evidence showing a reasonable probability existed that, but for any of the alleged deficiencies in the performance of petitioner's trial counsel, the outcome of the punishment phase of petitioner's trial would have been different.

The state habeas court's conclusions that petitioner's complaints about the performance of his trial counsel at the punishment phase of trial did not satisfy the dual prongs of the *Strickland* test were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; nor were those conclusions based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial, direct appeal, and habeas corpus proceedings. Therefore, petitioner's fifth and ninth claims herein do not warrant federal habeas relief.

## VIII. *Ineffective Assistance by Appellate Counsel*

### A. *Overview of the Claims*

In his seventh and thirteenth claims herein, petitioner argues his appellate counsel rendered ineffective assistance by failing to (1) raise a point of error on direct appeal challenging the absence of a "hung jury" instruction from petitioner's punishment-phase jury instructions and argue the Texas statute precluding the trial court from advising the jury of the effect of a less-than-unanimous verdict was unconstitutional and (2) argue in support of his first point of error on direct appeal that *Batson* applies to jury shuffles and preserve the record on appeal to ensure "the shuffle claim" could be effectively presented.[125]

### B. *The Constitutional Standard of Review*

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins,* 528 U.S. 259, 285, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000)(holding a petitioner arguing ineffective assistance by his appellate counsel must establish both (1) his appellate counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal); *Henderson v. Quarterman,* 460 F.3d 654, 665 (5th Cir.2006)(holding *Strickland* furnishes the proper standard for review of a complaint of ineffective assistance by state appellate counsel), *cert. denied,* —— U.S. ——, 127 S.Ct. 1383, 167 L.Ed.2d 160 (2007); *Amador v. Quarterman,* 458 F.3d at 410–11

---

**125.** *Petition,* at pp. 87–98, 116–23; *Reply,* at pp. 23–29.

(holding complaints of ineffective assistance by state appellate counsel are governed by the *Strickland* standard of review); *Moreno v. Dretke,* 450 F.3d 158, 168 (5th Cir.2006)(applying the dual prongs of *Strickland* analysis to complaints of ineffective assistance by appellate counsel), *cert. denied,* —— U.S. ——, 127 S.Ct. 935, 166 L.Ed.2d 717 (2007); *Busby v. Dretke,* 359 F.3d 708, 714 (5th Cir.2004)(holding *Strickland* applies to a prisoner's claim his appellate counsel was ineffective for failing to raise a certain issue on appeal), *cert. denied,* 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004); *Gutierrez v. Dretke,* 392 F.Supp.2d at 861–62 (applying *Strickland* analysis to complaints of ineffective assistance by state appellate counsel).

Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether appellate counsel's allegedly deficient performance "prejudiced" petitioner, i.e., whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of petitioner's appeal would have been different. *Smith v. Robbins,* 528 U.S. at 285, 120 S.Ct. at 764; *Henderson v. Quarterman,* 460 F.3d at 665; *Busby v. Dretke,* 359 F.3d at 714; *Schaetzle v. Cockrell,* 343 F.3d at 444; *United States v. Williamson,* 183 F.3d 458, 462 (5th Cir. 1999).

■ Appellate counsel who files a merits brief need not and should not raise every non-frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins,* 528 U.S. at 288, 120 S.Ct. at 765; *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983); *Henderson v. Quarterman,* 460

F.3d at 665; *Busby v. Dretke,* 359 F.3d at 714; *Schaetzle v. Cockrell,* 343 F.3d at 445.

The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986); *Jones v. Barnes,* 463 U.S. at 751–52, 103 S.Ct. at 3313.

Nonetheless, appellate counsel is obligated to research relevant facts and law or to make an *informed* decision that certain avenues will not prove fruitful. *See Busby v. Dretke,* 359 F.3d at 714 (a reasonable attorney has an obligation to research relevant facts and law or make an informed decision that certain avenues will not be fruitful); *United States v. Reinhart,* 357 F.3d 521, 525 (5th Cir.2004)(holding the same); *Schaetzle v. Cockrell,* 343 F.3d at 445 (failure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or applicable, denies adequate representation). Likewise, solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the appellate court's attention. *United States v. Reinhart,* 357 F.3d at 525; *Schaetzle v. Cockrell,* 343 F.3d at 445; *United States v. Williamson,* 183 F.3d at 463.

■ Where, as in petitioner's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more non-frivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores–Ortega,* 528 U.S. 470, 477 & 482, 120 S.Ct. 1029, 1034 & 1037, 145 L.Ed.2d 985 (2000)(holding the dual prongs of *Strickland* apply to complaints of ineffective ap-

pellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins,* 528 U.S. at 287–89, 120 S.Ct. at 765–66 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland* ); *Busby v. Dretke,* 359 F.3d at 714–17 (applying dual prongs of *Strickland* to a complaint about appellate counsel's failure to present a point of error on appeal).

## C. *Punishment–Phase "Hung Jury" Instruction*

### 1. *The Claim*

In his seventh claim herein, petitioner argues his appellate counsel rendered ineffective assistance by failing to raise a point of error on direct appeal challenging the absence of a "hung jury" instruction from petitioner's punishment-phase jury instructions and argue in support thereof the Texas statute precluding the trial court from advising the jury of the effect of a less-than-unanimous verdict was unconstitutional.[126]

### 2. *State Court Disposition*

The state habeas trial court concluded, because the state trial court properly denied petitioner's request for a jury instruction regarding the effect of a less-than-unanimous verdict, petitioner's initial complaint of ineffective assistance by his state appellate counsel did not satisfy the *Strickland* standard.[127]

### 3. *AEDPA Review*

#### a. *Deficient Performance Analysis*

As this Court explained in Section IV.C. above, the Supreme Court implicitly re-

jected petitioner's constitutional arguments underlying his contention he was entitled to a punishment-phase jury instruction addressing the effect of a less-than-unanimous verdict in *Jones v. United States,* 527 U.S. at 382, 119 S.Ct. at 2099, and no federal court has ever held a Texas capital defendant has a constitutional right to a punishment-phase jury instruction advising the jury of the effect of hung jury or a single hold-out juror. Thus, the availability of such an argument as a potentially meritorious point of error in petitioner's direct appeal was dubious, at best.

■■■ The same presumption of reasonableness which cloaks the strategic decision-making of trial counsel applies to strategic decisions by an appellate counsel as to which points of error to present on appeal. *See Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065 ("a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"); *Busby v. Dretke,* 359 F.3d at 714 (quoting *Strickland* for the proposition the defendant must overcome the presumption that, under the circumstances, appellate counsel's challenged action might be considered "sound trial strategy"); *Schaetzle v. Cockrell,* 343 F.3d at 445 (there is a strong presumption that appellate counsel's actions were reasonable).

Petitioner made no effort whatsoever to present the state habeas court with any evidence establishing the reasons why his state appellate counsel chose not to present such a point of error on direct appeal from petitioner's conviction and sentence. Petitioner did not call his appellate counsel to testify during petitioner's state habeas hearing and offered the state habeas court no affidavit or other evidence addressing

---

**126.** *Petition,* at pp. 87–98.

**127.** State Habeas Transcript, Volume 3 of 3, at pp. 671–72.

the thought processes employed by petitioner's state appellate counsel in identifying and selecting points of error to present in petitioner's direct appeal. Petitioner also offered no testimony or other evidence suggesting he or anyone else communicated with petitioner's state appellate counsel prior to the filing of petitioner's state appellant's brief with regard to identifying or selecting points of error to present on direct appeal. Thus, petitioner presented the state habeas court with no evidence showing the decision by his state appellate counsel not to include a point of error raising the constitutional arguments petitioner urges in his seventh claim herein fell outside the wide range of objectively reasonable professional assistance. Appellate counsel need not raise every non-frivolous ground of appeal available. *Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 445.

Under such circumstances, petitioner has failed to overcome the strong presumption of reasonableness afforded the decision by petitioner's appellate counsel *not* to present a point of error on direct appeal arguing the trial court should have instructed the petitioner's capital sentencing jury regarding the effect of a less-than-unanimous verdict or a single holdout juror.

### b. *Prejudice Analysis*

For the reasons set forth in Section V.C. above, there is no reasonable probability that, but for the failure of petitioner's appellate counsel to present and argue a point of error complaining about the matters identified in petitioner's seventh and eighth claims herein, the outcome of petitioner's direct appeal would have been different. The Supreme Court's holding in *Jones* and the authorities identified in this Court's many opinions rejecting these same arguments squarely foreclose the constitutional interpretation urged by petitioner in his seventh and eighth claims herein.

### 4. *Conclusions*

Petitioner's complaints that his appellate counsel failed to raise a point of error on direct appeal challenging the absence of a "hung jury" instruction from petitioner's punishment-phase jury instructions and failed to argue the Texas statute precluding the trial court from advising his capital sentencing jury of the effect of a less-than-unanimous verdict was unconstitutional satisfies neither prong of *Strickland*.

Therefore, the state habeas court's rejection on the merits of petitioner's analogous complaints about the performance of his appellate counsel was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; nor were those conclusions based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial, direct appeal, and habeas corpus proceedings. Therefore, petitioner's seventh claim herein does not warrant federal habeas relief.

### D. *Extending Batson to Jury Shuffles*

### 1. *The Claim*

In his thirteenth claim herein, petitioner argues his appellate counsel rendered ineffective assistance by failing to argue in support of petitioner's first point of error on direct appeal that *Batson* applies to jury shuffles and failing to preserve the record on appeal sufficiently (presumably by including the pre-shuffle list of venire members therein) to ensure "the shuffle claim" could be effectively presented.[128]

---

**128.** *Petition*, at pp. 116–23; *Reply*, at pp. 23–29.

#### 2. *State Court Disposition*

The state habeas trial court (1) found petitioner made no timely objection to the prosecution's request for a jury shuffle, (2) found petitioner's appellate counsel requested the juror lists be included in the appellate record, (3) found there was no evidence in the record as to why petitioner's appellate counsel raised two *Batson* claims on direct appeal but chose not to separately challenge the jury shuffle on *Batson* grounds, (4) concluded the prosecution furnished race-neutral reasons for its peremptory strike against the two African–American venire members in question, and (5) ultimately concluded petitioner's complaints regarding his appellate counsel's performance vis-a-vis petitioner's *Batson* claims did not satisfy the *Strickland* test.[129]

#### 3. *AEDPA Review*

##### a. *Deficient Performance Analysis*

 In the course analyzing these complaints under the first prong of the *Strickland* test, it is important to remember petitioner filed his appellant's brief on direct appeal on December 31, 2002, prior to the Supreme Court's issuance of its opinions in *Miller–El I* (February, 2003) and *Miller–El II* (June, 2005). Likewise, only a few months before petitioner filed his appellant's brief on direct appeal, the Fifth Circuit had opined the issue of whether *Batson* applied to jury shuffles was a matter of "first impression" in that court. *See Ladd v. Cockrell,* 311 F.3d at 353–55 ("reasonable arguments support both positions on whether *Batson* applies to jury-shuffling"). Moreover, as of the date petitioner filed his appellant's brief on direct appeal, the Texas Court of Criminal Appeals had expressly refused to extend the rule in *Batson* to jury shuffles. *See*

*Ladd v. State,* 3 S.W.3d at 563 n. 9 (declining to extend the holding in *Batson* to jury shuffles). Given these circumstances, petitioner's appellate counsel's decision not to assert a separate *Batson* claim on direct appeal premised on the prosecution's allegedly discriminatory request for a jury shuffle appears to have been eminently reasonable under then-existing law. *See Strickland v. Washington,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66 (holding judicial scrutiny of counsel's performance is highly deferential and counsel's performance must be evaluated based on the circumstances which existed at the time of counsel's challenged conduct).

In support of petitioner's first point of error on direct appeal, petitioner's appellate counsel vigorously argued (1) the prosecution's voir dire questioning of black venire member Michelle Johnson was substantially different from the prosecution's questioning of other venire members, reflected a race-based animus, and demonstrated the prosecution's proffered reasons for striking venire member Johnson were not credible; (2) the defense should not be faulted for waiting to challenge the prosecution's request for a jury shuffle until the prosecution began using peremptory strikes against black venire members because the prosecution's discriminatory intent was not discernable until that point in time; (3) the prosecution's reasons proffered for striking venire member Ann Henderson were irrelevant and immaterial to any issue in petitioner's trial and, therefore, pretextual in nature; and (4) the state trial court erroneously applied the *Batson* burden-shifting analysis in rejecting defense counsel's complaints about the prosecution's use of peremptory strikes against venire members Johnson and

---

**129.** State Habeas Transcript, Volume 3 of 3, at pp. 691–94.

Henderson.[130] While petitioner now argues his appellate counsel's arguments in support of petitioner's first point of error on direct appeal should have placed greater emphasis on the overtly discriminatory nature of the prosecution's request for a jury shuffle and the discriminatory impact of that jury shuffle, which effectively removed three black venire members from the first twenty members of petitioner's venire panel, petitioner has the benefit of the Supreme Court's opinions in *Miller–El I* and *Miller–El II* in making that critique of his appellate counsel's performance. At the time petitioner filed his appellant's brief, neither of those two opinions had been issued. Petitioner's appellate counsel cannot reasonably be faulted for failing to anticipate the Supreme Court's subsequent decisions in *Miller–El I* and *Miller–El II* focusing on the impact of racially discriminatory jury shuffles as a critical part of *Batson* analysis.

Petitioner also argues his appellate counsel should have done more to "preserve" petitioner's *Batson* claims for appellate review. However, the state habeas trial court specifically found petitioner's appellate counsel requested the juror lists be included in the record.[131] Petitioner

presents this Court with no evidence, much less clear and convincing evidence, showing this factual determination was erroneous.[132] Nor does petitioner identify any other steps his appellate counsel could or should have taken to ensure the juror lists would be made a part of the state appellate record. Moreover, petitioner offered the state habeas court no evidence addressing the reasons why his appellate counsel chose to couch petitioner's *Batson* claims in such a posture. Thus, petitioner failed to overcome the presumptions that his state appellate counsel's performance was within the range of reasonable professional judgment.

Petitioner's appellate counsel raised a point of error on direct appeal asserting *Batson* complaints regarding the prosecution's peremptory striking of venire members Johnson and Henderson. Petitioner's *Batson* complaints about the exclusion of venire member Johnson were especially compelling.[133] In so doing, petitioner's appellate counsel's performance, judged under the circumstances which existed at the time petitioner's state appellate counsel filed petitioner's appellant's brief, did not fall outside the wide range of professionally reasonable assistance.

130. Appellant's Brief, at pp. 16–58.

131. State Habeas Transcript, Volume 3 of 3, at p. 691.

132. Petitioner's appellate counsel's designation of the record on appeal included requests for the list of venire persons, as well as the strike lists and a list of all persons who sat as jurors at petitioner's trial. Trial Transcript, at p. 215.

133. This Court's independent review of the voir dire examination of venire member Johnson and many other members of the jury venire, along with Ms. Johnson's juror questionnaire, reveals the prosecution's voir dire questioning of Michelle Johnson, when compared to the voir dire questioning of other

venire members by the prosecution, was unusually perfunctory, included only vague allusions to the law, and seemed intended solely to highlight those answers Ms. Johnson gave on her juror questionnaire which suggested she would be unable to render an unbiased verdict. Unlike its treatment of many other venire members during voir dire, the prosecution made no serious effort to explain applicable law to Ms. Johnson, who had two years of college, or to ascertain if she could set aside her personal opinions and render a verdict based solely on the law and evidence. Ms. Johnson was struck even though her juror questionnaire revealed she was a member of the military reserve, thus, lending credence to petitioner's argument that the prosecution's proffered reasons for its request for a jury shuffle were insubstantial.

### b. *Prejudice Analysis*

The Supreme Court's opinions in *Miller–El I* and *Miller–El II* make clear the significance a showing the prosecution utilized a racially-discriminatory jury shuffle can have in the context of *Batson* analysis. Petitioner correctly argues the circumstances surrounding the prosecution's request for a jury shuffle in his case raise significant suspicions regarding whether the prosecution's motive for its requested jury shuffle was racial. Three of the five black members of petitioner's jury venire were located in the first twenty venire members of the initial venire panel; the prosecution's jury shuffle removed all black venire members from the first 63 members of the new panel.[134] Furthermore, petitioner correctly points out the prosecution's proffered race-neutral explanation for its jury shuffle request, given years after petitioner's trial, does not withstand even casual scrutiny. Having independently reviewed all the applicable evidence, this Court finds no correlation whatsoever between the occupation-related concerns voiced by the lead prosecutor during her testimony at petitioner's state habeas hearing and the composition of petitioner's initial venire panel. There was no concentration of venire members serving in any of the occupations the prosecutor found offensive among those persons seated in the front half of petitioner's initial venire panel.[135] Thus, a valid argument could be made the prosecution's request for a jury shuffle was race-based and the prosecution's proffered race-neutral reasons for same a mere ex post facto pretext. Moreover, as explained above, the prosecution's questioning of venire member Michelle Johnson was significantly different in scope and character from its voir dire questioning of non-black venire members.[136] Viewing the entire factual scenario surrounding the prosecution's exercise of its eighth peremptory strike against venire member Michelle Johnson, this Court independently concludes the prosecution's proffered race-neutral reasons for striking Michelle Johnson were more rationalization than rationale.

The foregoing determination does not end this Court's federal habeas review of the prejudice prong of *Strickland* in connection with this aspect of petitioner's thirteenth claim herein. The issue before this Court in the context of this federal habeas corpus proceeding is not whether the Texas Court of Criminal Appeals correctly rejected petitioner's *Batson* complaint regarding the prosecution's striking of venire member Michelle Johnson when that state court addressed that substantive claim in the course of petitioner's direct appeal.

**134.** State Habeas Transcript, Volume 3 of 3, at p. 692. Exhibit A attached to respondent's original answer lists the venire members in their post-shuffle order with a notation indicating each member's pre-shuffle location within the initial venire panel.

**135.** During her testimony at petitioner's state habeas hearing, petitioner's former lead prosecutor stated she exercised peremptory challenges based on the venire members' occupations, preferring to move teachers and social workers toward the back of the venire panel while moving venire members with ties to law enforcement, the military, and accountants toward the front. S.F. State Habeas Hearing,

Volume 2 of 7, testimony of Tamara Butler Strauch, at pp. 154–56, 163. However, the teachers in petitioner's jury venire were spread out fairly evenly throughout petitioner's initial venire panel, with six teachers among the first fifty and five in the latter half of the venire panel. Respondent's original Answer, at p. 60.

**136.** Pages 37–45 of petitioner's Appellant's Brief highlights a few examples of the differences between the prosecution's voir dire questioning of Michelle Johnson and its voir dire questioning of non-black venire members who actually served on petitioner's jury.

Rather, the question before this Court is whether the state habeas court's rejection on the merits of petitioner's ineffective assistance complaint regarding his appellate counsel's performance was either contrary to, or involved an unreasonable application of, clearly established federal law, as set forth in Supreme Court precedent (in this case, the well-settled standard of *Strickland* ). *Williams v. Taylor,* 529 U.S. at 407–08, 120 S.Ct. at 1520–21; *Henderson v. Quarterman,* 460 F.3d at 665; *Schaetzle v. Cockrell,* 343 F.3d at 444.

The state habeas trial court concluded (1) the jury shuffles in *Miller–El I* had a more profound impact on jury selection in that case than was the case at petitioner's trial, (2) unlike the situation in *Miller–El I,* petitioner had presented no evidence showing the prosecution had an official policy or long-standing pattern of racially discriminatory jury selection practices in criminal cases, (3) there was no evidence of purposeful or systematic discrimination in the State's practices or policies, (4) the trial court would not have abused its discretion in overruling a timely defense objection to the prosecution's jury shuffle request, and (5) petitioner's complaints about the performance of his appellate counsel in this regard satisfied neither prong of *Strickland.*[137]

This Court finds the state habeas court's analysis of the prejudice prong of *Strickland* myopic. Petitioner's complaints about the performance of his *appellate* counsel vis-a-vis the prosecution's peremptory challenge to venire member Michelle Johnson are not limited to issues of the timeliness of trial counsel's objection to the jury shuffle. Rather, petitioner argues a proper application of the legal principles set forth in *Miller–El I,* accompanied by an appellate argument highlighting the racially discriminatory motive underlying the prosecution's request for a jury shuffle as well as the disparate nature of the prosecution's voir dire questioning of venire members Johnson and Henderson, would have resulted in a different disposition for petitioner's first point of error on direct appeal.

The problem with petitioner's complaints about his *appellate* counsel's handling of petitioner's *Batson* claim arising from the prosecution's peremptory strike of Ann Henderson is that this complaint fails to satisfy the prejudice prong of *Strickland.* There is absolutely no possibility, much less a probability, anything petitioner's appellate counsel did or could have done would have helped petitioner prevail on direct appeal in connection with petitioner's *Batson* claim addressing the prosecution's peremptory strike of venire member Ann Henderson. The prosecution had ample race-neutral reasons for striking Ms. Henderson. In fact, the mystery to this Court is why the state trial court failed to strike her for cause when urged to do so by the prosecution. Ms. Henderson made it abundantly clear on her juror questionnaire and during her voir dire examination that (1) she did not believe she could serve on a jury which sentenced another person to death and (2) she would have to be convinced of a person's guilty beyond all doubt before she could vote to convict.[138] Ms. Henderson also explained her son had been convicted of a criminal offense in Bexar County and sent to serve a prison term which she considered to be excessive in duration.[139]

---

137. State Habeas Transcript, Volume 3 of 3, at pp. 693–94.

138. S.F. Trial, Volume 17, voir dire examination of Ann Henderson, at pp. 37–47, 53–54, 79–87.

139. *Id.,* at pp. 49–51.

In fact, she expressed a degree of bias toward the Bexar County District Attorney's office arising from her son's treatment which this Court can most charitably describe "just-short of open hostility." [140] Finally, Ms. Henderson admitted she had lied on her juror questionnaire when she failed to reveal she had been arrested several times, including once for drug possession.[141] Ms. Henderson recanted her earlier testimony and stated she could set aside her personal views and decide the issues based solely on the law and facts only after petitioner's trial counsel cleverly suggested her service on petitioner's jury might prevent more blacks from being "convicted and killed in Texas because they're black." [142] Nothing in the Supreme Court's *Batson* jurisprudence precludes a party in a capital case from peremptorily striking a venire member such as Ms. Henderson who admits to an open and obvious bias against that party or whose background makes it abundantly clear he or she is unlikely to be able to set aside their personal biases to render a verdict based solely on the law and evidence. Thus, even if petitioner's appellate counsel had convinced the state appellate court the prosecution's jury shuffle had been racially motivated, there is little likelihood the petitioner's *Batson* challenge to the prosecution's subsequent strike of venire member Henderson would have resulted in a reversal of petitioner's conviction on direct appeal.

Under the procedure employed by the Supreme Court in *Miller–El II*, a showing of a prima facie *Batson* violation does not entitle a criminal defendant to relief from a final conviction; rather, such a showing merely sets the stage for the ultimate inquiry, i.e., whether, under all the circumstances, the prosecution's use of a peremptory strike against Ms. Henderson was racially motivated. *See Miller–El v. Dretke*, 545 U.S. at 239–41, 125 S.Ct. at 2324–25 (once the prima facie *Batson* violation is shown, the prosecution must come forward with a reasonably specific explanation of legitimate reasons for exercising the challenge against the venire member in question, and then the issue becomes whether, under the circumstances, the prosecution's use of the challenge was motivated by racially discriminatory animus). The race-neutral reasons offered by the prosecution for its peremptory strike of Ms. Henderson mirrored the reasons it proffered in support of its challenge for cause to the same juror and were nothing short of compelling.[143] Thus, even if petitioner's appellate counsel had convinced the state appellate court the prosecution's request for a jury shuffle had been racially-motivated, there was abundant evidence in the record from Ms. Henderson's voir dire examination showing a plethora of race-neutral reasons supported the prosecution's peremptory challenge to Ms. Henderson.[144] Under such circumstances,

140. *Id.*

141. *Id.,* at p. 53.

142. *Id.,* at pp. 54–72.

143. S.F. Trial, Volume 17, at pp. 88–92.

144. Insofar as petitioner suggests a showing of discriminatory animus underlying the prosecution's request for a jury shuffle, *standing alone,* either establishes a prima facie *Batson* violation, i.e., satisfies the first step in the *Batson* analysis, or compels a trial court to reject all proffered race-neutral justifications proffered by the prosecution for its subsequent use of peremptory strikes against members of an identified group, i.e., the third step in *Batson,* analysis, petitioner identifies no legal support for such a position. The Supreme Court's opinions in *Miller–El I* and *Miller–El II* identify a suspicious request for a jury shuffle as relevant evidence of discriminatory animus in jury selection but do not

there is no reasonable probability that, but for the failures of petitioner's *appellate* counsel to (1) more explicitly argue the prosecution's jury shuffle was racially motivated and (2) present the legal arguments underlying the Supreme Court's holdings in *Miller–El I* and *Miller–El II*, the state appellate court's ultimate resolution of petitioner's *Batson* claim arising from the prosecution's peremptory strike of Ann Henderson would have been different.

A much more difficult question is posed by petitioner's similar complaints about his appellate counsel's failures in connection with petitioner's *Batson* claim arising from the prosecution's peremptory strike of Michelle Johnson, who described herself in her juror questionnaire answers as neither opposed to nor in favor of the death penalty. As explained above, viewed in the context of the highly suspicious circumstances surrounding the prosecution's request for a shuffle of petitioner's first venire panel, as well as the prosecution's perfunctory voir dire questioning of Ms. Johnson, the prosecution's proffered race-neutral reasons for striking Ms. Johnson defy credulity. This Court concludes there is a reasonable probability petitioner's *Batson* claim regarding the prosecution's peremptory strike of Michelle Johnson might have prevailed on direct appeal (at the United States Supreme Court level) had petitioner's state appellate counsel (1) specifically identified in petitioner's ap-

pellant's brief the racially discriminatory circumstances surrounding the prosecution's request for a shuffle of petitioner's initial venire panel and (2) made the same type of arguments which ultimately prevailed in *Miller–El II*. However, this Court's independent, *de novo* conclusion that petitioner was prejudiced within the meaning of *Strickland* by these failures of his appellate counsel does not satisfy the AEDPA's rather stringent standard for federal habeas review.

Under the AEDPA, the determinative issue is whether the state habeas court reasonably, even if incorrectly, concluded petitioner's complaints about the performance of his state appellate counsel in this regard failed to satisfy the prejudice prong of *Strickland*. As the Supreme Court has made clear, the focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *see Price v. Vincent*, 538 U.S. at 641, 123 S.Ct. at 1853("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). The state habeas trial court reasonably relied on (1) the absence of any evidence in the record before it showing either an official policy or long-standing practice of racially discriminatory jury selection practices employed

hold that such evidence, standing lone, suffices to establish the existence of an illicit discriminatory animus. The reality is that Ms. Henderson's bias against the prosecution is readily apparent upon even the most cursory review of her voir dire examination and her answers to the juror questionnaire. Even if the prosecution's request for a jury shuffle had been motivated by improper racially discriminatory animus, there were nonetheless a plethora of legitimate reasons why the Bexar County District Attorney would want to en-

sure Ms. Henderson did not sit on petitioner's petit jury. Nothing in the Supreme Court's opinions in either *Miller–El I* or *Miller–El II* eliminated the need for a party complaining about another party's use of peremptory strikes to satisfy the third step of *Batson* analysis. Thus, even if petitioner had established a discriminatory animus motivated the prosecution's request for a jury shuffle, that fact, standing alone, would not have established a violation of petitioner's equal protection rights under the third step of *Batson* analysis.

by the Bexar County District Attorney and (2) the trial court's implicit factual finding that the prosecution's proffered race-neutral reasons for striking venire member Johnson were credible to distinguish the petitioner's situation from the one the Supreme Court held in *Miller–El II* violated the rule in *Batson.* The Supreme Court's opinion in *Miller–El II* focused in part on the prosecution's repeated exercise of peremptory challenges against black members of several different jury venire panels employed to select the petit jury which finally heard Miller–El's trial. In fact, the prosecution struck ten black members of the Miller–El's jury venire panel after nine had been removed by agreement or for cause. *Miller–El v. Dretke,* 545 U.S. at 240–41, 125 S.Ct. at 2325. Thus, there was significant evidence presented in Miller–El's case showing a pattern of racially-motivated peremptory strikes in a particular case consist with a long-standing official policy of racial discrimination in criminal jury selection in Dallas County.

In contrast, in petitioner's case, because of the jury shuffle, only three black venire members were individually interviewed during voir dire, i.e., post-shuffle venire members 64, 68, and 76. One of these venire members was struck for cause and the prosecution employed peremptory challenges against the other two, i.e., Ms. Johnson (no. 68) and Ms. Henderson (no. 76). As explained above, there were compelling race-neutral reasons for the prosecution's peremptory challenge to Ms. Henderson. The individual voir dire process in petitioner's case ended with post-shuffle venire member no. 82. Assuming the same number of venire members had been subjected to individual voir dire had the original seating order of petitioner's jury venire mean employed, the same

number of black venire members (3) would have been interviewed during individual voir dire. The state habeas court's conclusion the prosecution furnished race-neutral reasons for its exercise of a jury shuffle could be construed by a reasonable court as implying a favorable factual finding on the credibility of the lead prosecutor's testimony during petitioner's state habeas corpus hearing. "Evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within the trial judge's province.'" *Miller–El v. Cockrell,* 537 U.S. at 339, 123 S.Ct. at 1041, *quoting Hernandez v. New York,* 500 U.S. at 365, 111 S.Ct. at 1869. While this Court has grave doubts as to the credibility of the prosecution's proffered reasons for its requested jury shuffle, there is far less evidentiary basis for questioning the credibility of the prosecution's proffered reasons for striking venire member Johnson.

When directed to give race-neutral reasons for striking venire member Johnson, the prosecution explained to the trial court Ms. Johnson's voir dire answers suggested she (1) possessed religious views opposed to the death penalty, (2) would hold the prosecution to a higher standard of proof than "beyond a reasonable doubt," and (3) believed capital murder should be reserved for only premeditated murders.[145] The state trial court immediately denied petitioner's *Batson* challenge to the prosecution's use of a peremptory strike against venire member Johnson.[146] When petitioner's trial counsel re-urged petitioner's *Batson* challenge regarding venire member Johnson and reminded the trial court of the suspicious circumstances surrounding the prosecution's request for a jury shuffle, the trial court nonetheless denied petitioner's *Batson* challenge a second

---

**145.** S.F. Trial, Volume 16, at pp. 44–45.

**146.** *Id.,* at p. 45.

time.[147] These rulings by the state trial court could reasonably be construed as incorporating implicit factual findings regarding the credibility of the prosecution's race-neutral reasons for striking venire member Johnson. *See Miller–El v. Cockrell*, 537 U.S. at 340, 123 S.Ct. at 1041 (recognizing that, in the context of direct review, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal"), *quoting Hernandez v. New York*, 500 U.S. at 364, 111 S.Ct. at 1868. Under the AEDPA, this Court is required to presume factual determinations by state courts are correct and may not overturn such findings unless they are objectively unreasonable in light of the evidence presented in the state-court proceeding. *Miller–El v. Cockrell*, 537 U.S. at 340, 123 S.Ct. at 1041. The deference this Court must afford to state court factual findings applies not only to explicit fact findings but also to "those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir.2005), *cert. denied*, —— U.S. ——, 127 S.Ct. 353, 166 L.Ed.2d 69 (2006); *Valdez v. Cockrell*, 274 F.3d 941, 948 n. 11 (5th Cir.2001), *cert. denied*, 537 U.S. 883, 123 S.Ct. 106, 154 L.Ed.2d 141 (2002).

 Thus, while this Court has concluded from its own *de novo* review of the entirety of the circumstances that the prosecution's request for a jury shuffle was racially motivated, there was evidence in the record from which the state habeas court could have reasonably concluded no racial animus motivated the prosecution's use of a peremptory challenge against either Ms. Henderson or Ms. Johnson. Under the AEDPA's narrow scope of review, any implied fact findings by the state ha-

beas court regarding the credibility of the prosecution's proffered race-neutral reasons for its peremptory strikes against venire members Johnson and Henderson are entitled to at least some deference from a federal habeas court. *See Miller–El v. Cockrell*, 537 U.S. at 340, 123 S.Ct. at 1041 ("The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that had been settled, there seems nothing left to review."), *quoting Hernandez v. New York*, 500 U.S. at 367, 111 S.Ct. at 1870. Likewise, the petitioner presented the state habeas court with no evidence showing any official policy or long-standing practice of racial discrimination in jury selection has ever held sway within the Bexar County District Attorney's office. Finally, because the number of black members of petitioner's jury venire was very small (5 out of 100), it is difficult to draw too many statistically significant conclusions from the fact the prosecution employed peremptory strikes against two black venire members after unsuccessfully challenging both for cause.

Under these circumstances, the state habeas court could have reasonably (although arguably incorrectly in this Court's view) concluded petitioner's complaints about the performance of his appellate counsel's presentation of petitioner's *Batson* claims on direct appeal failed to satisfy the prejudice prong of *Strickland*. A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from the Supreme court is, at best, ambiguous. *Mitchell v. Esparza*, 540 U.S. at 17, 124 S.Ct. at 11.

### 4. Conclusions

None of petitioner's complaints regarding the manner in which his appellate

147. *Id.*, at pp. 45–50.

counsel presented petitioner's *Batson* claims on direct appeal satisfy the deficient performance prong of *Strickland.* Petitioner's complaints about the manner in which his appellate counsel presented petitioner's *Batson* claims on direct appeal arising from the prosecution's peremptory strike of Ann Henderson do not satisfy the prejudice prong of *Strickland.* The state habeas court reasonably, albeit incorrectly, concluded petitioner's complaints about the manner in which petitioner's appellate counsel presented petitioner's *Batson* claims arising from the prosecution's use of a peremptory challenge against Michelle Johnson did not satisfy the prejudice prong of *Strickland.*

Accordingly, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's ineffective assistance complaints about the manner in which petitioner's state appellate counsel presented petitioner's *Batson* claims on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; nor were those conclusions based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial, direct appeal, and habeas corpus proceedings. Therefore, petitioner's thirteenth claim herein does not warrant federal habeas relief.

### IX. *Request for Evidentiary Hearing*

 Petitioner has requested an evidentiary hearing be held in this cause.[148] However, the AEDPA limits the circumstances in which a habeas corpus petitioner may obtain an evidentiary hearing in federal court, imposing a significant burden on petitioners who fail to diligently develop the factual bases for their claims in state court. *See Williams v. Taylor,* 529 U.S. 420, 433–34, 120 S.Ct. 1479, 1489, 146 L.Ed.2d 435 (2000)(prisoners who are at fault for the deficiency in the state court record must satisfy a heightened standard to obtain an evidentiary hearing); 28 U.S.C. § 2254(e)(2). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor,* 529 U.S. at 437, 120 S.Ct. at 1491. Under the AEDPA, if a petitioner failed to develop the factual basis of a claim in state court, he is entitled to a federal evidentiary hearing only if: (1) the claim relies on either (a) a new rule of constitutional law, made retroactive on collateral review by the Supreme Court, that was previously unavailable or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence and (2) the facts underlying the claim are sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable fact-finder would have found the petitioner guilty of the underlying offense. *Foster v. Johnson,* 293 F.3d 766, 775 n. 9 (5th Cir.2002), *cert. denied,* 537 U.S. 1054, 123 S.Ct. 625, 154 L.Ed.2d 532 (2002); *Dowthitt v. Johnson,* 230 F.3d 733, 757 (5th Cir.2000), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); 28 U.S.C. § 2254(e)(2).

Petitioner was afforded a full and fair opportunity to develop and litigate his claims for relief herein during his state habeas corpus proceeding. Petitioner has presented this Court with no new evidence or factual theories supporting any of his claims herein that were unavailable to him, despite the exercise of due diligence, during his state habeas corpus proceeding. Likewise, petitioner does not identify any new legal theories supporting his claims for relief herein that were unavailable at

---

**148.** *Petition,* at p. 162.

the time petitioner filed and litigated his state habeas corpus claims. Petitioner does not offer any rational explanation for his failure to fully develop any and all evidence supporting his claims herein during his state habeas evidentiary hearing. Nor does petitioner identify any additional evidence which he and his state habeas counsel were unable to develop and present to petitioner's state habeas court despite the exercise of due diligence on their part. Under such circumstances, petitioner is not entitled to a federal evidentiary hearing to further develop the facts supporting his claims herein.

### X. *Certificate of Appealability*

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998).

 Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000)(holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997)(holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

 A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569; *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S.

at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is authorized to address the propriety of granting a CoA *sua sponte*. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir.2000).

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell*, 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Foster v. Quarterman*, 466 F.3d 359, 364 (5th Cir.2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 2099, 167 L.Ed.2d 817 (2007); *Dickson v. Quarterman*, 462 F.3d 470, 476 (5th Cir.2006); *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir.2005), *cert. denied*, —— U.S. ——, 127 S.Ct. 351, 166 L.Ed.2d 49 (2006); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 2961, 165 L.Ed.2d 959 (2006).

Petitioner's eighth, tenth, and eighteenth claims herein are not only without arguable merit, they border on the legally frivolous. There is no room for disagreement among reasonable jurists that petitioner procedurally defaulted on his unexhausted fourteenth through twentieth claims herein.

All but two of petitioner's complaints about the performance of his trial and appellate counsel deserve no encouragement to proceed further. With regard to the performance of petitioner's *trial* counsel, the lone exception is petitioner's cornucopia of complaints about the adequacy of his trial counsel's performance in discovering, developing, and presenting mitigating evidence during the punishment phase of petitioner's capital trial. While this Court has concluded the state habeas court's rejection on the merits of petitioner's fifth claim herein was an objectively reasonable application of the Supreme Court's *Strickland* standard and consistent with the evidence petitioner presented to his state habeas court, those conclusions are subject to debate among reasonable jurists. After all, the performance of petitioner's trial counsel during the punishment phase of petitioner's trial was hardly flawless. Instead of simply obtaining and presenting in properly admissible form all of the petitioner's relevant medical, jail,

and education records, petitioner's trial counsel presented a "mitigation specialist" as a witness and that witness was effectively cross-examined by the prosecution. Likewise, petitioner's trial counsel did little to investigate petitioner's mental health beyond consulting with Dr. Schroeder after she evaluated petitioner and concluded petitioner possessed an antisocial personality. Such a diagnosis is hardly the appropriate place to end an inquiry into a capital murder defendant's character. On the contrary, there is nothing unique about such a diagnosis among the universe of capital murder defendants. Rather, the proper role of trial counsel is to present mitigating evidence to the capital sentencing jury, i.e., evidence explaining how the defendant came to possess such an antisocial personality. Reasonable minds could disagree over whether petitioner's trial counsel fulfilled their obligation to adequately investigate petitioner's background and present all relevant mitigating evidence to petitioner's capital sentencing jury. Accordingly, petitioner is entitled to a CoA on this aspect of his ineffective assistance claim directed against his trial counsel.

With one notable exception, petitioner's remaining complaints about the performance of his trial and appellate counsel all suffer from the same defect: reasonable minds could not differ over whether they satisfy both prongs of the *Strickland* test. The lone remaining exception is petitioner's complaint about his *appellate* counsel's presentation of petitioner's *Batson* claim addressing the prosecution's peremptory strike of venire member Michelle Johnson. As explained above, Ms. Johnson was far from the "vacillating" juror described by the Texas Court of Criminal Appeals in its opinion on direct appeal. Petitioner's appellate counsel failed to make that point as clearly as perhaps she should have. Admittedly, at the time petitioner filed his appellant's brief on direct appeal, no Texas or federal court had ever extended the rule in *Batson* to jury shuffles and the Supreme court had yet to issue either of its opinions in the *Miller–El* cases. However, once the Supreme Court issued its opinion in *Miller–El I*, i.e., on February 25, 2003, even the most minimally competent appellate counsel should have recognized the potentially beneficial implications of the Supreme Court's analysis of the *Batson* claim for petitioner's first point of error on direct appeal. Yet there is nothing in the record now before this Court suggesting petitioner's state appellate counsel filed or sought leave to file any supplemental briefing calling the Texas Court of Criminal Appeals' attention to the Supreme Court's holding in *Miller–El I*. Nor is there any mention of *Miller–El I* in petitioner's motion for rehearing on direct appeal. Even more appalling, petitioner's state appellate counsel did not pursue a petition for certiorari review by the United States Supreme Court after the Texas Court of Criminal Appeals rejected petitioner's first point of error on direct appeal without any mention of the Supreme Court's holding in *Miller–El I*. Petitioner wholly failed to interrogate his former state appellate counsel during his state habeas corpus proceeding regarding her reasoning for the manner in which she chose to present petitioner's *Batson* claim addressing the peremptory strike of Ms. Johnson from the jury venire on direct appeal. This Court has concluded that failure precludes petitioner from establishing his state appellate counsel's performance was objectively unreasonable. However, reasonable minds could disagree over whether the deficiencies in the performance of petitioner's appellate counsel noted by petitioner vis-a-vis petitioner's *Batson* claim regarding Michelle Johnson satisfy the first prong of *Strickland*. This Court concluded in Section VIII.D.3.b. above that

reasonable minds could disagree over whether these same deficiencies also satisfy the prejudice prong of *Strickland.* Therefore, petitioner is also entitled to a CoA with regard to his complaints about the manner in which his state appellate counsel presented petitioner's *Batson* claim regarding the prosecution's peremptory strike of venire member Michelle Johnson to the Texas Court of Criminal Appeals on direct appeal.

Accordingly, it is hereby **ORDERED** that:

1. All federal habeas corpus relief requested in petitioner's pleadings herein is **DENIED**.

2. Petitioner's request for an evidentiary hearing is **DENIED**.

3. Petitioner is **GRANTED** a Certificate of Appealability with regard to those portions of his ineffective assistance claims herein in which petitioner complains about (1) his *trial* counsel's failure to adequately investigate petitioner's background and present mitigating evidence during the punishment phase of petitioner's trial (i.e., petitioner's fifth claim herein) and (2) his *appellate* counsel's failure to adequately present petitioner's *Batson* claim regarding the prosecution's peremptory strike of venire member Michelle Johnson to the Texas Court of Criminal Appeals on direct appeal (i.e., a portion of petitioner's thirteenth claim herein).

4. All other pending motions are **DISMISSED** AS MOOT.

5. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.